**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**

-------------------------------------------------------------- X

UNITED STATES OF AMERICA, *ex rel* COMPLIN,     :   No. 1:09CV420

                            Plaintiff/Relator,    :

                                         :

        Versus                          :        **IN CAMERA**

                                         :        **AND UNDER SEAL**

NORTH CAROLINA BAPTIST HOSPITAL and    :
CAROLINAS MEDICAL CENTER,             :        **COMPLAINT**

                             Defendants.       :

                                         :        **JURY TRIAL**
                                         :        **DEMANDED**

-------------------------------------------------------------- X

COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3279 *ET SEQ.*

FILED ♦
JUN 1 1 2009
IN THIS OFFICE
Clerk U. S. District Court
Greensboro, N. C.
By _____

Pursuant to the aforementioned statutes and codes, the United States of America, (collectively the "Plaintiff" or "Relator"), by and through its undersigned attorneys, for their Complaint, allege as follows:

## I.   NATURE OF ACTION

1.      The Complaint, to be filed under seal, asserts claims under the *qui tam* provisions of the Federal False Claims Act, 31 U.S.C. §§ 3729-33, ("FCA" or "False Claims Act"), based upon violations of the Act, being false claims and statements submitted to the United States and from approximately 199_ to 2009, without regard to fines or penalties. All charges brought herein against the Defendants are based upon Defendants' false claims and statements made in connection with the submission of Medicare and/or Medicaid and/or TriCare reimbursement forms seeking cost report and/or Diagnosis Related Group ("DRG") reimbursement and Ambulatory Payment Classification ("APC") reimbursement from at least January 1, 1997 and continuing thereafter until at least 2009.

2.      The false claims herein alleged are further based, *inter alia*, on express or implied certifications by Defendant that it complied with applicable Federal law. Violations of these laws give rise to causes of action under the False Claims Act.

3.      (a)      Under the Act, a defendant is liable to the United States if the defendant (1) knowingly (2) presents or *causes to be presented* (3) to an officer or employee of the United States Government (4) a false or fraudulent claim for payment or approval. *See* 31 U.S.C. §3729(a)(1). A defendant may also be liable for (1) knowingly (2) making or causing to be made (3) a false record or statement (4) to obtain payment of a false or fraudulent claim. *See* 31 U.S.C. §3729(a)(2). For purposes of the Act, "know" or "knowingly" means that the defendant

had actual knowledge of the falsity of the information, acted in deliberate ignorance of its truth or falsity or acted in reckless disregard of the truth or falsity of the information

      (b)     The United States has the burden of proving a violation of the Act, or proving aiding and abetting a violation or conspiring to commit a violation of the Act, by a preponderance of the evidence. *See* 31 U.S.C. §3731(c).

      (c)     The Act does not permit a person: (i) to remain silent after discovering that an error that, if uncorrected, would result in the receipt or retention of improper payments; or (ii) to take steps designed to hide the occurrence of an error so that excess payments will be made or retained. 42 U.S.C.§1320a-7b(a)(3), captioned "Making or causing to be made false statements or representations," making both a felony:

> Whoever--
>
> (3) having knowledge of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment, or (B) the initial or continued right to any such benefit or payment of any other individual in whose behalf he has applied for or is receiving such benefit or payment, conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized...
>
> shall (i) in the case of such a statement, representation, concealment, failure, or conversion by any other person in connection with the furnishing (by that person) of items or services for which payment is or may be made under the program, be guilty of a felony...

      (d)     Under 31 U.S.C.§3729(a), anyone aiding and abetting or conspiring to obtain overpayments from the Government or who remains silent about a known overcharge, such as an outlier reimbursement, causes a false claim to be presented to the Government.

## II.    <u>JURISDICTION AND VENUE</u>

4.     This Court has jurisdiction over this action pursuant to 31 U.S.C. § 3729, 3732(b), *et seq.* and 28 U.S.C. § 1331 and 1345.

5.     Venue is appropriate pursuant to 31 U.S.C. § 3732, 3732(b) and 28 U.S.C. § 1391(b) and (c) in that certain of the claims herein arose, and certain of the acts of Defendants which are the subject of this action occurred, within this District. In addition, Defendants reside in and/or transact business in this District.

## III.     FALSE CLAIMS ACT AND SUMMARY OF COMPLAINT

6.     The False Claims Act was originally enacted during the Civil War, and was substantially amended in 1986. Congress amended the Act to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the FCA, which Congress characterized as the primary tool for combating government fraud, was in need of modernization. Congress intended that the amendments create incentives for individuals with knowledge of fraud against the government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf. A false claim related to a refund owed to the Government is known as a "reverse" false claim under the False Claims Act. See 31 U.S.C. § 3729(a)(7).

7.     The FCA provides that any "person," including corporations such as the Defendants, who knowingly or recklessly submits, or causes the submission of, a false or fraudulent claim to the U.S. Government for payment or approval is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government. Liability attaches when a defendant knowingly seeks payment, or causes others to seek payment, from the Government that is unwarranted.

8. The FCA allows any person including the Plaintiff herein, Complin partnership, having information about a false or fraudulent claim against the Government to bring an action for itself, and the Government, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendant during that time) to allow the Government time to conduct its own investigation and to determine whether to join the suit.

9. A summary of the Complaint is as follows. The defendants (together, "Hospitals" and/or Defendants), North Carolina Baptist Hospital ("NCBH" or "Hospital") and Carolinas Medical Center ("CMC" or "Charlotte Mecklenburg Hospital Authority" or "Carolinas Healthcare System"), co-owned a managed care organization, MedCost, which consisted of a Preferred Provider Organization (or "PPO") and a Third Party Administrator (or "TPA").[1] The Hospitals purchased MedCost as co-50% owners in 1996.

