# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA, *ex rel.,*
COMPLIN,

Plaintiff,

v.

NORTH CAROLINA BAPTIST
HOSPITAL and THE CHARLOTTE-
MECKLENBURG HOSPITAL
AUTHORITY, d/b/a CAROLINAS
HEALTHCARE SYSTEM,

Defendants.

Case No. 1:09-CV-420

**JURY TRIAL DEMANDED**

## RELATOR'S SECOND AMENDED COMPLAINT

### I.    INTRODUCTION

1.    Defendants North Carolina Baptist Hospital ("NCBH") and The Charlotte-Mecklenburg Hospital Authority, d/b/a Carolinas Healthcare System ("CHS") (collectively "Defendants" or "Hospitals") have violated the Federal False Claims Act by failing to disclose on their Medicare Cost Reports more than a billion dollars in related-party transactions and by falsely claiming more than a billion dollars in fictitious costs for employee healthcare benefits that were not actually out-of-pocket costs.

2.    In a nutshell, for a period of many years, these Hospital Defendants submitted false and fraudulent Medicare Cost Reports that overstated the actual costs of healthcare to their own employees (referred to as "domestic care") under their "self-funded" health benefit plans. Because the provision of healthcare to their own employees is considered to be a "related party transaction," the applicable federal laws mandated – as a condition of

1

participation in the Medicare program and as a condition of payment of Medicare claims – that the Hospital Defendants reduce the reported amounts for domestic care to only the actual unreimbursed costs. By failing to reduce the reported amounts to the actual unreimbursed costs, and thereby knowingly, falsely, and improperly inflating those amounts, these Hospital Defendants reaped hundreds of millions of dollars in undeserved and unlawful reimbursements and subsidies from the federal government and the taxpayers. In further consequence, these Defendants caused Medicare reimbursements to other hospitals in the region to be driven up, because Medicare reimbursement rates include – as part of the overall reimbursement formula – a component reflecting the average "Wage Index" for the pertinent geographic area. The actions of the Defendant Hospitals in falsifying material parts of their Medicare Cost Reports artificially increased the Wage Index component for the affected geographic areas. Moreover, Medicare relies upon cost data in the Medicare Cost Reports to annually fix the reimbursement amounts it pays to all hospitals nationally under the Prospective Payment System. By corrupting the data upon which Medicare relies, the Defendant Hospitals and others engaged in the same fraud have cost the Government and the taxpayers incalculable harm.

## II.     JURISDICTION AND VENUE

3.     This Court has jurisdiction over this action pursuant to 31 U.S.C. §§ 3729; 3732(b), *et seq.*, and 28 U.S.C. §§ 1331, 1345. It also has supplemental jurisdiction over the alleged violation of the retaliation provisions of the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605, *et seq.*, which arise from the same series of transactions as the federal retaliation claim.

4.     Venue is proper in this district pursuant to 31 U.S.C. §3732 and 28 U.S.C. § 1391(b) and (c) in that certain claims stated herein arose within this district, and certain acts of the

2

Defendants which are the subject of this action occurred within this district.   In addition, Defendants reside in and/or transact business in this district.

5.   There were no public disclosures of the allegations or transactions alleged in this action prior to the filing of this action.   Relator Complin (Joseph H. Vincoli) is the only person who made allegations prior to the filing of this action concerning the Defendants' employee healthcare benefit plans, their relationship with MedCost Benefit Services, LLC, and related-party transactions.   Although the misrepresented state of facts -- the misrepresentations that the Defendant Hospitals had no related-party transactions to disclose to the government – appear of record in Medicare Cost Reports that are part of the public domain, the true state of facts required to reach a conclusion of fraud – the fact that the Defendant Hospitals did in fact engage in undisclosed related-party transactions for which they could legally report only their "unrecovered cost" -- was not publicly known or disclosed prior to the filing of this action.

6.   In any event, if a public disclosure of the essential "allegations or transactions" set forth in this action occurred prior to the filing of the original complaint in this action, a fact that Relator unequivocally denies, then in the alternative, Relator Complin (Vincoli) qualifies as an original source because (1) he has direct and independent knowledge based upon his former employment at NCBH that both NCBH and CHS arrange their self-funded employee healthcare benefit plans in such a manner that they engage in related-party transactions with themselves for which they pay themselves for charges that exceed their actual "unrecovered cost;" (2) he has knowledge and information concerning such matters that is independent of and materially adds to any publicly disclosed "allegations or transactions"; (3) he fully disclosed all material facts to the United States

3

on or about May 9, 2008, prior to the filing of the original complaint in this action on June 11, 2009; and (4) he fully disclosed to the United States all additional facts and theories of liability raised in this amended complaint on or about January 28, 2016, prior to the filing of this amended complaint.

### III. PARTIES

7. The nominal Plaintiff herein is Complin, a Delaware general partnership which is not an entity distinct from its partners under Delaware law [Del. Rev. Uniform Partnership Act, §15-201(a)]. The real Plaintiff/Relator is Joseph H. Vincoli, a resident of Clemmons, North Carolina, who is the 99.9% partner in Complin. The other partner with a .1% partnership share is Vincoli's former counsel, Philip Michael. Vincoli and Michael organized Complin and made it the nominal Plaintiff herein, similar to a "John Doe" Plaintiff or "doing business as" designation, solely for the purpose of protecting the identity of Vincoli, who was rightly concerned about continued retaliation by NCBH if his identify were disclosed. For purposes of this amended complaint, Joseph H. Vincoli, d/b/a Complin, is unveiled as the real Plaintiff/Relator. Michael is also a .1% partner in Complin, but does not seek any recovery herein.

8. Vincoli was employed as Defendant NCBH's Associate Director of Patient Financial Services, Managed Care Contracting, between July 10, 2006, and October 2, 2007, and as such, he has direct and independent knowledge of NCBH's related-party transactions with itself through its employee healthcare benefit plan. As NCBH's Associate Director of Patient Financial Services, Managed Care Contracting, Vincoli's job responsibilities at NCBH also required him to perform analyses of competing and available employee health benefit plans other than NCBH's own plan. At NCBH, Vincoli also dealt with MedCost Benefit Services, LLC ("MedCost Services"), an administrative contractor to

4

the healthcare benefit plans of both NCBH and CHS, which was owned by the two hospitals in the proportions of 50% each. Vincoli's experiences at NCBH and his dealings with MedCost Services are how he learned about CHS's self-funded employee healthcare benefit plan, the role MedCost Services played in providing administrative services to that plan, and CHS's related-party transactions with itself.

9.    Before raising issues about NCBH's employee healthcare benefit plan and its relationship with MedCost Services, Vincoli had received nothing but positive feedback from his NCBH superiors.    Nevertheless, he was fired by NCBH on October 2, 2007, as a result of his complaints about transactions by which NBCH paid itself more for domestic care of its employees than commercial insurers were willing to pay for the same services. Subsequently, Vincoli entered into a Settlement and Mutual Release Agreement with NCBH effective as of May 28, 2008, by which he released all claims that he might have had against NCBH prior to the effective date of the agreement.  He did not release future claims, did not release claims of the United States, and did not release claims for which it would be against public policy for him to grant a release.  If the terms of the release are nevertheless enforceable and not against public policy as to Relator's qui tam claims asserted herein, then Relator's claims against NCBH are limited to those arising after May 28, 2008. Otherwise, Relator's claims against NCBH are limited only by applicable statutes of limitation.

10.    Defendant North Carolina Baptist Hospital ("NCBH"), a non-profit corporation organized and existing under the laws of North Carolina and located in Winston-Salem, serves as the primary clinical facility for the Wake Forest University Baptist Medical Center ("the Medical Center"), one of the nation's major academic medical centers.

NCBH owns the hospital component of the Medical Center, and contributes an 830-plus inpatient hospital facility, a primary care center, and a community health center to it. NCBH self-funds an employee health benefit plan for its own 12,500 employees.

