UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA, *ex rel.*
COMPLIN,

    Plaintiff/Relator,                      1:09CV420

v.

NORTH CAROLINA BAPTIST
HOSPITAL and CAROLINAS HEALTHCARE
SYSTEM,

    Defendants.

## RELATOR'S SUR-REPLY IN OPPOSITION TO MOTIONS TO DISMISS FILED BY NORTH CAROLINA BAPTIST HOSPITAL and CAROLINAS HEALTHCARE SYSTEM

**RABON LAW FIRM, PLLC**
/s/ Charles H. Rabon, Jr.
NC Bar #16800
225 E. Worthington Avenue
Suite 100
Charlotte, NC 28203
Telephone: 704-247-3247
Fax: 704-208-4645
Crabon@usfraudattorneys.com

**WATERS & KRAUS, LLP**
Wm. Paul Lawrence, II
37163 Mountville Road
Middleburg, VA 20117
Telephone: 540-687-6999
Fax: 540-687-5457
plawrence@waterskraus.com
(Pro Hac Vice)

*Attorneys for Relator Complin/
Joseph Vincoli*

# INTRODUCTION

By text order dated July 12, 2016, the Court granted leave for the Relator to submit this consolidated sur-reply in response to arguments raised in the Defendants reply briefs (D.E. 76 & 77) and the Declaration of Philip J. Mohr (D.E. 78).

## I. THE COURT MUST REJECT DEFENDANTS' ARGUMENT, MADE FOR THE FIRST TIME IN THEIR REPLY BRIEFS, THAT THEIR CHARGES TO THEMSELVES WERE ALLOWABLE BECAUSE THEY UTILIZED MEDCOST AS THEIR "THIRD PARTY ADMINISTRATOR"

In their reply briefs, Defendants suggest for the first time that the fictitious costs reported on their Medicare cost reports were allowable costs because those purported "costs" (which were actually no such thing) were paid by the hospitals to themselves by MedCost, their wholly-owned subsidiary, acting as a third party administrator or "TPA."[1] Prior to their reply briefs, Defendants arguments were remarkable for their failure to contend that the charges the hospitals made to themselves were allowable costs, contending only that the Relator had not adequately alleged that Defendants <u>knew</u> the costs were unallowable. Now in retreat, recognizing the weakness of that position, Defendants attempt to justify the reported costs on the grounds that checks alleged to have been written by the hospitals to themselves can be treated as "costs" because their wholly-owned TPA (actually a "plan supervisor")[2] acted as a disbursing agent to write the checks.

---

[1] Although Defendants' Exhibit A demonstrates that MedCost is registered with the state as a "third party administrator," the Defendants have entered into contracts with MedCost that designate it as a "plan supervisor" rather than a "third party administrator." See SAC ¶29. Just because MedCost was licensed by the state as a TPA does not mean that it had a TPA relationship with the Defendants. The nature of the relationship is contractual and the Relator has alleged that MedCost's contracts called for it to be merely a "plan supervisor" exercising only the responsibilities of a disbursing agent. We believe it assumed that limited role in order to avoid the fiduciary duties that a TPA might otherwise owe to plan participants.

[2] *Id.*

1

That this is an untenable position ought to be obvious to any reasonable person and was so held in *St. Francis Hospital Greenville, South Carolina*, 2007 WL 1774634 (P.R.R.B. April 19, 2007). In that case, the hospital had a wholly-owned TPA known as OHN that was contracted "to process and pay the Plan's claims for services that were rendered to its enrollees, including those services furnished by the Provider itself." *Id.*, at p. 2. Despite the use of the wholly-owned TPA to process and pay claims, the Provider Reimbursement Review Board ("PRRB" or "Board") held that "the Provider purchased services for its employees from itself, and is therefore subject to the rules for related parties at 42 C.F.R. §413.17." *Id.* at p. 5.