10. NCBH and CMC acted through their complicit high-level executives, not named defendants but who were co-conspirators and beneficiaries, to engage in a scheme that had the effect of (1) increasing the personal bonuses of many of these same executives and (2) enhancing the annual income of the Hospitals (and all other hospitals in the Hospitals' region) through a scheme of fraud that increased the reimbursements made by Medicare and Medicaid.

11. Under the inpatient Prospective Payment System (PPS) for acute-care hospitals, Medicare Part A pays hospital costs based on Diagnosis Related Groups ("DRGs") for Inpatient discharges and Ambulatory Payment Classifications ("APCs") for Outpatient services. These prospective payments are adjusted by the Wage Index applicable to the area in which each hospital is located.

---

[1] A "Third Party Administrator" or "TPA" is an independent entity hired by the Plan Sponsor to pay claims and provide administrative services to the Plan.

12.     The lynchpin of these frauds was the Hospitals' purposeful disregard of the requirement that they each needed to have in place an independent fiduciary with legal control of their respective self-funded employee health benefit Plans ("Plans"). Without an independent fiduciary with the ability to intervene on behalf of the Plans' employees, the Hospitals' scheme - - to select, use, and control MedCost as a vendor to Hospitals' Plans - - resulted in the victimization of the Plans' members (the "employees") and the Government, Medicare, Medicaid and TriCare.

13.     These acts were (and are) in violation of the Government's (Medicare, Medicaid and TriCare) anti-self-serving regulations, exemplified by Medicare's independent fiduciary requirements. These rules were put into place expressly to prevent the type of self-dealing that led to the frauds against Government set forth by the Relator's allegations in this case.

14.     This action focuses on NCBH's and CMC's failures to meet Medicare's independent fiduciary requirement (Medicare Provider Reimbursement Manual, §2162.7, *infra*), and similarly situated governmental health insurance programs. The Defendants, through their fraudulent conduct, did not comply with Medicare's requirements for reporting true wage data upon which the Wage Index is based. Instead, they fraudulently inflated this wage data by reporting non-allowable expenses and inflated expenses. This resulted in an inappropriate increase in each Hospital's area Wage Index. This inappropriate increase resulted not only in inflated payments to each of these Hospitals, but also in inflated payments to all hospitals in each Defendant's geographic region.

15.     As a result of the alleged fraud perpetrated by Defendants, Medicare, Medicaid and TriCare paid tens of millions of dollars in false cost report and DRG/APC claims.

IV.     **THE PARTIES**

-5-

**The Plaintiff**

16.     The Plaintiff is Complin, a Delaware general partnership which, pursuant to Section 15-201(a) of the Delaware Revised Uniform Partnership Act, is not an entity distinct from its partners.

**The Hospitals/Defendants**

17.     North Carolina Baptist Hospital ("NCBH"), located in Winston-Salem, North Carolina, is one of North Carolina's most comprehensive health care systems. It is a part of a three-pronged partnership of Wake Forest University Health Sciences (which includes the School of Medicine) and Wake Forest University Physicians (WFUP), its physician practice plan. Together they make up Wake Forest University Baptist Medical Center, one of the nation's major academic medical centers. NCBH was and is the Medical Center's primary clinical facility, which includes an inpatient hospital (830 beds), a community health center, a PPO and TPA (MedCost performed both functions) and primary care centers. As a teaching hospital, NCBH is the region's main tertiary referral center and employs approximately 11,500 people.

18.     Carolinas HealthCare System (CHS) is the largest healthcare system in the Carolinas, and the third largest non-profit public system in the nation. CHS owns, leases or manages 25 hospitals in North and South Carolina. Several of these hospitals are located in the jurisdiction of the Middle District (including: Carolinas Medical Center-NorthEast in Concord, Cabarrus County, North Carolina; Scotland HealthCare System in Laurinburg, Scotland County, North Carolina; and Stanly Regional Medical Center in Albemarle, Stanly County, North Carolina). Together, these operations comprise over 4,900 licensed beds and employ more than 35,000 full-time or part-time employees.

Case 1:09-cv-00420-UA-LPA   Document 1   Filed 06/11/09   Page 7 of 31

19. CHS's flagship facility is Carolinas Medical Center ("CMC") in Charlotte, an 874-bed hospital with a Level I trauma center, a research institute and a large number of specialty treatment units including heart, cancer, organ transplant, and behavioral health.

20. Carolinas Medical Center and NCBH engaged in the same scheme. Both used MedCost as the PPO and TPA for their respective employee health benefit plans; both are 50% co-owners of MedCost. Both have committed breaches of fiduciary duty by over-charging their own employees for their healthcare, with such overcharges having become the non-allowable charges to Government that fraudulently increased the DRG and APC payments received by the Hospitals. Searches of publicly available records have not unearthed any evidence that CMC retained the services of an independent fiduciary as required by PRM 2162.7, *infra*, which would have safeguarded the employees and Government from the excessive charges. In addition, CMC used MedCost, as did NCBH, as a vehicle to inflate reimbursement by approximately fifteen to twenty percentage points as compared to the available alternate networks. No information has been found to indicate that CMC provided any additional discounting to its own employee plan members to offset the inflationary and fraudulent pricing. Nor has research into the Employee Benefits Security Administration of archived Prohibited Transaction Exemptions for the years 1996 to present revealed the existence of an exemption to either NCBH or CMC from these requirements. Such exemptions are under the jurisdiction of the U.S. Department of Labor, 29 U.S.C.§1106. Any overstatement of expenses (both 'non-allowable' and 'inflated') by NCBH and CMC would also negatively impact the United States with regard to the DRG reimbursement rates that Medicare would pay to the NCBH Core Based Statistical Area ("CBSA") and the Charlotte CBSA, whose size exceeds the NCBH's.