11. The Charlotte-Mecklenburg Hospital, d/b/a Carolinas HealthCare System ("CHS"), a hospital authority organized and existing under the laws of North Carolina, is the largest healthcare system in the Carolinas and the third-largest non-profit public healthcare system in the nation, owning, leasing or managing some 39 hospitals in North Carolina, South Carolina, and Georgia, including those shown on **Exhibit A** which file Medicare Cost Reports. In its Annual Report, CHS refers collectively to all of the healthcare facilities that it owns, leases and manages in the Carolinas and Georgia as the "Total Enterprise."[1] Relator contends that CHS caused each of these owned, leased or managed hospitals to file false Medicare Cost Reports. Of these, at least three are located in the Middle District of North Carolina: 1) Carolinas Medical Center-NorthEast (Concord, Cabarrus County, N.C.); 2) Scotland HealthCare System (Laurinburg, Scotland County, N.C.); and 3) Stanly Regional Medical Center (Albemarle, Stanly County, N.C.). CHS's flagship hospital, located in Charlotte, North Carolina, is the Carolinas Medical Center ("CMC"), an 874-bed hospital with a Level 1 trauma center, a research institute, and a large number of specialty treatment units. Together, these operations comprise 7,500 licensed beds. Like NCBH, CHS also self-funds an employee benefit plan for its 60,000 employees.

---

[1] See http://www.carolinashealthcare.org/documents/CarolinasHCSystem/Annual_Reports/2014-CHS-Annual-Report-Web.pdf.

## IV.    SUMMARY OF THE FRAUDULENT SCHEME

12.    When a hospital purchases healthcare services for its employees from itself pursuant to a self-funded employee healthcare benefit plan, the hospital is engaged in related-party transactions with itself. *St. Francis Hospital Greenville, South Carolina*, 2007 WL 1774634 (P.R.R.B. April 19, 2007).

13.    By law, such a hospital is required to reduce related-party charges to the cost to the supplying organization (the hospital's actual out-of-pocket costs) and may report as an employee benefit cost on the Medicare Cost Report only the "unrecovered cost" of providing healthcare to its own employees. *See* 42 C.F.R. §413.17 ("the Related-Party Rule"), Medicare's Provider Reimbursement Manual §§ 332.1 and 2144.4, and the decision of the Provider Reimbursement Review Board in *St. Francis Hospital Greenville, South Carolina*, 2007 WL 1774634 (P.R.R.B. April 19, 2007).

14.    When a hospital provides medical care in its own facilities to its own employees pursuant to a self-funded employee healthcare benefit plan, the hospital *does* incur incremental costs for salaries and supplies for treatment.  These incremental costs are reported in the appropriate corresponding cost centers on the hospital's Medicare Cost Report such as the Outpatient Clinic.   Additionally, the hospital pays certain third-party costs for administration of the plan, which are usually more than offset by employee contributions, deductibles and co-payments under the plan. All of the employee salaries and supplies used by the hospital in the care of its own employees are already reported on the Medicare Cost Report in other cost centers such as the Outpatient Clinic, so to report them again because the hospital has charged itself for treating its own employees is to add a wholly fictional category of cost to the Medicare Cost Report. For this reason, Medicare limits the hospital to reporting only its "unrecovered cost," which amounts to

7

only fees paid to third parties for plan administrative services, as offset by employee contributions, deductibles or co-payments. Medicare Provider Reimbursement Manual §§ 332.1 and 2144.4.

15. Worksheet A-8-1 of Form CMS-2552, the Medicare Cost Report, requires disclosure of related-party transactions and recording of entries to reduce related-party charges to the actual cost of the supplying organization. Because the supplying organization making the "charge" and the purchasing organization incurring the "cost" are one and the same when a hospital purchases healthcare services from itself, proper adjustment of the charges would require that they be reduced to zero. To record a cost in the Employee Benefit cost center (Line 4 or 5 on Worksheet A[2]), the hospital would reclassify the hospital's already reported corresponding costs for cost centers such as the Outpatient Clinic (Line 60.05 on Worksheet A), and reclassify those costs to the cost center for Employee Benefits (Line 4 or 5 on Worksheet A).

16. For example, if NCBH or CHS provides health care services to an employee for stated charges of $100.00, the hospital may incur an incremental (out-of-pocket) cost of $40.00 to the Outpatient cost center, may pay an additional $10.00 of administrative fees, and may recover $20.00 in co-pays from the employee on the stated charges of $100.00. The hospital, in this example, would be entitled to record $30.00 ($40.00 + $10.00 - $20.00 = $30.00) as employee benefit costs on the Medicare Cost Report. If instead the hospital reports $80.00 in costs because it has billed its self-funded plan $80.00 on stated charges of $100.00 for providing health care services to this employee ($100.00 - $20.00 co-pay = $80.00), and the hospital has reimbursed itself this $80.00 by moving money from one

---

[2] Prior to 2011 the appropriate line was Line 5; in 2011 and subsequent years, it was Line 4.

of the hospital's bank accounts to another, the hospital is fraudulently recording an additional employee benefit cost of $80.00, more than twice its actual unrecovered cost of $30.00. The hospital's motive for doing so is to inflate its employee benefit costs, which has a direct impact upon the rates at which the hospital is reimbursed by Medicare.

17.     Under the Related Party Rule and Medicare's Provider Reimbursement Manual §§ 332.1 and 2144.4, a provider is required to reduce its related-party transactions to "unrecovered costs," meaning actual (out-of-pocket) costs, less any costs recovered from the employees through employee contributions, deductibles and co-payments.   In the example above, the total unrecovered cost is $30.00 ($40.00 incremental costs, plus $10.00 administrative costs, less employee co-pay of $20.00).   This $30.00 of "unrecovered costs" is already included in the appropriate cost centers such as Outpatient Clinic (Line 60.05 on Worksheet A) because the employee salaries and supplies are recorded there. Therefore, the $80.00 the hospital supposedly pays to itself is a fraudulent addition to the Medicare Cost Report if knowingly recorded as an allowable cost.  To record proper "unrecovered costs" of $30.00 in the Employee Benefit cost center (Line 4 or 5 on Worksheet A), the hospital would simply reclassify $30.00 of costs from the Outpatient Clinic cost center. It would not record a new $80.00 of cost based upon the "charges" it paid to itself; otherwise, it would report more than twice its costs on the Medicare Cost Report.

18.     Instead of properly recording their costs, NCBH and CHS have for years knowingly completed Worksheets A and A-8-1 of CMS Form 2552 (the Medicare Cost Report) in a false and deceptive manner by failing to disclose the hospitals' related-party transactions with themselves and by failing to reduce the "charges" for domestic care of employees to their unrecovered costs, all with the motive of inflating their Medicare reimbursement

9

rates through a local wage-index adjustment that is highly dependent upon employee benefit costs. NCBH and CHS have simply moved money from one pocket (the employee healthcare plan bank account) and placed it into another pocket (the general operating bank account) and then fraudulently called the resulting transactions an employee benefit "cost" for the purpose of inflating their Medicare reimbursements.

19. The Medicare Cost Report, CMS Form 2552, requires a certification by an officer or administrator of the Hospitals that the cost report is *"true, correct, complete"* and *"prepared . . . in accordance with applicable instructions, except as noted."* It also requires a certification that *"I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations."*

20. Defendant Hospitals have knowingly made those certifications on their annual Medicare Cost Reports each year from approximately 2000 to the present when, in truth and in fact, the "charges" from the hospitals to themselves for treating their own employees were not disclosed as related-party transactions, the charges were not reduced to unrecovered costs, and the actual costs were more than doubled, all in violation of generally accepted accounting principles, Medicare cost accounting principles, the Related-Party Rule, 42 C.F.R. § 413.17, the Medicare Provider Reimbursement Manual §§ 332.1 and 2144.4, and the decision of the Provider Reimbursement Review Board in *St. Francis Hospital Greenville, South Carolina*, 2007 WL 1774634 (P.R.R.B. April 19, 2007).