The Board further held that "[u]nder those rules, the proper measure of allowable costs is the <u>actual costs of the services provided</u>." *Id.* (emphasis added). The Board further stated that "the allowable amount of claims <u>paid through OHN</u> for services provided by the hospital to its employees must be reduced from charges to costs in order to eliminate the mark-up in excess of the hospital's actual costs." *Id* (emphasis added). Thus the Board refused to give credence to the hospital's attempt to justify charges to itself as costs by interposing a related "third party" administrator.

Defendants' attempt to demean the PRRB by contending that its decision in *St. Francis Hospital* is "non-binding" is legally incorrect. Defendants offer no authority for the proposition that its decisions are "non-binding."[3] Contrary to Defendants' assertion, it is apparently well-settled that decisions of administrative agencies are binding precedent under the doctrine of *stare decisis*. As one administrative law judge has stated:

> [A] close look at the cases and authorities reveals that administrative agencies follow the doctrine of *stare decisis* in much the same way as do courts. Just as the courts change their minds from time to time, so do the agencies ... the courts do not bind themselves forever to decisions which experience teaches them to have

---
[3] NCBH Reply, p. 3, fn. 1; CHS Reply, p. 9, fn. 10.

2

been wrong and to work harm under present conditions. However, the decision to depart from precedent is not taken lightly and requires compelling reasons.... Although agencies are given some leeway in changing their minds in light of experience and changing conditions, the courts are emphatic in requiring agencies to follow their precedents or explain with good reason why they choose not to do so. All the circuits impose this requirement.

*Bimsha International, Complainant v. Chief Cargo Services, Inc. and Kaiser Apparel, Inc., Respondents*, 2013 WL 9808692, at *14 (opinion concurring in part and dissenting in part), *quoting Harrington & Co and Palmetto Shipping & Stevedore v. Georgia Port Authority*, 23 SRR 753, 766 (ID 1986).

Moreover, agency decisions of the Department of Health and Human Services interpreting complicated Medicare regulations are accorded substantial deference by the courts. As the Supreme Court has stated:

> We must give substantial deference to an agency's interpretation of its own regulations. Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given "'controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" In other words, we must defer to the Secretary's interpretation unless an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." This broad deference is all the more warranted when, as here, the regulation concerns "a complex and highly technical regulatory program," in which the identification and classification of relevant "criteria necessarily require significant expertise and entail the exercise of judgment grounded in policy concerns."

*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S. Ct. 2381, 2386–87, 129 L. Ed. 2d 405 (1994) (internal citations omitted).

By statute, the PRRB is comprised of five members appointed by the Secretary of Health and Human Services ("HHS"), two of whom must be representative of providers of services and all of whom must be persons "knowledgeable in the field of payment of providers of services." At least one of them has to be a certified public accountant. 42 U.S.C. §1395oo(h). A decision

3

Case 1:09-cv-00420-WO-LPA   Document 81   Filed 07/29/16   Page 4 of 12

of the Board is final unless the Secretary, on his own motion, and within 60 days after the provider of services is notified of the Board's decision, reverses, affirms, or modifies the Board's decision." 42 U.S.C. §1395oo(f)(1).

Thus a decision of the PRRB, unless reversed by the Secretary of HHS, *is* a final decision of the agency on a complex matter that "necessarily require[s] significant expertise and entail[s] the exercise of judgment grounded in policy concerns." The decision of the Board in the *St. Francis Hospital* case is entitled to the Court's deference and must be considered controlling precedent under the doctrine of *stare decisis*.

## II. THE COMPLAINT ALLEGES "FACTS" DEMONSTRATING THAT THE DEFENDANTS ACTED KNOWINGLY

Defendants consistently refer to the fictitious charges paid to themselves and the failure to disclose related-party transactions as mere "errors," contending that Relator has failed to allege any "facts" supporting an inference that the hospitals acted knowingly in submitting their "erroneous" cost reports. Defendants also refuse to consider any allegation a "factual allegation" that is not direct evidence of the defendant's state of mind, such as evidence that the Defendants were put on notice of Relator's allegations or that employees made incriminating admissions of culpability.