## V. THE MEDICARE AND MEDICAID PROGRAMS

21.    Medicare and Medicaid are the principal federal programs that help pay for health care furnished by non-government providers.  The federal annual share of the cost of Medicare and Medicaid is $500 billion, one-fifth of the national $2.5 trillion budget.  The states' Medicaid costs are an additional $200 billion.

22.    The Medicare program, created in 1965 by the enactment of Title XVIII of the Social Security Act, pays for necessary medical services rendered to people over the age of 65 and other eligible recipients.  The Center for Medicare and Medicaid Services ("CMS") of the United States Department of Health & Human Services issues comprehensive guides governing reimbursement for the cost of covered medical services provided to eligible patients.  The Medicare program consists of two parts:  Part A and Part B.  Part A, funded by Social Security taxes, provides major medical insurance coverage for the costs of hospital care, related post-hospital services, home health services and hospice care.  See generally 42 U.S.C. §§11395c-395i-4.  Part B is a federally subsidized, voluntary health insurance program.  It provides supplemental insurance coverage for medical and other services excluded from Part A, including laboratory diagnostic services.  See generally 42 U.S.C. §§1395c-1395i-4.

23.    Federal funding of Medicare and Medicaid is protected by the False Claims Act from fraudulent and wrongful claims, including schemes to falsely certify compliance with the applicable laws, rules and regulations.

24.    As a prerequisite to Medicare reimbursement of the cost of eligible medical service rendered to Medicare beneficiaries, CMS requires hospitals to submit annually a form CMS-2552, more commonly known as a hospital cost report.  After the end of its fiscal year, the hospital files its cost report, itemizing the reimbursement claimed for that year.  *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; 42 C.F.R. § 405.1801(b)(l).  Medicare relies upon the cost report

-8-

to determine whether the hospital has been underpaid and is entitled to reimbursement beyond the interim Medicare payments, or whether the hospital has been overpaid and must reimburse Medicare, including outlier reimbursement. *See* 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1). At all times relevant to this action, the two Defendant Hospitals were required to file Medicare and Medicaid cost reports.

25.     Acting under the direction and control of the executives of the two Defendant Hospitals, these entities were required by law to submit complete and truthful information in their Medicare cost reports.

26.     Every Medicare hospital cost report contains an express certification signed by the hospital's chief administrator or the administrator's designee. Hospitals filing their cost reports electronically are required to submit a paper certification, which must be signed and dated. *See* 42 C.F.R. § 413.24(f)(4). Medicaid cost reports submitted to NYS DOH must be certified by a CPA.

27.     The Medicare cost reports for the calendar years 2005-2007 of the two Defendant Hospitals contained the following certification:

> Misrepresentation or falsification of any information contained in this Cost Report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.
>
> Certification by officer or administrator of provider(s)
>
> I hereby certify that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report and the balance sheet and statement of revenue and expenses prepared by [name and provider number of provider] for the cost reporting period beginning [date] and ending [date], and that to the best of my knowledge and belief, it is a true, correct and complete statement prepared from the books and

Case 1:09-cv-00420-UA-LPA   Document 1   Filed 06/11/09   Page 10 of 31

records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services and that the services identified in this cost report were provided in compliance with such laws and regulations.

(Signed) _____ (Signature on File) _____
Officer or Administrator of Provider(s)

28.     A hospital is required to certify that the filed hospital cost report is: (i) truthful, *i.e.*, contains only true and accurate cost information; (ii) correct, *i.e.*, that the provider is entitled to reimbursement for the reported costs in accordance with the applicable instructions; and (iii) complete, *i.e.*, that the cost report is based upon all information known to the hospital.

## VI.     DEFENDANT'S WRONGFUL CONDUCT

### The Wage Index

29.     Although the fraudulent scheme used by the Hospitals is simple, it involves Medicare's complicated reimbursement methodologies. A basic explanation of the relevant Medicare reimbursement methodologies reveals the nature of and motives for the alleged fraud.

30.     Medicare reimburses hospitals through what is known as the Prospective Payment System. This system is designed to pay hospitals a fixed and predetermined amount for Inpatient and Outpatient care that is rendered to Medicare beneficiaries. For Inpatient Care, Medicare reimburses by Diagnosis Related Groups (DRGs). This methodology classifies all inpatient stays into about 500 groups. Each group is designed so that all cases that fall into it have similar resource and labor needs. The system uses a "weight" mechanism to relate the amount of resource consumption for a given DRG to that of other DRGs (using a base rate of 1.000). In other words, a case that is not resource intensive (*e.g.*, an appendectomy) would have a relatively low weight *(e.g., *.9001), while a very resource intensive case (*e.g.*, a heart transplant) would have a very high weight (*e.g.*, 18.8653). Each year the Government establishes a fixed amount

-10-

that it will pay for the base rate of 1.000. This base rate is then multiplied by the patient-admissions' assigned DRG weight to yield a prospective payment amount. Thus, by grouping cases into similar "buckets," a predetermined amount can be paid for each case based on its grouping.

31.     The Government recognized, however, that the cost of delivering care varies across the country. This variation is primarily due to differences in labor costs. For example, nurses in San Francisco, California are able to demand a higher wage and benefit package than are nurses in rural Arkansas. The Cost of Living in each of these areas is dramatically different as well. To address this issue, the Government created a mechanism to adjust the prospective payment so that DRG payments recognize regional variations in labor costs. To do this, the Government sets aside a portion of the total DRG payment as the "labor component." During the period of time in which this fraud was perpetrated, the labor component was set at approximately 71% of the total DRG payment. (The remaining 29% of the payment covers supplies and equipment.) If a DRG payment was $1,000, then the labor component would be $710, based on this formula. Prior to DRG payment, the labor component is adjusted for the geographical region in which the hospital is located. This adjustment is accomplished through a factor called the "Wage Index" or "Wage Index Factor."