21. Therefore, the annual Medicare Cost Reports filed by NCBH and CHS and the interim billings submitted to Medicare for payment under the Prospective Payment System in

reliance upon those false cost reports constitute false or fraudulent claims in violation of Section 3729(a)(1)(A) of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A), and/or false records or statements material to a false or fraudulent claim in violation of Section 3729(a)(1)(B) of the federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B).

22.    The overstated costs amount to more than $1 billion for both NCBH and CHS; they corrupted the cost data that Medicare relies upon to establish prospective payment rates for all hospitals under the Prospective Payment System; they caused extra wage-index funding to be shifted to NCBH, CHS and other hospitals in their local statistical areas; and they caused Medicare to make interim payments under the Prospective Payment System that Medicare would not have paid had it known of the Hospitals' false reporting of their costs on their Medicare Cost Reports.

## V.    THE DEFENDANTS' SELF-FUNDED HEALTHCARE PLANS

23.    NCBH and CHS are two of North Carolina's major healthcare employers and, as such, employ some 72,500 employees who require healthcare services. Some of those healthcare services are provided by third-party providers such as physicians who are unaffiliated with the Hospitals, but much of the healthcare for employees of the Hospitals is provided by the Hospitals themselves and is sometimes referred to herein as "domestic care," meaning care provided domestically at the Hospitals' own facilities.

24.    Whether employee healthcare services are provided by third parties or domestically by the Hospitals themselves, the costs thereof are covered by self-funded employee healthcare benefit plans adopted by the Defendant Hospitals and may be reported to Medicare as a fringe benefit component of the Hospitals' employee benefit costs on the

Medicare Cost Report, provided that related-party transactions are properly disclosed, the "cost" is properly reported and the cost is not counted more than once.

25.     Although some "fully insured" hospitals purchase commercial health insurance for their employee benefit plans and some "self-insured" hospitals make periodic payments comparable to insurance premiums into a fund held by an independent fiduciary, both Defendants and their subsidiaries "self-fund" by paying the cost of employee healthcare from their own general funds and operate without insurance other than "stop-loss insurance" to protect themselves against catastrophic claims.  Stop loss insurance is not health insurance as such, but rather is a form of reinsurance that provides an insurance benefit to the hospitals when individual employee claims or aggregate claims of all employees exceed certain trigger points.

26.     For purposes of Medicare cost reporting, such self-funded plans with stop loss insurance are covered by Section 2162.5 of the Medicare Provider Reimbursement Manual, which states that "first dollar losses not covered by a purchased insurance policy, a funded self-insurance program, or a combination of both" may be reported as allowable costs on the Medicare Cost Report.  However, Section 2162.5 does not trump, and must be read *in para materia* with, the Related Party Rule and Sections 332.1 and 2144.4, which require disclosure of related-party transactions, that "losses" like any other related-party cost be properly reported at the hospital's unrecovered cost, and that those costs are not counted twice.   The amount of the hospital's "loss" on such claims is not the "charge" that the hospital chooses to bill itself, but rather *the hospital's actual unrecovered costs*, counted only one time, and properly reclassified between applicable cost centers on the Medicare Cost Report if necessary.

27.     Also, while some "self-insured" hospitals organize their employee health benefit plans as trusts overseen by independent trustees or fiduciaries to whom the employers pay periodic contributions equivalent to insurance premiums to cover the costs of employee healthcare, both Defendants herein have organized their plans without the creation of a separate trust, without an independent fiduciary and without periodic contributions by the Hospitals to a fund from which claims are to be paid.[3]   Under Section 2162.7 of the Medicare Provider Reimbursement Manual, the Defendants' plans are not "self-insurance" because they do not involve contributions to a fund held by an independent fiduciary.

28.     Instead, the Defendant Hospitals simply "self-fund" by paying from their own accounts the costs of employee healthcare as they are incurred, whether those costs are incurred domestically at the hospital or represent the charges of a third-party provider, such as an unaffiliated physician.[4] This type of healthcare plan is generally referred to as a "self-funded" plan, although there are many different types of self-funded plans, some of which involve truly independent "third-party administrators" (such as insurance companies who pay claims from their own funds), and others of which, like the plans of the Defendants at issue herein, use captive or affiliated entities like MedCost Services as "plan supervisors," rather than interposing an unaffiliated "third party administrator" between the hospitals and themselves in their dual roles as plan administrator/payer and billing supplier of care.

---

[3] Employees do make contributions through payroll deductions, but the employee contributions are not turned over to an independent fiduciary for safe-keeping; they are simply deposited to the Hospitals' bank accounts from which claims are paid.

[4] By way of contrast, "self-insured" healthcare plans maintain their funds in the fiduciary account of an independent fiduciary, who is not affiliated with the plan sponsor and whose bank account is separate and apart from the hospital's general operating accounts.

29.     Because the Defendants' healthcare plans are organized with "plan supervisors" rather

        than true "third party administrators,"[5] because MedCost Services is a captive affiliate of

        the Defendants rather than a "third party," and because MedCost Services, as the "plan

        supervisor," does not pay claims from its own funds, the Defendant Hospitals do not

        qualify for a CMS ruling that permits the reporting as allowable healthcare cost for wage

        index purposes of "amounts" a *third party administrator* "*pays* to the hospital or other

        health care providers." *See* Medicare Provider Reimbursement Manual § 4005 at p. 40-

        62, originally promulgated by CMS Memorandum dated April 17, 2003 entitled

        "Clarification of Health Insurance and Health-Related Costs Included in Wage Index"

        (emphasis added).   Again, Section 4005 and the CMS clarification do not trump, and

        must be read *in para materia* with, the Related Party Rule and Sections 332.1 and 2144.4,

        which require disclosure of related-party transactions and reduction of related-party

        charges to unrecovered costs.   The Defendant hospitals cannot in good faith transform

        related-party transactions with themselves into allowable costs by interposing a sham

        entity which is owned and controlled by the Hospitals, which is contractually designated

        as a "plan supervisor" rather than a "third party administrator," and which acts only as a

        disbursing agent to write checks on the Hospitals' own bank accounts to pay themselves.[6]

30.     Both Defendants serve as the named "sponsor" and "administrator" for their respective

        plans and contract with MedCost Services, an affiliated entity they own jointly in the

---

[5] Despite loose language used by the Hospital Defendants, the Relator and others referring to MedCost as a "TPA," contractually it is not a "third party administrator" under its agreements with the Hospital Defendants; it was intentionally relegated to the lower status of a "plan supervisor" with ministerial duties only and does not enjoy that degree of independence from oversight, direction and control that would be required to make it a "third party."

[6] It is not known whether Defendant Hospitals (or MedCost Services as disbursing agent) actually write checks between the hospital's own accounts or whether such transfer of funds from one hospital account to another is done electronically.   The concept of payments by check as described herein is merely illustrative of the transaction, and the same result ensues whether transfers are accomplished by check or by electronic funds transfer.

proportions of 50% each, to provide only ministerial services as the "plan supervisor." The duties of MedCost Services as "plan supervisor" include claims adjudication and acting as a disbursing agent to write checks on the Hospitals' bank accounts to pay providers, including themselves.

31.     Despite MedCost Services' role as a disbursing agent, all claims for employee healthcare covered by the plans are paid by checks drawn on the Hospitals' own bank accounts, whether the services are provided by third parties or by the hospitals themselves.  In the case of domestic care for employees in the Hospitals' own facilities, the Hospitals issue checks drawn on their own bank accounts to pay themselves for their own "charges," which they alone determine.

32.     The checks that the Hospitals issue to themselves for domestic care of their employees do not represent actual out-of-pocket costs as the money goes from one pocket of the hospital into another.  If the Hospitals report these related-party payments to themselves as "costs," then there is a double reporting of costs that are otherwise already recorded on the Hospitals' Medicare Cost Reports.  Moreover, even if the costs are properly reclassified to Employee Benefits from other cost centers on the Medicare Cost Report so that they are not counted twice, the transactions must be disclosed as related-party transactions and the charges must be reduced to the Hospitals' actual unrecovered costs.