By ignoring the big picture that, across the board, Defendants failed to reduce their domestic care charges to actual cost; by completely disregarding "deliberate ignorance" and "reckless disregard" as the statutory equivalent of knowledge; and instead focusing only on the mere "error" argument that its certifying agents might have just made innocent mistakes akin to simple errors of arithmetic in their cost reports, Defendants seek to divert the Court's attention from what is in fact is a well-orchestrated scheme to "pump up" the cost reports and thereby make false claims to the United States.

4

It is not a mere "error" for the Defendants to report amounts they paid themselves as "costs" on their Medicare cost reports or to fail to disclose transactions with themselves, or with their wholly-owned plan supervisor, as related-party transactions in the places on the cost report form that specifically call for the disclosure of related-party transactions. How does anyone make an innocent error in failing to disclose related-party transactions when expressly called upon to do so? How does anyone make an innocent "error" in reporting wholly fictitious costs for which it has written a check on one of its bank accounts and deposited that check into another of its own bank accounts? And why would anyone engage in such an economically pointless transaction unless they were attempting to deceive? The very nature of the hospitals' shell-game transactions, cloaked in complicated plan arrangements overseen by a related-party "plan supervisor," accompanied by a failure to disclose these transactions as related-party dealings, plainly suggests an intent to deceive and an intent to avoid the close scrutiny by fiscal agents of the Government that would result from disclosure of related-party dealings.[4]

In the Supreme Court's recent *Escobar* decision, the Court noted that scienter can be established through "deliberate ignorance" or "reckless disregard" where a defendant actually knows that the government considers an undisclosed fact material or where a reasonable person would realize that an undisclosed fact is material to the government. The Court stated:

> Nor does the Act's scienter requirement, § 3729(b)(1)(A), support Universal Health's position. A defendant can have "actual knowledge" that a condition is material without the Government expressly calling it a condition of payment. If the Government failed to specify that guns it orders must actually shoot, but the defendant knows that the Government routinely rescinds contracts if the guns do

---

[4] Defendants argue, based upon Relator's allegation that cost reports are generally reviewed annually, that their cost reports were in fact "reviewed" every year by a fiscal intermediary who failed to note any objections. The allegations in ¶ 37 of the SAC about how the Medicare reimbursement system works did not make specific allegations about review of the Defendants' particular cost reports. Moreover, even if the fiscal intermediary did review the cost reports annually, it would not have known to examine the related-party transactions between the hospitals and themselves because the defendants failed to disclose, in the required places on the cost report form, that they had engaged in related-party dealings with themselves and MedCost, or that they owned MedCost.

5

not shoot, the defendant has "actual knowledge." Likewise, because a reasonable person would realize the imperative of a functioning firearm, a defendant's failure to appreciate the materiality of that condition would amount to "deliberate ignorance" or "reckless disregard" of the "truth or falsity of the information" even if the Government did not spell this out.

*Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2001–02 (2016).

Here, any reasonable person would know that the Government considers it material that reported costs have been incurred in transactions with related parties as the Medicare cost report form, CMS Form 2552, contains specific worksheets A and A-8-1 where related-party transactions are required to be disclosed and adjusted to allowable cost. See SAC ¶¶18, 41, 57, 58, 67 & 69. Accordingly, Defendants' failure to disclose the related-party transactions in which they were engaged was done at least in "deliberate ignorance" or with "reckless disregard" for the truth or falsity of the information they submitted. Also, there is at least circumstantial evidence, related above and below, that Defendants acted with actual knowledge of the falsity of the fictitious costs they claimed based upon checks they had written to themselves using a related party as an intermediary. Those actions do not reflect simple errors of arithmetic, or any other sort of merely negligent conduct.

To be clear, the facts that Relator has alleged that suggest knowing submission of false claims are (1) the fact that Defendants reported fictitious costs, not just erroneously overstated costs, on their Medicare cost reports; (2) the fact that Defendants used complicated plan structures with MedCost acting as a disbursing agent to obscure the fact that the Defendants were simply writing checks to themselves; (3) the fact that the Defendants failed to disclose that the "costs" reported on their cost reports resulted from related-party transactions with themselves and/or MedCost, matters that a reasonable person would know were material to the Government; (4) the fact that the Defendants had a motive to defraud to obtain enhanced reimbursements from

6

the Government; (5) the fact that the Defendants had an opportunity to defraud by overstating costs on their cost-reports; and (6) the fact, legally presumed, that as hospitals which participate in the Medicare program, the Defendants knew the law as set forth in the *St. Francis Hospital* decision.