32.     The Wage Index is created from data supplied by hospitals on their Medicare cost reports. The numerator of the Wage Index includes salaries and benefits paid to qualified employees (nurses, etc.) The salary and benefit data included in the numerator is collectively referred to as "wage data." By definition, "wage data" includes certain allowable benefits provided to the employees such as health insurance benefits. The denominator includes the hours that these employees worked. The resulting Average Hourly Wage (AHW) is then

-11-

converted to a Wage Index Factor. In a given year, the Wage Index Factor across the country may range from a low of .7010 to a high of 1.5819, as compared to the base rate of 1.000.

33. Although each hospital reports its expenses separately on its Medicare cost report, its Wage Index Factor is assigned based on the hospital's Core Based Statistical Area (CBSA). This is because hospitals compete for nurses (and other employees) in a region and therefore have to pay a market based rate for their services. To determine the Wage Index Factor for a CBSA, Medicare sums the individually reported wage and hour data from each of the hospitals in the CBSA and divides the wage data reported by the number of hours reported for the entire CBSA. This Average Hourly Wage (AHW) is then converted into the Wage Index Factor which is then applied to all the hospitals in the CBSA.

## Manipulation of DRG Reimbursement

34. Using the example of a $1,000 DRG with a $710 labor component, the final payment amount is then determined by multiplying the $710 labor component by the Wage Index Factor. So, in the highest wage index CBSA the hospital would be paid the $290 operational component (supplies and equipment) plus a labor component of $1,123.15 ($710 x 1.5819) for a total of $1,413.15. In the lowest wage index CBSA, the hospital would be paid the $290 operational component plus a labor component of $497.71 ($710 x .7070) for a total of $787.71. The difference between the two institutions would have been $625.44, with the higher wage index CBSA being paid 79% more for providing the exact same service.

35. The law requires that any adjustment to a hospital's individual Wage Index for a given year must be budget neutral to Medicare. Therefore, if a hospital overstates its expenses in a given year, it is paid more but at the expense of other hospitals. However, to adjust for increases in the cost of labor from year to year, the Government uses a 'market basket' approach

to determine accurate increases in reimbursements for costs over time. The hospital's filed Medicare Cost Reports are used to create this 'market basket.'

36.     Salary and fringe benefits are one of the items in the market basket. Thus, any overstatement of wage data on the cost report or the inclusion of non-allowable expenses will result in inflated payments to all hospitals in an affected CBSA.

### Manipulation of APC Reimbursement

37.     In a similar fashion, Medicare reimburses outpatient procedures based on a classification scheme referred to as APCs. As with DRGs, the labor portion of the APC is adjusted by the Wage Index Factor. The labor portion for APCs is 60% of the total proposed payment. Thus, any overstatement of wage data on the cost report or the inclusion of non-allowable expenses will result in a higher rate of payment for all Outpatient Services at all hospitals in the affected CBSA. In addition, APC payment rates are adjusted annually for inflation. Wage Data reported by hospitals is used to determine this annual inflation rate. Thus, any overstatement of wage data on the cost report or the inclusion of non-allowable expenses will result in an annual inflation adjustment that is overstated, resulting in inflated payments for Outpatient services to all hospitals in an affected CBSA.

37.     For several years, both hospitals have been using MedCost's PPO network and its Third Party Administrator (TPA) for their respective self-funded health plans. For NCBH, it was the only health plan option that was offered to employees. As a PPO rental network, MedCost's business model is to secure negotiated (discounted) rates from physicians and hospitals as a condition of participation in exchange for potential increased patient volume or the protection from the loss of existing patient volumes by these participating physicians and hospitals. This

Case 1:09-cv-00420-UA-LPA   Document 1   Filed 06/11/09   Page 14 of 31

network is then 'rented' by self-funded companies and insurance companies seeking discounted health care services.

38.     NCBH's CFO Ramsey would make all decisions on rate and language issues with all payers. Ramsey was in control, but never filled the role of fiduciary, on paper or otherwise. To be clear, this meant that when, for example, MedCost approached NCBH about securing a deeper discount Ramsey, whose employer NCBH controlled MedCost, would determine what rates NCBH would agree to accept from MedCost. Ramsey controlled all rate negotiations.

39.     There were significant "pricing differences" between these various contracts. By "pricing differences," what is meant is the rate of reimbursement that is contractually prescribed by each contract. These contracts between the Defendant Hospitals and the managed care payers establish rates for Inpatient and Outpatient services that the Defendant Hospitals agree in advance will be accepted as reimbursement in full for rendered covered services. These rates apply to the managed care payer's entire book of business (both fully-insured and self-funded). Most often, these contracts provide for Outpatient Services to be reimbursed on a percent of charge basis (as in 80% of the charge). Inpatient Services are reimbursed under a number of different methodologies (Diagnosis Related Groups (DRGs), Per Diems, Percent of Charge, etc.).

40.     The pricing differences that existed between the managed care contracts (*i.e.*, MedCost, BCBSNC, United Health Care, *etc.*) were large. The expected discount agreed to by NCBH for Inpatient services rendered under the MedCost contract was 27.1%. However, the expected discount under the BCBSNC contract agreed to by NCBH was 42.9%. Similar disparities are believed to have existed with regard to CMC's employees and MedCost.

41.     Excessive MedCost costs of $2,763,628 were levied on NCBH employees and Plan members for Outpatient services. The discount under the MedCost/NCBH contract was

-14-

20% (netting a payment of 80% of charges), whereas the corresponding data for BCBSNC had a discount of 40.3% (netting a payment of 59.7% of charges).

42. Excessive MedCost costs of $1,547,257 were levied on NCBH employees and Plan members for Inpatient services. A Comparison of the reimbursement rates in place with MedCost to those in place with BCBSNC revealed that the MedCost inpatient rates are 28% higher than the BCBSNC rates. The same is believed to have occurred with regard to CMC and its employees.