**VI.     THE MEDICARE HOSPITAL REIMBURSEMENT SYSTEM & RULES**

33.     The Medicare program was established to provide health insurance to the aged and disabled. 42 U.S.C. §§1395-1395cc. The Centers for Medicare and Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA) is the operating component of the Department of Health and Human Services (DHHS) charged with administering the Medicare program. CMS' payment and audit functions under the

15

Medicare program are contracted out to insurance companies known as fiscal intermediaries or, more recently, as contractors. Fiscal intermediaries/contractors determine payment amounts due the providers under Medicare law and under interpretive guidelines published by CMS. See, 42 U.S.C. §1395h, 42 C.F.R. §§413.20(b) and 413.24(b).

34.     As a condition of both participation and payment, and prerequisite to Medicare reimbursement to hospitals for the cost of eligible medical service rendered to Medicare beneficiaries, CMS requires hospitals to submit an annual cost report (the "Medicare Cost Report") on CMS Form 2552. *See* 42 U.S.C. § 1395g(a); §42 C.F.R. 413.20, §42 C.F.R. 405.1801(b)(1).

35.     Medicare reimburses hospitals both prospectively at patient discharge (prospectively because an interim payment is made before filing of the hospital's Medicare Cost Report at year end) and retrospectively (after close of the hospital's fiscal year and filing of the Medicare Cost Report). The bulk of the reimbursement is made prospectively through Medicare's Prospective Payment System and smaller amounts are either paid or recovered retrospectively after close of the year and filing of the Medicare Cost Report.

36.     For inpatient care, Medicare reimburses prospectively by Diagnosis Related Groups ("DRGs"), a system that classifies all inpatient stays into approximately 500 groups. For outpatient care, Medicare reimburses prospectively by Ambulatory Patient Classifications ("APCs"). To receive a prospective payment, the hospital submits a bill on CMS Form UB-04, or its electronic equivalent, CMS Form UB-8371, showing the services rendered and other pertinent information such as the discharge diagnosis. Medicare then remits a prospective payment in a fixed amount established periodically based upon review of

Medicare Cost Report data for all hospitals. Medicare endeavors to set the prospective reimbursement rates such that efficient hospitals recover all their costs of serving Medicare beneficiaries.

37. At the close of a hospital's fiscal year, it must submit a Medicare Cost Report on CMS Form 2552 showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare. 42 C.F.R. §413.20. Medicare's fiscal intermediary/contractor reviews the cost report, determines the total amount of Medicare reimbursement due the provider for the year and issues the provider a Notice of Program Reimbursement (NPR). 42 C.F.R. §405.1803. If the hospital has recovered less through its prospective payments than the total reimbursement to which it is entitled, an additional payment is made to the hospital by the fiscal intermediary/contractor. If the hospital has recovered more through the prospective payments than it was entitled to, then the overpayment is recouped by the fiscal intermediary/contractor. *See* 42 C.F.R. §§405.1803, 413.60, and 413.64(f)(1).

38. In *St. Francis Hospital Greenville, South Carolina*, 2007 WL 1774634 (P.R.R.B. April 19, 2007), the Medicare Provider Reimbursement Review Board held that a hospital like NCBH or CHS that provides domestic healthcare to its employees through a self-funded employee health benefit plan *is engaged in related-party transactions with itself* and is limited by the Related-Party Rule and § 2144.4 of the Medicare Provider Reimbursement Manual to reporting its actual "unrecovered costs" of domestic care on its Medicare Cost Report.

39. The Related-Party Rule, 42 C.F.R. § 413.17, states in pertinent part:

> (a) Principle. [C]osts applicable to services, facilities, and supplies
> furnished to the provider by organizations related to the provider

17

by common ownership or control are included in the allowable cost of the organization *at the cost to the related organization*. . . .
. . . . .

(c) Application.... (2) If the provider obtains items of services, facilities, or supplies from an organization, even though it is a separate legal entity, and the organization is owned or controlled by the owner(s) of the provider, *in effect the items are obtained from itself*. . . . Therefore, reimbursable cost should include the costs for these items *at the cost to the supplying organization*. . . .

42 C.F.R. § 413.17 (emphasis added).

40. Section 1000 of the Medicare Provider Reimbursement Manual states in this connection that:

Costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization. . . . The purpose of this principle is two-fold: (1) to avoid the payment of a profit factor to the provider through the related organization (whether related by common ownership or control), and (2) to avoid payment of artificially inflated costs which may be generated from less than arm's-length bargaining.

41. Hospitals completing the Medicare Cost Report are required to disclose related-party transactions on Worksheet A-8-1 and record adjustments on Worksheet A-8 Line 12 or 14[7] to reduce those transactions to the cost of the supplying organization. If reclassification of costs between cost centers is required, those reclassification entries are made on Worksheets A and A-6 of the Medicare Cost Report.

42. Section of 332 the Medicare Provider Reimbursement Manual states that "[a]llowances, or reduction in charges, granted to employees for Medicare services as fringe benefits related to their employment are . . . usually given under employee hospitalization and personnel health programs." It also states that *"[t]he allowances [reductions in cost]*

---

[7] Prior to 2011 the appropriate line was Line 14; in 2011 and subsequent years, it was Line 12.

*themselves are not costs . . . [h]owever, any costs of the services not recovered by the provider from the charge assessed the employee are allowable costs.*" (Emphasis added). It further states that "[t]he *unrecovered cost* of services furnished to employees as fringe benefits may be included in allowable costs . . . ." (Emphasis added.)

43. Section 2144.4 of the Provider Reimbursement Manual states that fringe benefits includable as a provider's cost include the "Provider's *unrecovered cost* of medical services rendered to employees (see §332.1)." (Emphasis added.)

44. Neither the Related-Party Rule, nor Section 1000, nor Worksheet A-8-1, nor Section 2144.4, nor Section 332 permit a hospital to report its "charges" to itself, rather than its actual "unrecovered cost," because the charges include a profit for the hospital and would double report the hospital's costs unless an entry is made on the Medicare Cost Report to adjust the charges to actual costs. To report "charges" the hospital pays itself would be to double report the Hospitals' costs and add a profit.

45. Medicare uses data on the Medicare Cost Report to make local wage index adjustments to its interim DRG and APC payments to reflect differences in regional costs of medical services, which are affected by differences in local wages and benefits, including the employee healthcare benefits at issue in this case. Additionally, the Medicare Payment Advisory Commission uses Medicare Cost Report data to annually recommend increases or decreases in DRG and APC reimbursement amounts with a view to reimbursing efficient hospitals all of their costs.

46. Defendants overstated their employee healthcare benefit costs by failing to reduce charges to only the unreimbursed costs, and then double-counting costs reported in other sections of their Medicare Cost Reports, resulting in the submission of false records and

19

claims to the government. The Defendants' motive for overstating their costs was to inflate their Medicare reimbursements through the wage-index adjustment.  In so doing, the Defendant Hospitals acted knowingly and willfully both in the overstatement of their costs and in the failure to disclose their related-party transactions with themselves.

47    Moreover, by overstating their employee healthcare benefit costs, the Defendant Hospitals increased the level of reimbursement other hospitals in their local areas received through the wage index adjustment. Furthermore, because Medicare adjusts its DRG and APC payments to hospitals annually based upon data derived from a sample of all Medicare Cost Reports nationally, if a sufficient number of hospitals have pursued the same revenue-enhancement scheme, which the Relator believes to be the case, Medicare's prospective DRG and APC payments have been artificially inflated nationally for all hospitals, resulting in billions of dollars in added costs for Medicare.  These fraudulent actions have resulted in substantial damages to the Government and to the taxpayers.