In the alternative, if the Court determines that Relator is required to allege direct evidence of knowledge such as notice to the Defendants that they were guilty of filing false cost reports or admissions by employees of the Defendants that they had filed false cost reports, then Relator requests that he be granted leave of Court to file a Third Amended Complaint in which he would allege that (1) NCBH was placed on notice through a demand letter on or about November 7, 2007 written by the Relator's attorney Robert Zaytoun to McLain Wallace, legal counsel for NCBH, that stating *"these overstated costs may have been rolled up into the hospital's Medicare and Medicaid cost reports (under the line item 'Employee Health Care Costs'). If this is indeed true, the hospital may well have overstated its costs to Medicare and Medicaid . . . ;"* and (2) CHS was placed on notice that its Medicare cost reports contained overstated related-party charges when the Complaint and First Amended Complaint in this matter were partially unsealed and served upon CHS on or about September 14, 2010 (D.E. 17 & 19), yet did nothing to correct its earlier-filed cost reports and continued thereafter filing cost reports that reported fictitious costs and failed to disclose related-party transactions.

### III. NCBH'S BLACKLISTING OF THE RELATOR IS ACTIONABLE BECAUSE IT AFFECTED THE TERMS AND CONDITIONS OF HIS EMPLOYMENT WITH THE N.C. DEPARTMENT OF PUBLIC SAFETY

NCBH never squarely addresses the Relator's position that Section 3730(h) of the False Claims Act requires only that a Relator be "discriminated against in the terms and conditions of employment" and is not limited to discrimination in the particular job from which the Relator

7

was fired. Clearly, there are cases holding that the statutory proscription applies to retaliatory acts that cause employers or potential employers to discriminate against the Relator in (1) his re-application for work with the same employer[5] and (2) his application for, or dismissal from, subsequent employment with other employers.[6] Both of these situations arise post termination, so Section 3730(h) clearly applies post termination if terms and conditions of subsequent employment are affected.

Although there are cases stating that post-termination retaliation is not covered by 3730(h), these statements are dicta and must be limited to their facts because these broad statements are not borne out by the facts of other cases in the reported jurisprudence as noted above. If blacklisting affects the terms and conditions of the relator's employment with his former or subsequent employer, then the blacklisting is actionable within the plain meaning of the statute.

NCBH makes a revealing statement in its reply brief that goes to the heart of Mr. Vincoli's blacklisting claim. NCBH states that a more plausible explanation of Mr. Vincoli's termination is that "he is a difficult employee with a pattern of wrongfully accusing his employers of engaging in unethical or illegal conduct." NCBH Reply, at p. 10. This is exactly what Mr. Vincoli believes that NCBH managers have been telling everyone who will listen, including a former Womble Carlyle lawyer at the N.C. Department of Public Safety, and it is completely false and defamatory.

Mr. Vincoli is not a difficult employee. In fact, he received nothing but outstanding reviews at NCBH and in the two jobs he has held since leaving NCBH, i.e., at North Carolina

---

[5] *See Ortino v. Sch. Bd. Of Collier County*, 2015 WL 157960 (M.D. Fla. Apr. 8, 2015) and *Haka v. Lincoln County*, 533 F. Supp. 2d 895 (W.D. Wisc. 2008).
[6] *See Nguyen v. City of Cleveland*, 121 F. Supp. 2d 643 (N.D. Ohio 2000) and *U.S. Ex rel. Kent v. Aiello*, 836 F. Supp. 720 (E.D. Ca. 1993).