43. The rates contained in the MedCost contract were more favorable to the Defendant Hospital than were the rates in the BCBSNC contract, the United Health Care contract, and the NC State Employees contract. Documentation of this difference in pricing is found in NCBH's budgeting documents. A fiduciary breach has occurred because the NCBH self-funded health Plan only offered MedCost to its employees at a higher cost than MedCost's competing plans although it was well known to NCBH that as a medical provider it had agreed to provide the same quality of services to other payers- - MedCost's competition - -for significantly lower rates of reimbursement. Emails exchanged between NCBH and entities that would only use NCBH's services if it provided a discount to MedCost comparable to MedCost's competitors establish that NCBH was untruthful in reporting to others the size of discount it allowed MedCost to obtain from NCBH. An email from NCBH CEO Len Preslar, CEO, to Gina Ramsey, NCBH CFO clearly details his understanding that NCBH's employees were being made to pay more to NCBH for services than were BCBSNC members for the exact same services.

44. A proposal to have NCBH employees bear a full 9% increase in charges from the Hospital while having MedCost's 'commercial accounts' bear only a 3% increase makes clear that it was NCBH's intention, in order for its 50% interest in MedCost to be more profitable, that

NCBH intended to overcharge its own employees. Since NCBH controlled the plan to which its own employees were assigned, NCBH took the position, forsaking its fiduciary responsibility, that it could and intended to subject them to unreasonable costs of participation.

45. The financial impact of NCBH's selection of MedCost, a PPO network that NCBH knew paid itself at a much higher rate than it accepted from the other network alternatives, caused the Plan to overspend by approximately $4.4 million per year, and charge the Plan members for the administrative expenses for the services provided by MedCost, which are estimated to have averaged between $2.5 and $3 million per year. These unauthorized costs have been, and continue to be, included in the wage data that inflated the Wage Index and, ultimately, the DRG and APC payments for the whole of both CBSA regions influenced by the two Defendant Hospitals.

46. MedCost as a vendor to the NCBH Plan was a "prohibited transaction" under ERISA since NCBH owned 50% of MedCost, making MedCost a "related party" in Medicare terminology and a "party in interest" for ERISA purposes. A public ERISA lawsuit was filed against NCBH, which raised issues similar to the allegations herein under the False Claims Act. A consequence of this ERISA lawsuit was to assure that the Defendant Hospitals and their executives were well aware of the fiduciary breaches that were applicable to Medicare, Medicare and TriCare with respect to hospital costs reporting and Wage Index and DRG/APC calculations.

47. In other words, if the Plan was charged $100 for a medical service, the reimbursement to NCBH would be $60 under the alternate network but would receive $80 under the MedCost network. In fact, NCBH offered discounts, through MedCost, to other plans, but not to its employee-participants in its Plan – NCBH intended to offer discounts to the plans of *every* employer who used the MedCost network except for its own employees. NCBH's purpose

in selecting MedCost as its PPO network and TPA was not made on the basis of quality or cost from a fiduciary standpoint but was based on NCBH's own economic interests - - which were contrary to the economic interests of its employees and Medicare. The reason that NCBH was able to not offer its own Plan participants greater discounts was that the Plan was a "captive plan," and the control exercised over MedCost by NCBH and by CMC was not arm's length. Medicare's "Related Party Rule" looks to control transactions between providers and related parties to ensure that "arms length negotiations" occur.

48.    This alleged scheme by the Defendant Hospitals was to overstate expenses on NCBH's and CMC's Medicare Cost Reports to ensure that DRG and APC payments from Medicare remained at inflated rates, thereby yearly income to NCBH and CMC was increased and the bonuses of the offending executives enlarged. To carry out this fraud, the Defendants hid the fact of MedCost being a "related party." NCBH's filed Cost Report schedule A-8-1, a subset of Worksheet A-8, line 14, is blank in the place where MedCost should have been entered as a related party. In addition to the cost report, the provider is required to submit CMS Form 339. This form has a question to be answered about related parties, which NCBH answered *in the negative,* relying upon its false A-8-1.

49.    The fraud at NCBH was accomplished through the use of a "closed circle." The head of this closed circle was Gina Ramsey, CFO. Although other executives assisted and were complicit in this fraud, Ramsey was the orchestra leader. As CFO, she controlled NCBH's rate negotiations with MedCost, of which NCBH owned 50%. As CFO, she controlled whether there would be a true fiduciary, and she controlled the Plan's Assets. As CFO she controlled the Controller and the preparation of the Cost Report. As CFO she signed off that she "knew or should have known" that the costs reported were accurate. While Ramsey was not the "named"

-17-

fiduciary, Ramsey directed the selection of the network, MedCost, and what MedCost would charge the NCBH employees.

50.    If NCBH had made the correct decision, and had selected the lowest priced network, then NCBH's associated costs for their Plan would have been lower. This would have resulted in a reduction in the employee health benefits costs reported on its Cost Report, causing a corresponding reduction in its Cost Report wage data. That, in turn, would have resulted in a reduction in reimbursement to the Hospital from Medicare and Medicaid affecting both DRG and APC payments as well as other payments made by Medicare that are based on reported costs.

### Excessive Costs on Cost Reports

51.    The Plan paid NCBH, as a medical provider to the Plan, approximately $23 million in 2007 for health care services (Inpatient and Outpatient) rendered by NCBH to Plan members (employees and dependents). Similar payments were made for a number of years. As a result of NCBH's fraudulent conduct, whereby it caused payments to itself higher than were reasonable or required, the Plan was overcharged by $5 million per year. This amount was then reported on the Hospital's Cost Report. This amount should be disallowed and the over-reimbursements it caused Medicare to make over the years were false claims under the FCA.