## VII.    THE MEDICARE FRAUD ENFORCEMENT SCHEME

48.    The Medicare Anti-Fraud & Abuse Statute, 42 U.S.C.A. § 1320a-7b (which is sometimes referred to as the Anti-Kickback Statute, but applies also to Medicare frauds other than kickbacks), provides for criminal fines and imprisonment for not more than five years or both for anyone who "(1) knowingly and willfully makes or causes to be made any false statement or representation of a material fact in any application for any benefit or payment under a Federal health care program . . . , (2) at any time knowingly and willfully makes or causes to be made any false statement or representation of a material fact for use in determining rights to such benefit or payment, [or] (3) having knowledge

of the occurrence of any event affecting (A) his initial or continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized."

49. The Medicare Anti-Fraud & Abuse Statute also states that "[w]ith respect to violations of this section, a person need not have actual knowledge of this section or specific intent to commit a violation of this section." It further provides that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of subchapter III of chapter 37 of Title 31," i.e. the False Claims Act.

50. Failure to accurately report related-party transactions on the Medicare Cost Report can be prosecuted as a felony under Subsection (a) (2) of the Medicare Anti-Fraud & Abuse Statute, the subsection that makes it a crime to knowingly and willfully make any false statement of a material fact for use in determining rights to any benefit or payment under Medicare. *See United States v. Kluding*, 16 F. Appx 827, 829 (10th Cir. 2001).

51. In addition to the criminal remedies provided by the Medicare Anti-Fraud & Abuse Statute, the Medicare Civil Monetary Penalties Law, 42 U.S.C.A. § 1320a-7a, ("CMPL"), provides for civil monetary penalties and assessments and exclusion from federal healthcare programs for any person who "commits an act described in [the Medicare Anti-Fraud & Abuse Statute]," *see* 42 U.S.C.A. § 1320a-7a (a) (7); anyone who "knowingly presents or causes to be presented to an officer, employee, or agent of the United States, or of any department or agency thereof . . . a claim . . . that the Secretary determines . . . is for a medical or other item or service and the person knows or should know the claim is false or fraudulent," *see* 42 U.S.C.A. § 1320a-7a (a) (1); and anyone

21

who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim for payment for items and services furnished under a Federal health care program," see 42 U.S.C.A. § 1320a-7a (a) (8).

52. The term "claim" is defined in the CMPL as "an application for payments for items and services under a Federal health care program." 42 U.S.C.A. § 1320a-7a (i) (2). The term "item or service" is defined in the CMPL to include "in the case of a claim based on costs, any entry in the cost report, books of account or other documents supporting such claim." 42 U.S.C.A. § 1320a-7a (i)(3)(B). The term "should know" means "that a person, with respect to information-- (A) acts in deliberate ignorance of the truth or falsity of the information; or (B) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required." 42 U.S.C.A. § 1320a-7a (i) (7). Thus, a hospital that knowingly submits a false Medicare Cost Report that fails to disclose violations of the Related-Party Rule is subject to penalties, assessments and exclusion from the Medicare program under the CMPL.

53. The amount of the assessment that can be imposed is "not more than 3 times the amount claimed for each such item or service in lieu of damages sustained by the United States or a State agency because of such claim. . . ." 42 U.S.C.A. § 1320a-7a (a). The courts have recognized that the CMPL allows the Government to recover three times the amount falsely *claimed*, whether the Government was damaged or not. *Horras v. Leavitt*, 495 F.3d 894, 902-03 (8th Cir. 2007) ("Unlike the FCA, the CMPL focuses on the amount falsely or fraudulently "claimed"). And the government is permitted to deduct the assessment "from any sum then or later owing by the United States or a State agency to

the person against whom the penalty or assessment has been assessed." 42 U.S.C.A. § 1320a-7a (f).

54. Under the Federal False Claims Act, 31 U.S.C. §§3729-33 ("FCA"), a defendant is liable to the United States if the defendant 1) knowingly 2) presents or *causes to be presented* 3) to an officer or employee of the United States Government 4) a false or fraudulent claim for payment or approval. *See* 31 U.S.C. §3729(a)(1)(A). A defendant may also be liable for 1) knowingly 2) making or causing to be made 3) a false record or statement 4) material to a false or fraudulent claim. 31 U.S.C. §3729(a)(1)(B). For purposes of the FCA, "know" or "knowingly" means that the defendant had actual knowledge of the falsity of the information, acted in deliberate ignorance of its truth or falsity or acted in reckless disregard of the truth or falsity of the information. 31 U.S.C. §3729(b)(1).

55. Any person violating the FCA is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the Government.

56. False Medicare Cost Reports are considered false claims actionable under the False Claims Act. *See e.g. United States v. Bourseau,* 531 F.3d 1159, 1162 (9th Cir. 2008) and *U.S. ex rel. Augustine v. Century Health Servs., Inc.,* 289 F.3d 409, 415 (6th Cir. 2002).

## VIII. DEFENDANTS' FALSE CLAIMS

57. All FCA claims brought by the Relator in this case are based upon Defendants' false records, statements and certifications, express or implied, made on CMS Form 2552 (the annual Medicare Cost Report), Worksheet A-8-1 (used for disclosure of related-party transactions on the cost report), Worksheet A-8 (used for adjustment of related-party transactions on the cost report), Worksheet A & A-6 (used for reclassification of costs to the Employee Benefit cost center), and/or Form UB-04, or its electronic equivalent, Form

23

UB-8371 (used to claim prospective payments based upon certifications contained in the annual CMS Form 2552, the Medicare Cost Report).

58.     To be true, correct and complete, the Medicare Cost Reports which CHS submitted annually since at least 2000 and which NCBH submitted annually since at least 2002 required disclosure of related party transactions on Worksheet A-8-1, the reduction of related-party charges to cost on Worksheet A-8 and, if the Hospitals wished to claim the cost of domestic care in their Employee Benefit cost center, the reclassification of costs from other cost centers to that for Employee Benefits on Worksheet A-6 and Line 4 or 5 of Worksheet A.

59.     Those Medicare Cost Reports also contained the following certification executed annually by an officer of each Defendant Hospital:

> *Misrepresentation or falsification of any information contained in this Cost Report may be punishable* by criminal, civil and administrative action, fine and/or imprisonment under federal law.  Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or *were otherwise illegal*, criminal, civil and administrative action, fines and/or imprisonment may result.
> Certification by officer or administrator of provider(s)
> *I hereby certify that I have read the above statement and that I have examined the accompanying electronically filed or manually submitted cost report* and the balance sheet and statement of revenue and expenses prepared by [name and provider number of provider] for the cost reporting period beginning [date] and ending [date], and that to the best of my knowledge and belief, *it is a true, correct and complete statement* prepared from the books and records of the provider in accordance with applicable instructions, except as noted.  *I further certify that I am familiar with the laws and regulations regarding the provision of health care services and that the services identified in this cost report were provided in compliance with such laws and regulations.*

(Signed) _____ (Signature on File)
Officer or Administrator of Provider

Medicare Cost Report, CMS Form 2552 (emphasis added).

60.  Hospitals filing their Medicare Cost Reports electronically are required to submit a paper certification, which must be signed and dated. See 41 C.F.R. § 413.24(f)(4).  On information and belief, Relator alleges that Defendants executed and submitted such paper certifications for each Medicare Cost Report they filed electronically on or about the dates stated on **Exhibit A**.

61.  In truth and in fact, the amounts claimed as "charges" by the Defendant Hospitals and "paid" to themselves for healthcare services provided to employees of the Hospitals were knowingly and willfully reported to Medicare on the Medicare Cost Reports without disclosure of related-party transactions between the Hospitals and themselves, without any reduction of "charges" to the actual unrecovered costs, and without any reclassification of costs already recorded to other cost centers on the Medicare Cost Report, all of which was in violation of Sections 332.1 and 2144.4 of the Medicare Provider Reimbursement Manual, the decision of the Provider Reimbursement Review Board in *St. Francis Hospital Greenville, South Carolina*, 2007 WL 1774634 (P.R.R.B. April 19, 2007), the Related-Party Rule, 42 C.F.R. §413.17, the Medicare Anti-Fraud & Abuse Statute, 42 U.S.C.A. § 1320a-7b, and the Medicare Civil Monetary Penalties Law, 42 U.S.C.A. § 1320a-7a.