Medicaid and the N.C. Department of Public Safety.[7] He has made only three complaints of unethical or illegal conduct and they all concerned NCBH or CHS: (1) the complaint that NCBH violated ERISA by engaging itself through MedCost's provider network to provide care to its own employees at above-market rates; (2) the complaint that NCBH and CHS overstated costs on their Medicare cost reports and failed to disclose related-party transactions; and (3) the complaint that NCBH intentionally failed to notify the N.C. State Health Plan ("SHP") of its rate increases, causing the SHP to overpay for services. Allegations 1 and 3 have already been proven correct[8] and allegation 2 will be proven correct in this action. It is therefore completely false and defamatory for NCBH to state that Vincoli is a "difficult employee with a pattern of wrongfully accusing his employers of engaging in unethical or illegal conduct." If there is a pattern of wrongful conduct here, it is on the part of NCBH, not Vincoli, who just happens to be a scrupulously honest employee with no tolerance for fraud or deception.

NCBH also makes the argument that its threat that Vincoli would never hold another hospital job in North Carolina is irrelevant because Vincoli's job with the N.C. Department of Public Safety was not a hospital job. This argument overlooks the retaliatory state of mind demonstrated by NCBH's threat, whether the particular job from which Vincoli was fired was a hospital job or not. But the truth of the matter is that Vincoli's job with the state was in fact a hospital job. Mr. Vincoli worked for the Department of Public Safety's Division of Health

---

[7] *See* SAC ¶¶ 9, 87 & 97. At NCBH, the Relator's six-month review was excellent. His annual review (after he had raised the ERISA issue with CFO Gina Ramsey) was mixed. The Relator's boss (Rhonda Miller) told him that Gina Ramsey (the CFO) had instructed Miller not to write his review because Ramsey was going to write it herself. The mixed annual review written by Ramsey retaliated against Relator for his criticism of Ramsey's actions concerning the ERISA issue. If granted leave to amend, Relator will make this additional allegation in his Third Amended Complaint.

[8] Allegation 1 was vindicated when the independent fiduciary appointed by Judge Beaty in *John and Jane Does v. North Carolina Baptist Hospital*, No. 1:09-cv-12 on the docket of this Court, found that NCBH had acted imprudently in retaining MedCost. NCBH thereafter settled that action for approximately $5.4 million (D.E.51). Allegation 3 was vindicated in September, 2011 when the North Carolina State Auditor released an audit report finding that the State Health Plan had overpaid NCBH by $1.34 million.

Services and the Central Prison Health Care Complex, the latter being the North Carolina hospital for inmates. If this fact is deemed relevant by the Court, Mr. Vincoli will allege this fact in his proposed Third Amended Complaint.

## CONCLUSION

Vincoli's SAC states valid and plausible claims against both Defendants under the FCA and against NCBH under the retaliation provision of Section 3730(h) of the FCA. Accordingly, the motions to dismiss should be denied. Despite the Court's accommodation of the Relator's request to file this sur-reply brief, Relator would again respectfully request that the Court also schedule oral argument. If the Court believes that further development of the particulars of the fraud and retaliation claims are required, Vincoli respectfully requests leave to file a Third Amended Complaint.

Respectfully submitted,

**RABON LAW FIRM, PLLC**
/s/ Charles H. Rabon, Jr.
NC Bar #16800
225 E. Worthington Avenue
Suite 100
Charlotte, NC 28203
Telephone: 704-247-3247
Fax: 704-208-4645
Crabon@usfraudattorneys.com

**WATERS & KRAUS, LLP**
Wm. Paul Lawrence, II
37163 Mountville Road
Middleburg, VA 20117
Telephone: 540-687-6999
Fax: 540-687-5457
plawrence@waterskraus.com
(Pro Hac Vice)

**CERTIFICATE OF SERVICE**

I, Charles Rabon, hereby certify that on July 29, 2016, I electronically filed the foregoing Relator's Sur-Reply in Opposition to Motions to Dismiss Filed by North Carolina Baptist Hospital and Carolinas Healthcare System with the Clerk of the Court using the CM/ECF system which will send notification to all registered users of record.

/s/ Charles Rabon