### Disallowance of Fund Payments Due to Lack of Independent Fiduciary

52.    Medicare regulations require that any Medicare service provider with a self-funded health plan must have an independent fiduciary with legal title to the plan in order for any payments made into the fund to be considered allowable expenses. Documentary evidence establishes that NCBH did not have an independent fiduciary. Nor did CMC. The fund payments made by NCBH into its Plan were approximately $30 million per year. It is estimated

-18-

that CMC's fund payments are slightly larger (perhaps $45 million) since it has more employees. Per Medicare regulations, these fund payments are not allowable expenses.

### Financial Impact of The Wage Index Factor

53. Misreporting of wages can cause significant financial harm to the Medicare system: a 10 cent variance in the Average Hourly Wage (AHW) can cost Medicare more than $1 million annually in many labor markets. The data used for these calculations is taken from wage data found in the Cost Reports submitted by hospitals. When an officer signs the cost report, it is a certification, under oath, that the Cost Report is accurate.

54. Any hospital's misreporting of wage data results in overpayments to all of the hospitals in its CBSA because all hospitals in a CBSA are assigned the same Wage Index. There are four hospitals in NCBH's region and twelve in CMC's. When a hospital, as here, is liable for falsely and fraudulently inflating the Wage Index, it should be held responsible under the False Claims Act for having caused Medicare to overpay *every hospital* in the region.

55. Analysis of the Wage Index and the Hospital's Medicare Cost Reports has found that NCBH's inclusion of the amount it overcharged its employees and the inclusion of unallowable administrative fees paid to MedCost caused the Wage Index to be inflated by 1% to 2% for the NCBH's entire CBSA.

56. This data shows that NCBH's reported wages and benefits were $303,333,426.58 and its reported hours were 10,908,329.85. To determine the Average Hourly Wage, the wage number is divided by the hours. In this case, NCBH's individual Average Hourly Wage comes out to be $27.81.

57. To determine the Average Hourly Wage for the entire CBSA, the reported wage data for all the hospitals is summed. These reported wage data total $528,667,589.08. Similarly,

Case 1:09-cv-00420-UA-LPA   Document 1   Filed 06/11/09   Page 20 of 31

the reported hours for the CBSA totaled 19,219,604.88. The Average Hourly Wage for the CBSA is then calculated by dividing the CBSA wage data total by the CBSA hours total which yields an AHW of $27.51 for the CBSA.

58.     The wage data reported by NCBH also includes $7.4 million of the Defendant's overstated expenses and the inclusion of unallowable administrative expenses. These excessive and non-allowable expenses were then automatically summed up into the entire CBSA's wage total, resulting in an overstatement of the CBSA wage data by $7.4 million as well.

59.     When the inappropriate expenses are removed from the equation, the AHW for the entire CBSA decreases from $27.51 to $27.12, a reduction of 39 cents per hour.

60.     Since the Wage Index Factor is based on the AHW, the Wage Index Factor for the entire CBSA also drops when these inappropriate and unallowable expenses are removed. Current FY 2007 CMS data shows that the Wage Index Factor for the entire CBSA was .9276 When the Wage Index Factor is recalibrated based on the 'correct' AWH ($27.12), the Wage Index Factor for the entire CBSA decreases to a more appropriate .9146, a 1.4% reduction.

61.     The Labor Portion of Medicare's DRG payment to the Hospital is approximately 71% of the base payment amount; the Labor Portion is adjusted by the Wage Index. NCBH received annually approximately $120 million in Medicare payments, 71% of which equals $85 million. An exaggeration of wage costs of 1% to 2% would cause an annual DRG overpayment to NCBH of $850,000 to $1,700,000 per year. These damage amounts are almost doubled when the inflated DRG is applied to all hospitals in NCBH's region. A comparable, but larger, amount of Wage Index damages can be ascribed to CMC.

62.     Wage Data also affects APC payment rates in the same way. For APCs, 60% of the proposed payment amount is considered the 'labor portion'. Prior to payment, this portion is

-20-

adjusted by the Wage Index Factor for the CBSA. Thus, a higher Wage Index results in greater payment. In addition, APCs are given an "annual inflation update" that is based, in part, on the Wage Index.

### Failure To Have An Independent Fiduciary

62. Medicare's rules and regulations require the involvement of an independent fiduciary in situations such as are presented here, and anticipated this risk as well by seeking to prevent fiduciary breaches. It has demanded that a provider-sponsored self-funded plan must have an independent fiduciary in place (with legal title to the fund) in order for any contributions to the fund to be considered allowable Medicare expenses. These regulations are detailed in the Provider Reimbursement Manual ("PRM"), Section 2162.7.

63. §2162.7, Conditions Applicable to Self-Insurance:

A. Definition of Self-Insurance - -Self-Insurance is a means whereby a provider(s), whether proprietary or nonproprietary, undertakes the risk to protect itself against anticipated liabilities by providing funds in an amount equivalent to liquidate those liabilities. . . .

B. Self-Insurance Fund - -The provider . . . establishes a fund with a recognized independent fiduciary, such as a bank .. . .The provider . . .and fiduciary must enter into a written agreement which includes all of the following elements: . . .

2. . . . Control of Fund. The fiduciary must have legal title to the fund and be responsible for proper administration and control. The fiduciary cannot be related to the provider either through ownership or control as defined in Chapter 10 . . .withdrawals must be for [among other things] . . .employee health benefits coverage . . .evidence of a practice of payments from the fund for purposes unrelated to the proper administration of the fund [*e.g.*, excessive payments to NCBH for payment of medical treatments] may result in a withdrawal of recognition of the self-insurance fund by the Medicare program. In such instances, payments into the fund will not be considered an allowable cost. . . .