62.   Also, prospective billings submitted by the Hospitals on CMS form UB-04, or its electronic equivalent, UB-8371, subsequent to submission of false Medicare Cost Reports on CMS Form 2552 contained an express or implied certification, based upon certification language on the reverse side of the claim form, that "Submission of this

claim constitutes certification . . . [t]hat the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts."

63.    In truth and in fact, the Hospitals knowingly, willfully and recklessly disregarded, misrepresented and concealed related-party transactions on their Medicare Cost Reports and continued to do so with each submission of a claim for prospective payment on CMS form UB-04, or its electronic equivalent, CMS Form UB-8371.

64.    Subsection 3 of the Medicare Anti-Fraud & Abuse Statute, 42 U.S.C.A. § 1320a-7b (3) makes it a crime for any person "having knowledge of the occurrence of any event affecting (A) his initial *or continued right* to any [healthcare] benefit or payment . . . [who] conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment either in a greater amount or quantity than is due or when no such benefit or payment is authorized."

65.    In truth and in fact, the Defendant Hospitals, having knowledge of their undisclosed related-party transactions, knowingly and willfully concealed and failed to disclose those transactions with an intent fraudulently to secure continued prospective payments claimed on CMS form UB-04, or its electronic equivalent, CMS Form UB-8371.

66.    Defendant Hospitals submitted prospective and retrospective claims for payment, falsely certifying that they had not engaged in violations of the Related Party Rule, 42 C.F.R. § 413.17, the Medicare Anti-Fraud & Abuse Statute, 42 U.S.C. § 1320a-7b or the Medicare Civil Monetary Penalties Law, violations of which entitled the government to withhold payment of the prospective and retrospective claims and/or assess penalties in the amount of three times the cost overstatement. *Cf. United States ex rel. Thompson v. Columbia/HCA Healthcare*, 125 F.3d 899 (5th Cir. 1997), *rehearing denied* (1998), *on*

*remand*, 20 F. Supp. 2d 1017, 1046 (S.D. Tex. 1998).   Defendant Hospital's false statements were material to both payment and retention of payment, i.e., "a condition of payment and retention of payment," not only for prospective payments claimed pursuant to CMS form UB-04, or its electronic equivalent, UB-8371 (which certified disclosure of all "material facts), but also for retrospective payments claimed on the Medicare Cost Report, CMS Form 2552.

67.   *True, correct and complete* disclosure of related-party transactions, reduction of resulting charges to unrecovered costs, and reclassification of costs to prevent duplication thereof on the Medicare Cost Report, CMS Form 2552, were required of Defendant Hospitals, as a material condition of payment, to obtain both prospective and retrospective payments from Medicare, and to retain and not be forced to refund those interim prospective payments already received upon final audit and reconciliation of the Medicare Cost Report.

68.   The annual Medicare Cost Reports on CMS Form 2552, and subsequent prospective billings by Defendant Hospitals on CMS form UB-04, or its electronic equivalent, CMS Form UB-8371, constitute false or fraudulent claims in violation of Section 3729(a)(1)(A) of the federal False Claims Act,  31 U.S.C. § 3729(a)(1)(A), and/or false records or statements material to a false or fraudulent claim in violation of Section 3729(a)(1)(B) of the federal False Claims Act,  31 U.S.C. § 3729(a)(1)(B).

69.   Examples of false Medicare Cost Report claims made or caused to be made by NCBH and CHS on CMS Form 2552 include those described on the Attached **Exhibit A**.   Each of the Medicare Cost Reports listed on **Exhibit A** have been carefully examined by the Relator and necessarily lead to the plausible inference that domestic care claims paid by

the Defendant Hospitals to themselves were reported as allowable costs on the Medicare Cost Report without declaring them related-party transactions or reducing the claims to actual unrecovered costs because (1) Relator knows from personal experience that the Defendant Hospitals organized their employee healthcare benefit plans as self-funded plans that paid themselves for domestic care of employees; (2) Relator knows from personal experience and industry custom that hospitals with such self-funded plans account for all "losses" on claims for employee healthcare as employee benefit costs whether the claims involve third-party providers or domestic claims paid by the hospitals to themselves; (3) there are no entries on Worksheet A-8-1 of the Hospitals' Medicare Cost Reports that self-report related-party transactions involving domestic care claims; (4) there are no entries on Worksheet A-8 of the Hospitals' Medicare Cost Reports adjusting employee benefit costs to remove domestic care claims; and (5) there are no entries on Worksheet A or A-6 of the Hospitals' Medicare Cost Reports reclassifying costs of domestic care to Employee Benefits from other cost centers, which would be seen if domestic care claims were reduced to unrecovered costs.

70. For the following reasons, the Defendant Hospitals' fraudulent conduct in connection with their Medicare Cost Report claims necessarily leads to the plausible inference that legally false prospective claims were presented on CMS Form UB-04, or its electronic equivalent, CMS Form UB-8371: (a) because the filing of a true, correct and complete Medicare Cost Report is a condition of payment for each interim prospective claim; (b) because interim prospective claims are necessarily filed by any hospital that receives any of its funding from Medicare; (c) because all of the Defendant hospitals receive a major portion of their funding from Medicare (in the absence of which they would not be filing

Medicare Cost Reports); and (d) because all interim claims that rely (as a condition of payment) upon a preceding year's fraudulent cost report are necessarily tainted by the cost report fraud.

71.  Interim prospective claims are necessarily tainted by fraud on the Medicare Cost Report because it is a felony for anyone "having knowledge of the occurrence of any event affecting . . . his . . . continued right to any such benefit or payment . . . conceals or fails to disclose such event with an intent fraudulently to secure such benefit or payment . . . when no such benefit or payment is authorized." *See* Medicare Anti-Fraud & Abuse Statute, 42 U.S.C.A. § 1320a-7b (3). *See also United States ex rel. Thompson v. Columbia/HCA Healthcare*, 125 F.3d 899 (5th Cir. 1997), *rehearing denied* (1998), on remand, 20 F. Supp. 2d 1017, 1046 (S.D. Tex. 1998).

## IX.  DAMAGES FOR FCA VIOLATIONS

72.  Medicare payments to hospitals are a subsidy provided subject to certain conditions, including true, correct and complete disclosures on the Medicare Cost Report and non-violation of the Related-Party Rule, the Medicare Anti-Fraud & Abuse Statute and the Civil Monetary Penalties Law.  If the Medicare conditions to payment and retention of payment are not satisfied, nothing is due to the Hospitals.  *See United States ex rel. Thompson v. Columbia/HCA Healthcare*, 125 F.3d 899 (5th Cir. 1997), *rehearing denied* (1998), *on remand*, 20 F. Supp. 2d 1017, 1046 (S.D. Tex. 1998); *United States v. Rogan,* 517 F.3d 449, 453 (7th Cir. 2008) and *United States ex rel. Drakeford v. Tuomey*, 976 F. Supp. 2d 766 (D.S.C. 2013), aff'd 792 F.3d 364 (4th Cir. 2015).

73.  Accordingly, the United States has been damaged in the amount of all prospective payment claims submitted by the Defendants on CMS Form UB-04, or its electronic equivalent, CMS Form UB-8371, and all retrospective payment claims submitted by the

Defendants on CMS Form 2552 subsequent to filing of false Medicare Cost Reports in which they failed to disclose their related-party transactions.

74. Nevertheless, Relator limits his damage claim herein under the Federal False Claims Act to three times the amount by which the Defendants *overstated their costs* on their Medicare Cost Reports (i.e., the amounts stated on their Medicare Cost Reports over and above their actual unreimbursed costs), which is the measure of damages under the CMPL, together with applicable penalties, attorneys' fees, costs, expenses and interest as permitted by applicable law.