C. Soundness of the Fund - -The provider submits to the intermediary an annual certified statement from an independent actuary . . .experienced in the appropriate field of . . .employee health care insurance. To be independent, there must not be any financial ownership or control, as defined in Chapter 10, either directly or indirectly in the provider.. . The actuary . . .shall determine the amount necessary to be paid into the fund. . . .Where funds have been established to cover employee health care, the actuary . . .must limit fund payments to the

-21-

cost of insurance premiums for comparable purchased coverage at the same level offered by the fund. Fund payments exceeding this amount will be treated as excess payments"

"§2162.9 <u>Reimbursement Principles Where a Provider Has Self-Insurance</u>
        A.     Medicare's participation in the fund contributions will be limited to actual funded payments made by a provider into the fund and only to the extent of the amounts permitted by §2162.7C. . . .

64.     As proscribed by §2162.7(B)(2), "evidence of a practice of payments from the fund for purposes unrelated to the proper administration of the fund may result in a withdrawal of recognition of the self-insurance fund by the Medicare program." When combined with the absence of the required, impartial fiduciary, it is clear that such administration was not "proper."

65.     The 2007 ERISA 5500 form on file for NCBH confirms that the Hospital did not have an 'independent fiduciary' with 'legal title' to the plan in place. This form, which is completed and filed by the Hospital on a yearly basis, does not name an independent fiduciary for the period in question. Instead, it names Kerry Garrigan, VP of HR for the Hospital. PRM 2162.7 (b)(2) states: "The fiduciary cannot be related to the provider either through ownership or control as defined in Chapter 10..." The Hospital's VP of Human Resources is 'related' to the provider.

66.     The Hospital indicated on the form that all of the Plan's assets were held in the general assets of the hospital and not in a separate trust (ERISA 5500 Question 9). This confirms that there was no independent fiduciary with 'legal title to the fund' because the very process of assigning legal title to the fund over to an independent fiduciary necessitates that all Plan assets be placed in a trust. This is required because an independent fiduciary could not have legal title to a portion of a company's general assets. In order to have legal control over the fund, the Plan assets of that fund must be placed in a trust. The 5500 shows that the Hospital did not place the

Plan assets in a trust; thus, there could not have been an 'independent fiduciary' with 'legal title to the fund' in place.

67.     Neither NCBH nor CMC used an independent fiduciary to administer their plans. That failure rendered their associated costs "non-allowable."

68.     NCBH breached its fiduciary duty to act prudently and in the sole interest of participants and beneficiaries when, knowing that it sought to be a medical provider for the Plan, it failed to appoint an independent fiduciary to determine whether it should be a provider to the Plan and, if so, how it should be compensated. NCBH breached its fiduciary duty to act prudently and in the sole interest of participants and beneficiaries when it chose to pay itself from Plan assets at significantly inflated and unreasonable rates for medical services rendered to participants and beneficiaries at NCBH. NCBH was unjustly enriched and profited from its fiduciary breaches to the damage of the Plan and the Plan's participants and beneficiaries not only in receiving excessive and unreasonable reimbursement from the Plan and the Plan's participants but also in receiving excessive and unreasonable reimbursement from the Government through the manipulation of the Wage Index.

69.     Medicare requires the disclosure of any "related party" in order to avoid paying a profit margin to a provider for services provided by a "related party" and to ensure that rates for services are determined by an 'arms length negotiation.' The following regulations, which apply to all providers seeking reimbursement from Medicare, illustrate Medicare's concern for a provider's ability to inflate expenses, and thereby overcharge Medicare, through the use of a related party.

> Provider Reimbursement Manual Chapter 10 "COST TO RELATED ORGANIZATIONS", pp 10-3 to 10-11.

> PRINCIPLE 1000

-23-

Costs applicable to services...furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization. *However, such cost must not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere.* The purpose of this principle is two-fold: (1) to avoid the payment of a profit factor to the provider through the related organization (whether related by common ownership or control), and *(2) to avoid payment of artificially inflated costs which may be generated from less than arm's-length bargaining...*

## 1002. DEFINITIONS

1002.1  Related to the provider means that the provider to a significant extent is associated or affiliated with, or has control of, or is controlled by, the organization furnishing the services, facilities, or supplies.

1002.2  Common ownership exists when an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider.

1002.3  Control exists where an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution.
.....

## 1004. DETERMINATION OF COMMON OWNERSHIP OR CONTROL....

In determining whether a provider organization is related to a supplying organization, the tests of common ownership and control are to be applied separately. If the elements of common ownership or control are not present in both organizations, the organizations are deemed not to be related to each other. ....

1004.1    Common Ownership Rule
A determination as to whether an individual (or individuals) or organization possesses significant ownership or equity in the provider organization and the supplying organization, so as to consider the organizations related by common ownership, will be made on the basis of the facts and circumstances in each case. This rule applies whether the provider organization or supplying organization is a sole proprietorship, partnership, corporation, trust or estate, or any other form of business organization, proprietary or nonprofit....

1004.2    Examples of Common Ownership
The following examples illustrate the general application of the common ownership rule....
Example No. 1--Direct Ownership

Mr. B owns a 60 percent interest in the provider organization and a 55 percent interest in an organization supplying the provider. The provider and the

-24-

supplying organization are considered related by common ownership since Mr. B possesses significant ownership in both organizations....

1004.3    Control Rule
The term "control" includes any kind of control, whether or not it is legally enforceable and however it is exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise

## VII.    DAMAGES

70.    As set forth above, Defendants knowingly submitted or caused to be submitted to Medicare and Medicaid reimbursement claims that were based upon violations of the Federal False Claims Act related to DRG and cost report reimbursement, for the period from at least January 1, 1997 to present, in violation of 31 U.S.C. § 3729, causing damages to the United States' Medicare, and TriCare programs. The Relator estimates that Defendants' false and fraudulent conduct resulted in the Federal Governments paying in excess of tens of millions of dollars pursuant to false claims prohibited by the FCA, which constitute actual damages, without regard to fines or penalties.