## X. VIOLATIONS OF THE NORTH CAROLINA FALSE CLAIMS ACT

75. NCBH has also violated Section 1-607(a)(7) of the North Carolina False Claims Act by knowingly concealing, or knowingly and improperly avoiding an obligation to refund, some $1.34 million in overpayments it received from the North Carolina State Health Plan (hereafter the "State Health Plan") for treatment of state employees, although Relator does not assert that claim in this amended complaint and states the facts related to the claim only for purposes of his retaliation claims asserted below under the North Carolina False Claims Act.

76. The State Health Plan and NCBH entered into a contract effective July 1, 2003 to June 30, 2008 where the parties agreed to a percentage discount on outpatient medical services provided to plan members. The contract contained an inflation adjustment provision that allowed for an increase in the discount rate if the outpatient fee increased more than the "Medical Cost Component" of the U.S. Department of Labor's Consumer Price Index (M-CPI). If outpatient fees increased more than the M-CPI inflation rate, the State Health Plan had the right to increase the outpatient discount rate by the amount that the fee increase exceeded the rate of inflation.

77.    However, the State Health Plan could increase its discounts *only if it knew* that NCBH had increased its chargemaster rates.  NCBH knowingly and intentionally defrauded and took advantage of the State Health Plan by concealing its chargemaster rate increases.  As a result, inflation adjustment analyses were not performed by the State Health Plan and the discount rate was not increased during the entire contract period.

78.    NCBH routinely and customarily notified each of its insurance payers before the implementation of any general increase in its chargemaster rates and therefore singled out the State Health Plan not to receive such notice and thereby to conceal its chargemaster rate increases, knowing that the amount of any increase in its chargemaster rates would be material to the State Health Plan and would trigger an increase in the discount rate demanded by the State Health Plan.

79.    On information and belief, the dates of applicable changes in the chargemaster rates, when good faith performance of the contract by NCBH would have required notification to the State Health Plan, were approximately July of 2004, 2005, 2006 and 2007.

80.    Relator contacted the State Health Plan and made a full disclosure of this fraud in December 2008, and January 2009, subsequent to the termination of his employment with NCBH and execution of the Settlement Agreement and Mutual Release dated effective May 28, 2008.

81.    In September 2011, the North Carolina State Auditor released an audit report finding that "[u]sing the combination of variables most closely aligned with the cost containment intent of the contract's inflation adjustment provision, the estimated overpayment to Baptist Hospital for outpatient services is approximately $1.34 million, or 75% higher than the Plan's calculation method." However, the auditor concluded that the state did not

have grounds for legal recourse against NCBH because there was no express notice requirement in the State Health Plan contract, a decision that has been adopted by the North Carolina Attorney General.

82. Although Vincoli believes the state's position on the availability of legal recourse is incorrect and legally unsound, and suggests that state officials were likely misled or unduly influenced by NCBH, Relator does not seek herein to recover on behalf of the State of North Carolina pursuant to the North Carolina False Claims Act. Relator recites these facts only because of their relevance to the retaliation claim against NCBH set forth in the following section of this amended complaint.

## XI. RETALIATION AGAINST VINCOLI BY NCBH

83. NCBH has further engaged in acts of retaliation against the Relator herein, Joseph H. Vincoli, on account of his filing of this action and reporting of the $1.34 million North Carolina claim against NCBH. The Relator entered into a Settlement and Mutual Release Agreement with NCBH effective May 28, 2008, after his firing by NCBH on October 2, 2007, so his wrongful discharge itself was covered by the release and is not made the subject of this claim.

84. What the Relator does make the subject of this claim are acts of retaliation that occurred after the May 28, 2008, release including, *inter alia,* NCBH's filing of a 2011 lawsuit against Vincoli that was subsequently dismissed without prejudice and NCBH's exercise of its influence to cause the State of North Carolina's termination of Relator's employment with the Department of Public Safety because of lawful acts done by him in furtherance of this action and to stop violations of the North Carolina False Claims Act involving the $1.34 million owed to the State Health Plan.

85. As stated previously, on October 2, 2007 NCBH fired Vincoli. The discharge was without cause or warning. NCBH explained to the North Carolina's Employment Security Commission that Vincoli was fired due to a "strained relationship with the CFO." The Commission ruled that Vincoli had been fired without cause and awarded him unemployment benefits, a ruling NCBH did not contest.

86. In December 2008, and January 2009, Vincoli contacted the North Carolina State Health Plan and suggested that the state investigate whether they were receiving NCBH's annual notices of rate increases, a matter important to the state's efforts to control costs of healthcare for state employees.

87. The original complaint in this qui tam action was filed on June 11, 2009. In February 2010, the Relator was hired by North Carolina Medicaid, where he received outstanding reviews for his work. In November 2010, Vincoli joined the North Carolina Department of Corrections (later renamed "Department of Public Safety") to fill a newly created position tasked with finding solutions to the problem of ever-escalating inmate healthcare costs. He made a cost-saving proposal that was subsequently adopted by the North Carolina General Assembly and resulted in cost savings for the state of over $45 million per year.

88. In late 2010 or early 2011, NCBH learned through undisclosed sources in North Carolina state government that Vincoli had contacted the State Bureau of Investigation "alleging that NCBH had committed fraud with respect to the SHP contract," according to paragraph 16 of the lawsuit that NCBH filed against Vincoli in January 2011, for allegedly breaching the terms of a non-disparagement clause in the May 2008 Settlement and Mutual Release Agreement between the parties.

89.     During discovery in that proceeding, Vincoli obtained documents showing NCBH intentionally concealed the rate notification issue from the SHP and misrepresented important factual details to the North Carolina Attorney General's office. Vincoli contacted the State Auditor's office and asked that he be subpoenaed so that he could provide these documents to the Auditor. (The State Auditor's office ultimately subpoenaed Vincoli for these documents in July of 2015).

90.     In September 2011, the North Carolina State Auditor released an audit report finding that "[u]sing the combination of variables most closely aligned with the cost containment intent of the contract's inflation adjustment provision, the estimated overpayment to Baptist Hospital for outpatient services is approximately $1.34 million, or 75% higher than the Plan's calculation method." However, the auditor concluded that the state had no legal recourse against NCBH.

91.     In June 2011, on information and belief, NCBH learned of the filing of this qui tam action through the issuance of subpoenas by the Office of Inspector General, Department of Health and Human Services, and through communications with the Office of the United States Attorney.

92.     In October 2011, NCBH withdrew its suit against Vincoli to avoid adverse publicity in the news media and perhaps also to protect itself against allegations that it was retaliating against Vincoli on account of his filing of this action.

93.     In January 2013, Vincoli filed with the State of North Carolina a State Property Incident Form which included, in a sealed envelope, the above-referenced emails obtained during discovery in the suit filed by NCBH. Vincoli clearly identified these documents as confidential and protected.

34

94.     In July 2013, Vincoli copied his representative in the General Assembly, Donny Lambeth, a former NCBH executive, on two emails, one of which concerned his efforts to report the $1.34 million overpayment by the State Employee Plan to NCBH and the other of which concerned a Department of Labor investigation of CHS' status as a governmental entity. Using his legislative email account, Representative Lambeth forwarded those emails to MedCost Vice President Joel Groce, including a note stating: "Here is this weeks (sic) email from JV. Pass along to your attorney until I get him set up." On information and belief, Relator alleges that Representative Lambeth sent similar e-mails to NCBH, although Lambeth has not produced those e-mails, despite requests that he do so.

95.     In August 2013, Vincoli learned that the Department of Public Safety leadership, in violation of state law, had decided not to submit the State Property Incident Form to the State Bureau of Investigation even though such submissions are not discretionary.

96.     Vincoli emailed George Solomon, Director of Prisons, about the matter, stating (among other things), that the Department of Public Safety executive who made the decision not to forward the documents to the State Bureau of Investigation was Ellis Boyle, who, prior to his appointment to the department by Governor McCrory, formerly worked for the law firm providing counsel to NCBH in this qui tam action.

97.     In October 2013, Governor McCrory's administration reclassified Vincoli as "managerial exempt" and stripped him of his North Carolina Personnel Act protections even though Vincoli did not meet the established criteria for managerial exempt status and all of his employment reviews throughout his tenure with the Department of Public Safety were

"outstanding." In December 2013, Governor McCrory's administration fired Vincoli without notice, severance, or even a full day's pay for his last day at work.