## FIRST CAUSE OF ACTION

### False Claims Act: Presentation of False Claims and Making and Using a False Statement or Record (31 U.S.C. § 3729 (a)(1) and (a)(2)).

71.    Plaintiff/Relator repeats and re-alleges each allegation in paragraphs 1 through 70 of this Complaint, as though fully set forth herein.

72.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729 et seq.

73.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States. Government for payment or approval by Medicare, Medicaid and TriCare.

-25-

74. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false and/or fraudulent records and statements, to induce the Government's Medicare, Medicaid and TriCare programs to approve and pay such false and fraudulent claims.

75. By virtue of the act described acts above, Defendants have falsely certified its compliance with all applicable statutes in connection with the submission of Medicare, Medicaid and/or TriCare reimbursement forms from at least January 1, 1997 through the present.

76. Each claim submitted by and each reimbursement received by Defendants that was as a result of a false or fraudulent record or statement and/or a false or fraudulent claim for payment.

77. The Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' conduct. The false claims were presented on behalf of NCBH and CMC for DRG and APC payments for thousands of patients from the period at least from at least January 1, 1997 to present, covering the entirety of the Defendant Hospitals' respective CBSA regions. In addition, false claims were made annually by the Defendant Hospital's Medicare and Medicaid cost reports. Relator has no control over or access to the records of such false claims which are within the control and custody of the Defendant Hospitals.

78. The Government, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, paid the claims that would not be paid but for the Defendants' false statements and false claims.

79. By virtue of the false or fraudulent claims made by Defendants, the United States has suffered and has been damaged, in substantial amounts to be determined at trial, including

the Government's entitlement to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $11,000 for each violation.

## SECOND CAUSE OF ACTION

### False Claims Act: Failure to Refund "Reverse False Claims (31 U.S.C. § 3729 (a)(7))

80.  Plaintiff/Relator repeats and re-alleges each allegation in paragraphs 1 through 79 of this Complaint, as though fully set forth herein.

81.  This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729 et seq.

82.  By virtue of the acts described above, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States. Government for payment or approval by Medicare, Medicaid and TriCare.

83.  By virtue of the acts described above, Defendants knowingly failed to refund to the United States funds unlawfully obtained in violation of the False Claims Act

84.  The Relator cannot at this time identify all of the false claims for re-payment to the United States that were not made and such non-payment was caused by Defendants' conduct. The false claims to be refunded were presented on behalf of Defendant Hospitals for thousands of patients, and for annual cost reports, from the period at least from 199_ to 2009. Relator has no control over or access to the records of such false claims which are within the control and custody of Defendants.

85.  The Government, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendants, related to the non-repayment of claims that would not be paid but for the Defendants' false statements and false claims.

86.     By virtue of the false or fraudulent failure to re-pay by Defendants of aforesaid claims, the United States has suffered and has been damaged, in substantial amounts to be determined at trial. The Medicare, Medicaid and TriCare programs have paid thousands of claims, amounting to million of dollars, for illegal reimbursements that were obtained by the Defendants, from at least January 1, 1997 through the present, and, therefore, is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $11,000 for each violations.

## THIRD CAUSE OF ACTION

### False Claims Act: Conspiracy to Submit False Claims (31 U.S.C. § 3729 (a)(3))

87.     Plaintiff/Relator repeats and re-alleges each allegation in paragraphs 1 though 86 of this Complaint, as though fully set forth herein.

88.     This is a claim for false damages and penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq.*

89.     By virtue of the act described above, Defendants conspired with others, to defraud the United States by creating an illegal reimbursement scheme in violation of the False Claims Act. Defendants took substantial steps in furtherance of the conspiracies by, *inter alia*, agreeing to prepare and submit false and fraudulent claims and statements in support thereof to Medicare, Medicaid and TriCare, and did fail to refund dollars unlawfully received from Medicare, Medicaid and TriCare

90.     The Government, unaware of the Defendant's conspiracy, paid claims that would not be paid absent the unlawful conspiracy.

91.     By virtue of Defendant's conspiracy and the acts taken in furtherance thereof, the United States has been damaged in substantial amounts to be determined at trial. The Medicare,

-28-

Medicaid and TriCare programs have paid thousands of claims, amounting to million of dollars, and for false cost reports, for illegal reimbursements that were obtained by the Defendant, from at least January 1, 1997 through the present, and, therefore, is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,000 to $11,000 for each violation.

## PRAYER

WHEREFORE, Plaintiff/Relator prays for judgment against the Defendants as follows:

(a)     that Defendants cease and desist from violating 31 U.S.C. § 3729 *et seq*;

(b)     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of U.S.C. §3729;

(c)     that Plaintiff/Relator be awarded the maximum amount allowed pursuant to 3730(d) of the False Claims Act, and the equivalent provisions of the state statute set forth above;

(d)     that Plaintiff/Relator be awarded all costs and expense of this action, including attorneys' fees and expenses; and

(e)     that Plaintiff/Relator recover such other relief as the Court deems just and proper

**DEMAND FOR JURY TRIAL**

        Plaintiff demands a jury trial as to all issues triable by a jury.


Dated:    June 11, 2009

                                   Respectfully submitted,


                                  *LaDonna Williams*
                                  Robert Zaytoun
                                  LaDonna Williams
                                  Zaytoun Law Firm, PLLC
                                  510 Glenwood Avenue, Suite 301
                                  Raleigh, NC 27603
                                  Telephone: (919) 832-6690


                                  *Philip R. Michael (by LaDonna Will—)*
                                  Philip R. Michael
                                  Troutman Sanders LLP
                                  The Chrysler Building
                                  405 Lexington Avenue
                                  New York, N.Y. 10174
                                  (212) 704-6318
                                  Attorneys for the Relator


1351481v1 TBA.TBA