98. The state's explanation for why Vincoli was fired was that they bought a computer program that could do his job. However, Vincoli's supervisor was not even involved in the decision to fire him. If the mere purchase of a computer program that could do Vincoli's job was the true reason for his firing, rather than a pretext, Vincoli would have surely received at least notice and a full day's pay for his last day of work. All in all, the termination process had such a punitive nature and overtones to it that it was clear that someone or some organization of importance or influence wanted Vincoli fired for reasons unrelated to his job performance.

99. On information and belief, the Governor's office took these punitive and discriminatory employment actions against Vincoli at the behest of his former employer, North Carolina Baptist Hospital (and accomplished, at least partly, via Representative Lambeth's communications),[8] whose motive was to crush Vincoli financially and thereby silence his complaints in this qui tam action and his complaints about the $1.34 million owed by NCBH to the State of North Carolina. Representative Lambeth has refused to answer questions about the matter or to turn over copies of e-mails from his legislative e-mail account that refer to Vincoli.

100. Vincoli has been unemployed since his firing by the state of North Carolina and has suffered emotional pain and suffering, together with lost earnings, past and future, as a result of damage to his career and reputation.

---

[8] On January 6, 2014, Representative Lambeth engaged in an e-mail exchange with CHS officer Joseph Piemont by which Lambeth reported to CHS on "the recent efforts" by Vincoli and asked Piemont to "[l]et me know how I can help you in Raleigh," i.e. with state government in the capital. It may well be that CHS conspired with Lambeth and NCBH to retaliate against Vincoli, but the Relator is not yet in a position, prior to discovery, to make that allegation.

## COUNT ONE
## VIOLATIONS OF THE FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(1)(A) and 31 U.S.C. § 3729(a)(1)(B)
## BY BOTH DEFENDANTS

101.   Relator, acting in the name of and on behalf of the United States, restates and re-alleges the allegations contained in the preceding paragraphs as if all were stated herein in their entirety and said allegations are incorporated herein by reference.

102.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

103.   By virtue of the acts described herein, Defendants knowingly presented, or caused to be presented, to officers, employees or agents of the United States false or fraudulent claims for payment or approval, and made, used and caused to be made and used false records and statements material to false claims.

104.   Defendants knew that these claims for payment were false or fraudulent, or were deliberately ignorant of the truth or falsity of the claims, or acted in reckless disregard of whether the claims were true or false.

105.   Unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants, and in reliance on the truthfulness and accuracy of certifications made by the Defendants, the United States paid and continues to pay on claims that would not have been paid but for Defendants' wrongful actions and omissions.

106.   The United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial.

## COUNT TWO
## FEDERAL FALSE CLAIMS ACT RETALIATION
## BY NCBH
## 31 U.S.C. § 3730(h)

107.   Relator, acting in his own name and for his own benefit, restates and re-alleges the allegations contained in the preceding paragraphs as if all were stated herein in their entirety and said allegations are incorporated herein by reference.

108.   Relator seeks relief against North Carolina Baptist Hospital under Section 3730(h) of the False Claims Act.

109.   Relator investigated and advised his supervisors of the false and fraudulent claims that Relator reasonably believed North Carolina Baptist Hospital was making as a result of the structure of its employee healthcare benefit plan and contractual relationships with its 50% subsidiary MedCost Services.

110.   Relator's investigation involved matters which were, or were reasonably likely to be, viable actions under the False Claims Act.

111.   North Carolina Baptist Hospital had explicit or implicit knowledge of Relator's protected activity. After Relator began complaining about the hospital's actions, he was wrongfully terminated from employment by the hospital.   After Relator settled his employment claims with the hospital and filed this qui tam action, North Carolina Baptist Hospital first sued the Relator, then voluntarily dismissed its action, then caused Relator to be terminated from his position with the North Carolina Department of Public Safety.

112.   By reason of North Carolina Baptist Hospital's acts and conduct, Relator has been discharged, harassed and discriminated against in the terms and conditions of his employment because of lawful acts done by him in furtherance of an action under this section or other efforts to stop violations of the False Claims Act.

113.   By reason of North Carolina Baptist Hospital's acts and conduct, Relator has been damaged in a substantial amount to be determined at trial.

## COUNT THREE
## NORTH CAROLINA FALSE CLAIMS ACT RETALIATION
## N.C.G.S. § 1-613

114.   Relator, acting in his own name and for his own benefit, restates and re-alleges the allegations contained in the preceding paragraphs as if all were stated herein in their entirety and said allegations are incorporated herein by reference.

115.   Relator seeks relief against North Carolina Baptist Hospital for retaliation action under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-613.

116.   Relator investigated and advised his supervisors of the fraud that Relator reasonably believed North Carolina Baptist Hospital was committing by failing to notify the State Health Plan of increases in its rates.

117.   Relator's investigation involved matters which were, or were reasonably likely to be, viable actions under the North Carolina False Claims Act.

118.   North Carolina Baptist Hospital had explicit or implicit knowledge of Relator's protected activity. After Relator began making complaints to the State Health Plan, North Carolina Baptist Hospital first sued the Relator, then voluntarily dismissed its action, then caused Relator to be terminated from his position with the North Carolina Department of Public Safety.

119.   By reason of North Carolina Baptist Hospital's acts and conduct, Relator has been discharged, harassed and discriminated against in the terms and conditions of his employment because of lawful acts done by him in furtherance of an action under this section or other efforts to stop violations of the North Carolina False Claims Act.

120. By reason of North Carolina Baptist Hospital's acts and conduct, Relator has been damaged in a substantial amount to be determined at trial.

## PRAYER FOR RELIEF

121. Relator respectfully requests this Court to enter judgment against defendants, as follows:

(a) That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false claims and fraud alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

(b) That civil penalties of $11,000 be imposed for each and every false claim that Defendants presented or caused to be presented to the United States;

(c) That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d) That the Court grant permanent injunctive relief to prevent any recurrence of violations of the False Claims Act for which redress is sought in this Complaint;

(e) That the Relator be awarded the maximum percentage of any recovery allowed to him pursuant the False Claims Act, 31 U.S.C. §3730(d)(1),(2);

(f) That the Relator be awarded against NCBH front pay, two times the amount of his lost back pay, interest on the back pay, and compensation for any special damages he has sustained as a result of the retaliation by NCBH, including litigation costs and reasonable attorneys' fees.

(f) That this Court award such other and further relief as it deems proper.

## DEMAND FOR JURY TRIAL

Relator hereby demands a jury trial.

Respectfully submitted,

**RABON LAW FIRM, PLLC**

/s/ Charles H. Rabon, Jr. _____
Charles H. Rabon, Jr.
NC Bar #16800
225 E. Worthington Avenue
Suite 100
Charlotte, NC 28203
Telephone: 704-247-3247
Fax: 704-208-4645
Crabon@usfraudattorneys.com

Marshall P. Walker
NC Bar #45040
225 E. Worthington Avenue
Suite 100
Charlotte, NC 28203
Telephone: 704-247-3247
Fax: 704-208-4645
mwalker@usfraudattorneys.com


**WATERS & KRAUS, LLP**
Wm. Paul Lawrence, II
37163 Mountville Road
Middleburg, VA 20117
Telephone: 540-687-6999
Fax:  540-687-5457
plawrence@waterskraus.com
(Pro Hac Vice)

Kay Gunderson Reeves
3219 McKinney Ave.
Dallas, Texas 75204
Telephone: 214-357-6244
Fax: 214-357-7252
kreeves@waterskraus.com
(Pro Hac Vice)

**CERTIFICATE OF SERVICE**

       I, Charles H. Rabon, Jr., hereby certify that on February 4, 2016, a true and correct copy of the foregoing Second Amended Complaint was served via ECF upon all the parties.

                            */s/  Charles H. Rabon, Jr.*_____