**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| ex rel. COMPLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:09cv420 |
| | ) | |
| NORTH CAROLINA BAPTIST HOSPITAL | ) | |
| and THE CHARLOTTE-MECKLENBURG | ) | |
| HOSPITAL AUTHORITY, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This case comes before the undersigned United States Magistrate Judge for a recommendation on "Defendant North Carolina Baptist Hospital's Motion to Dismiss Plaintiff's Second Amended Complaint" (Docket Entry 64) ("Baptist's Motion") and "Defendant Carolinas Healthcare System's Motion to Dismiss Plaintiff's Second Amended Complaint" (Docket Entry 67) ("CHS's Motion," and collectively with Baptist's Motion, the "Motions to Dismiss"). For the reasons that follow, the Court should grant the Motions to Dismiss and dismiss "Relator's Second Amended Complaint" (Docket Entry 62) with prejudice.

## BACKGROUND

In June 2009, Complin[1] commenced a <u>qui tam</u>[2] action by filing a Complaint asserting claims under the federal False Claims Act, 31 U.S.C. § 3729 <u>et seq.</u> (the "FCA"), against North Carolina Baptist Hospital ("Baptist") and The Charlotte-Mecklenburg Hospital Authority ("CHS") for allegedly obtaining improper "Medicare and/or Medicaid and/or TriCare reimbursement[s]" (Docket Entry 1, ¶ 1). In July 2010, Complin amended the Complaint to add parallel claims under the North Carolina False Claims Act, N.C. Gen. Stat. § 1-605 <u>et seq.</u> (the "NC FCA"). (<u>See</u> Docket Entry 16 (the "First Amended Complaint").) In February 2016, Complin again amended its pleading, this time pursuing a "substantially different" Medicare reimbursement theory under the FCA against Baptist and CHS and adding retaliation claims against Baptist under the FCA and NC FCA (collectively, the "Acts"). (Docket Entry 61 at 2; <u>see also</u> Docket Entry 62 (the "Second Amended Complaint").)

---

[1] Complin constitutes "a Delaware general partnership which . . . is not an entity distinct from its partners." (Docket Entry 1, ¶ 16; Docket Entry 16, ¶ 16; <u>see also</u> Docket Entry 62, ¶ 7.)

[2] "*Qui tam* is short for the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means 'who pursues this action on our Lord the King's behalf as well as his own.'" <u>Vermont Agency of Nat. Res. v. United States ex rel. Stevens</u>, 529 U.S. 765, 768 n.1 (2000). Subject to certain limitations, including intervention by the United States, an individual may pursue a <u>qui tam</u> claim on behalf of the United States. <u>See</u> 31 U.S.C. § 3730.

## I.  Statutory Background

Medicare Part A provides hospital (and other) insurance benefits for the elderly and disabled.  See 42 U.S.C. §§ 1395c to 1395i-5.  Hospitals participating in Medicare Part A may submit interim bills and must submit an annual cost report (the "Medicare Cost Report") to receive reimbursement for eligible Medicare services.  See 42 U.S.C. § 1395g; 42 C.F.R. §§ 405.1801(b)(1), 413.20, 413.60.  Hospitals submit these reports to designated fiscal intermediaries, which audit the Medicare Cost Reports and calculate the appropriate reimbursement amounts for each hospital. See 42 U.S.C. §§ 1395h, 1395kk-1; 42 C.F.R. §§ 405.1801(b)(1), 405.1803, 413.24.  The hospital's administrator or chief financial officer must sign the Medicare Cost Report, with the following certification immediately preceding such signature:

> I hereby certify that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by _____ (Provider Name(s) and Number(s)) for the cost reporting period beginning ___ and ending ___ and that to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted.  I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

42 C.F.R. § 413.24(f)(4)(iv).  Hospitals utilize Form CMS-2252-10 for their Medicare Cost Reports.  See Medicare Provider Reimbursement Manual, Part II, Chapter 40.[3]

The Centers for Medicare and Medicaid Services ("CMS") bear responsibility for "administering the Medicare and Medicaid programs" and "interpret[ing] Medicare policies, procedures and rules."  (Docket Entry 43 at 4.)  CMS provides detailed guidance for completing Medicare Cost Reports.  See, e.g., Medicare Provider Reimbursement Manual, Part II, Chapter 40.  For instance, CMS specifies that certain fringe benefits qualify for inclusion in the hospital's costs, including the cost of any health insurance premiums that the hospital incurs on behalf of its employees.  Id., Part I, § 2144.4.[4]

The hospital's "unrecovered cost of medical services rendered to employees" likewise qualifies as an includable cost.  Id. (citing id. § 332.1).  This fringe benefit refers to "[a]llowances, or reduction in charges, granted to employees for medical services as fringe benefits related to their employment," which "are usually

---

3  For fiscal years between September 1996 and May 2010, hospitals utilized CMS Form 2552-96. See https://www.cms.gov/Research-Statistics-Data-and-Systems/Downloadable-Public-Use-Files/Cost-Reports/Hospital-1996-form.html (last visited Dec. 28, 2016).

4  According to CMS, fringe benefits constitute "amounts paid to, or on behalf of, an employee, in addition to direct salary or wages, and from which the employee . . . derives a personal benefit."  Id. § 2144.

given under employee hospitalization and personnel health programs." Id. § 332. Because these discounts "are not considered courtesy allowances," "any costs of the services not recovered by the provider from the charge assessed the employee are allowable costs." Id.; see also id. § 300 (explaining that "courtesy allowances are deductions from revenue and are not to be included in allowable costs"). To facilitate correct calculations, CMS specifically details the appropriate method for including the unrecovered cost of this fringe benefit in the Medicare Cost Report. See id. § 332.1 (providing sample calculations for 30% employee discount).

CMS further specifies how hospitals should account for "health insurance and health-related costs" in their Medicare Cost Reports wage index information. Id., Part II, § 4005.2, at 40-62.[5] Hospitals that purchase employee health insurance can include any "[p]remium costs" and any "[c]osts paid to external organizations for plan administration." Id. Hospitals that self-fund their employee health insurance can likewise include "[c]osts paid to external organizations for plan administration." Id. In addition,

_____

5    The terms "domestic claim" and "domestic care" refer to healthcare services that a hospital provides to its own employees. See, e.g., Medicare Provider Reimbursement Manual, Part II, § 3605.2, at 36-36. Per CMS instructions, in completing their Medicare Cost Reports, hospitals "are not required to remove from domestic claims costs, the personnel costs that are associated with hospital staff who deliver the services to employees." Id. § 4005.2, at 40-62.

CMS instructs any hospital with "a Third-Party Administrator (TPA)" for its plan to include the "[a]mount the TPA pays to the hospital or other health care providers for services rendered under the plan." Id. However, a self-funding hospital that lacks a TPA can include only the "[h]ospital's payment to unrelated health care providers for services rendered, under the plan, to [the] hospital's employees" and the "[c]osts the hospital incurs in providing services under the plan to its employees." Id.

Finally, various regulations impact hospitals' Medicare Cost Reports and reimbursements. For instance, subject to certain exceptions, "costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization." 42 C.F.R. § 413.17(a). Those costs, however, "must not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere." Id.

## II.  Procedural Background

In the Complaint and First Amended Complaint, Complin challenged the alleged failure of Baptist and CHS (collectively, the "Hospitals") to comply with Medicare "and similarly situated governmental health insurance programs[']" independent fiduciary requirements for their self-funded health insurance plans (Docket Entry 1, ¶ 14). (See Docket Entries 1, 16.)  In those complaints,

6

Complin maintained that the Hospitals "co-owned a managed care organization, MedCost, which consisted of a Preferred Provider Organization (or 'PPO') and a Third Party Administrator (or 'TPA')."  (Docket Entry 1, ¶ 9; Docket Entry 16, ¶ 9;)[6]  Complin further explained that,

> [f]or several years, both [H]ospitals have been using MedCost's PPO network and its Third Party Administrator ("TPA") for their respective self-funded health plans. . . . As a PPO rental network, MedCost's business model is to secure negotiated (discounted) rates from physicians and hospitals as a condition of participation in exchange for potential increased patient volume or the protection from the loss of existing patient volumes by these participating physicians and hospitals.  This network is then 'rented' by self-funded companies and insurance companies seeking discounted health care services.

(Docket Entry 16, ¶ 44; <u>accord</u> Docket Entry 1, ¶ 37.)

> According to the Complaint and First Amended Complaint,

> [t]he lynchpin of these frauds was the Hospitals' purposeful disregard of the requirement that they each needed to have in place an independent fiduciary with legal control of their respective self-funded employee health benefit Plans ("Plans").  Without an independent fiduciary with the ability to intervene on behalf of the Plans' employees, the Hospitals' scheme — to select, use, and control MedCost as a vendor to Hospitals' Plans — resulted in the victimization of the Plans' members (the "employees") and the Government, Medicare, Medicaid and TriCare.

(Docket Entry 1, ¶ 12; Docket Entry 16, ¶ 12.)  The Hospitals primarily committed such fraud, Complin asserted, by offering a

---

6    According to these pleadings, "[a] 'Third Party Administrator' or 'TPA' is an independent entity hired by the Plan Sponsor to pay claims and provide administrative services to the Plan."  (Docket Entry 1 at 4 n.1; Docket Entry 16 at 4 n.1.)

smaller discount on healthcare services to MedCost participants
than they did to participants in other "managed care contracts"
such as "BCBSNC, United Health Care, *etc.*" (Docket Entry 1, ¶ 40;
Docket Entry 16, ¶ 47.) This conduct, Complin maintained, inflated
the Hospitals' Medicare Cost Report wage data and Medicare and
Medicaid reimbursements. (See Docket Entry 1, ¶¶ 9-15, 29-61;
Docket Entry 16, ¶¶ 9-15, 35-69.) In addition, Complin alleged,
the absence of an independent fiduciary disqualified certain Plan
contributions that the Hospitals (improperly) claimed as allowable
Medicare expenses. (Docket Entry 1, ¶ 52; Docket Entry 16, ¶ 59.)

For six years, the United States investigated Complin's
allegations. (See generally Docket Entries 6-48.)[7] In so doing,

--------

7    The United States summarized Complin's allegations as
follows:

> Specifically, Complin alleges that Baptist and [CHS]
> included inflated costs of employee health insurance in
> their respective cost reports causing Medicare and
> Medicaid to pay both hospitals in excess of what they
> should have been paid if the employee health insurance
> costs had been reported correctly.
>
> Complin also alleges that Baptist and [CHS] failed
> to comply with Medicare rules and regulations requiring
> self-insurance plans to be managed by fiduciaries and
> requiring the hospitals to report any "related parties"
> as that term is defined by Medicare. As a result of
> Baptist's and [CHS's] failure to report their related
> party, MedCost, and comply with self-insurance
> regulations requiring a fiduciary, [Complin] alleges that
> the funds contributed to the plans by the hospitals
> should be disallowed in their cost reports.

(Docket Entry 43 at 2 (paragraph numbering omitted).)

the United States received guidance from CMS on "both issues in this case," namely (1) whether each of the Hospitals needed "a fiduciary because it was self-insured and (2) [whether] MedCost was a 'related party,' as defined by Medicare, that [the Hospitals] failed to disclose on [their] cost report[s] and that costs of services provided to [their] own employees were inflated on the cost reports." (Docket Entry 43 at 4.) As part of this investigation, the United States audited the Hospitals' "Medicare [C]ost [R]eports for the years in question" and reviewed "voluminous documentation produced by Baptist" (Docket Entry 31 at 4-5; see also Docket Entry 40 at 4-5) "and MedCost in order to determine if false claims have been submitted to the government" (Docket Entry 43 at 5; see Docket Entry 46 at 4-5). By August 2014, CMS determined that the Hospitals were "not required to have a fiduciary for [their] self-insurance plan[s, resolving] that allegation in the [First Amended C]omplaint." (Docket Entry 43 at 4.) In August 2015, after CMS finished reviewing information from the Hospitals and MedCost regarding the "related party" issue (see id. at 4-5; Docket Entry 46 at 4-5), the United States officially declined to intervene in this action. (See Docket Entry 48 at 1.)

Six months later, Complin filed the Second Amended Complaint (Docket Entry 62), which, Complin concedes, "is substantially different than the [First] Amended Complaint." (Docket Entry 61 at 2; see also id. at 3 (same), 4 (explaining that "the Second Amended

9

Complaint differs substantially from the [First] Amended Complaint").) As an initial matter, the Second Amended Complaint asserts that Complin constitutes "[t]he nominal Plaintiff" in this case, but that "[t]he real Plaintiff/Relator is Joseph H. Vincoli" (Docket Entry 62, ¶ 7), a former Baptist employee (see id., ¶ 8).[8] Next, the Second Amended Complaint takes issue with the domestic care costs identified on the Hospitals' Medicare Cost Reports. Specifically, the Second Amended Complaint alleges that the Hospitals violated the FCA by failing to reduce the sum listed for their employee healthcare services from the amount that MedCost paid the Hospitals for those services to the Hospitals' "out-of-pocket costs" for those services. (See id., ¶¶ 1-2, 23-32, 57-71.)[9] Finally, the Second Amended Complaint maintains that Baptist violated the Acts' anti-retaliation provisions by "exercise of its influence to cause the State of North Carolina's termination of

---

8  In conjunction with filing the Second Amended Complaint, Vincoli filed a "Notice of Ratification by Joseph Vincoli of Acts of Complin," which states that Vincoli (1) "is one and the same person as Complin, the plaintiff and relator in this action," and (2) "ratifies and confirms any and all actions taken in this proceeding in the name of Complin." (Docket Entry 70 at 1.) This Memorandum Opinion henceforth refers to the plaintiff/relator in this action as "Vincoli."

9  Although acknowledging Vincoli's prior allegation that MedCost constitutes a TPA (see id. at 14 n.5), the Second Amended Complaint maintains that MedCost constitutes "a sham entity which is owned and controlled by the Hospitals, which is contractually designated as a 'plan supervisor' rather than a 'third party administrator,' and which acts only as a disbursing agent to write checks on the Hospitals' own bank accounts to pay themselves" (id., ¶ 29).

[Vincoli's] employment with the Department of Public Safety" in December 2013. (Id., ¶ 84; see also id., ¶ 97.)

The Hospitals moved to dismiss the Second Amended Complaint on the grounds, inter alia, that it failed to comply with the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure (the "Rules"), and also failed to allege the requisite scienter for an FCA claim. (Docket Entries 64, 67.) In response, Vincoli maintained that the Second Amended Complaint "states valid and plausible claims," but "request[ed] leave to file a Third Amended Complaint" "if the Court believes that further development of the particulars of the fraud and retaliation claims are [sic] required." (Docket Entry 73 (the "Response") at 30.) In addition, the Response proffers new factual allegations in support of Vincoli's retaliation claims and indicates a desire to amend the Second Amended Complaint to add "blacklisting" claims against Baptist. (Id. at 24 n.44.)

Vincoli also sought leave to file a surreply opposing the Motions to Dismiss. (See Docket Entry 79 at 1-2.) The Court granted this leave. (See Text Order dated July 12, 2016.) Noting that the Response proffers only Vincoli's proposed additional retaliation allegations, the Court directed that any surreply "clearly set forth any additional, fraud-related, factual allegations [Vincoli] would include in any Third Amended Complaint." (Id.) Vincoli subsequently filed a surreply outlining

additional factual allegations regarding his fraud and retaliation claims. (See Docket Entry 81 (the "Surreply").)

## DISCUSSION

### I. Pleading Standards

To survive a Rule 12(b)(6) motion, a complaint must contain sufficient factual allegations "to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To qualify as plausible, a claim needs sufficient factual content to support a reasonable inference of the defendant's liability for the alleged misconduct. Id. (citing Twombly, 550 U.S. at 556). Facts that remain "'merely consistent with'" liability fail to establish a plausible claim for relief. Id. Moreover, "[a] pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." Id. (internal quotation marks and citation omitted; second set of brackets in original).

In reviewing a motion to dismiss, the Court must "accept the facts alleged in the complaint as true and construe them in the light most favorable to the plaintiff." Coleman v. Maryland Court of Appeals, 626 F.3d 187, 189 (4th Cir. 2010), aff'd sub nom., Coleman v. Court of Appeals of Md., __ U.S. __, 132 S. Ct. 1327 (2012). The Court must also "draw all reasonable inferences in

favor of the plaintiff." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 440 (4th Cir. 2011) (internal quotation marks omitted). Nevertheless, the Court "will not accept 'legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments.'" United States ex rel. Nathan v. Takeda Pharm. N. Am., Inc., 707 F.3d 451, 455 (4th Cir. 2013) (quoting Wag More Dogs, LLC v. Cozart, 680 F.3d 359, 365 (4th Cir. 2012)). "At bottom, determining whether a complaint states . . . a plausible claim for relief . . . will 'be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Iqbal, 556 U.S. at 679).

On a Rule 12(b)(6) motion, the "[C]ourt evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." E.I. du Pont, 637 F.3d at 448. The Court may also consider documents "attached to the motion to dismiss, so long as they are integral to the complaint and authentic." Philips v. Pitt Cty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Finally, the Court "may properly take judicial notice of matters of public record" when ruling on a motion to dismiss. Id.

In addition to satisfying the Rule 12(b)(6) facial plausibility standard, a complaint alleging qui tam claims must satisfy the heightened pleading requirements of Rule 9(b). Nathan,

707 F.3d at 455.  At a minimum, the FCA plaintiff must "describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."  Id. at 455-56 (internal quotation marks omitted).  "More precisely, the complaint must allege 'the who, what, when, where and how of the alleged fraud.'"  United States ex rel. Ahumada v. NISH, 756 F.3d 268, 280 (4th Cir. 2014) (quoting United States ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008)).  "Requiring such particularized pleading . . . 'prevent[s] frivolous suits, . . . eliminat[es] fraud actions in which all the facts are learned after discovery, and . . . protect[s] defendants from harm to their goodwill and reputation.'"  Id. (ellipses and all three sets of brackets in original) (quoting Nathan, 707 F.3d at 456).

Moreover, "'a qui tam plaintiff, who has suffered no injury in fact, may be particularly likely to file suit as a pretext to uncover unknown wrongs.'"  United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co., 612 F.3d 724, 732 (4th Cir. 2010) (quoting United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 231 (1st Cir. 2004)).  Accordingly, "Rule 9(b) plays an especially important role in the context of FCA qui tam actions."  Id. at 731.  Nevertheless, "generally, [the C]ourt should hesitate to dismiss a complaint under Rule 9(b) if the [C]ourt is satisfied (1) that the defendant has been made aware of

the particular circumstances for which [it] will have to prepare a defense at trial, and (2) that [the] plaintiff has substantial prediscovery evidence of those facts." Smith v. Clark/Smoot/Russell, 796 F.3d 424, 432 (4th Cir. 2015) (internal quotation marks omitted).

## II.  FCA Liability

As pertinent to this action, the FCA imposes liability upon any person who "knowingly presents" to the United States "a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," 31 U.S.C. § 3729(a)(1)(B). (See Docket Entry 62, ¶¶ 101-06.)[10] "To plead an FCA claim, a relator must plausibly allege four distinct elements:  '(1) [ ] there was a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter [knowledge]; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e., that involved a "claim").'" United States ex rel. Rostholder v. Omnicare, Inc., 745 F.3d 694, 700 (4th Cir.), cert. denied, __ U.S. __, 135 S. Ct. 85 (2014) (both sets of brackets in original) (quoting Harrison v. Westinghouse Savannah River Co., 176

---

10  The FCA defines "'knowing' and 'knowingly'" to "mean that a person, with respect to information — (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1).

F.3d 776, 788 (4th Cir. 1999)).  "To satisfy th[e] first element of an FCA claim, the statement or conduct alleged must represent an objective falsehood."  <u>Wilson</u>, 525 F.3d at 376.  To satisfy the second element, a complaint "'must set forth specific facts that support an inference of fraud.'"  <u>Id.</u> at 379 (quoting <u>United States ex rel. Willard v. Humana Health Plan of Tex. Inc.</u>, 336 F.3d 375, 385 (5th Cir. 2003)).

The United States Supreme Court recently cautioned that the FCA's scienter requirement qualifies as "rigorous."  <u>Universal Health Servs., Inc. v. United States</u>, __ U.S. __, __, 136 S. Ct. 1989, 2002 (2016).  Thus, although one need not possess a "'specific intent to defraud,'" the FCA does "'not punish honest mistakes or incorrect claims submitted through mere negligence.'"  <u>Owens</u>, 612 F.3d at 728 (first quoting 31 U.S.C. § 3729(b); then quoting <u>United States ex rel. Hochman v. Nackman</u>, 145 F.3d 1069, 1073 (9th Cir. 1998)).  Moreover, "imprecise statements or differences in interpretation growing out of a disputed legal question are similarly not false under the FCA." <u>Wilson</u>, 525 F.3d at 377 (internal quotation marks omitted).  Accordingly, "'[w]here there are legitimate grounds for disagreement over the scope of a . . . regulatory provision, and the claimant's actions are in good faith, the claimant cannot be said to have knowingly presented a false claim.'"  <u>United States ex rel. Kirk v. Schindler Elevator Corp.</u>, 130 F. Supp. 3d 866, 877 (S.D.N.Y. 2015) (ellipsis in

original) (quoting <u>United States v. Southland Mgmt. Corp.</u>, 326 F.3d 669, 684 (5th Cir. 2003) (en banc) (Jones, J., concurring), and collecting cases); <u>see also, e.g.</u>, <u>Rostholder</u>, 745 F.3d at 703 ("Because the Medicare and Medicaid statutes do not prohibit reimbursement for drugs packaged in violation of the [FDA regulations], [the defendant] could not have *knowingly* submitted a false claim for such drugs." (emphasis in original)).

### III.  Preliminary Matters

To begin with, the Second Amended Complaint specifies that Vincoli and Baptist "entered into a Settlement and Mutual Release Agreement" (the "Release") in May 2008, by which Vincoli "released all claims that he might have had against [Baptist] prior to the effective date of the agreement." (Docket Entry 62, ¶ 9.)[11] Vincoli's Response explains that, per its execution date, the Release became effective on May 30, 2008. (Docket Entry 73 at 2.)[12] As such, Vincoli concedes that "any qui tam or retaliation claims against [Baptist] that arose from conduct that occurred prior to

---

11  Baptist submitted the Release in support of Baptist's Motion. (<u>See</u> Docket Entry 65-1.) Because the Release qualifies as integral to the Second Amended Complaint (<u>see</u> Docket Entry 62, ¶ 9) and Vincoli does not dispute its accuracy (<u>see</u> Docket Entry 73 at 2), the Court may properly consider it in ruling on the Motions to Dismiss, <u>see</u> <u>Pitt Cty. Mem'l Hosp.</u>, 572 F.3d at 180.

12  According to the Second Amended Complaint, the Release's effective date constitutes May 28, 2008. (Docket Entry 62, ¶ 9.) Baptist provided a partially executed copy of the Release, from which the Court cannot independently confirm its effective date. (<u>See</u> Docket Entry 65-1 at 6.)

May 30, 2008, have been released by Vincoli." (Id. (emphasis omitted).) The Court should therefore grant Baptist's request to dismiss with prejudice all claims against it that arose on or before May 30, 2008 (see Docket Entry 65-1 at 3 (releasing "any and all claims of any nature, whether known or unknown, which [Vincoli] may have . . . through the Effective Date of this Agreement")). See United States ex rel. Radcliffe v. Purdue Pharma L.P., 600 F.3d 319 (4th Cir. 2010) (affirming dismissal with prejudice of qui tam claim as barred by relator's general release).

Next, the Second Amended Complaint concedes that the Release bars any retaliation claim against Baptist related to Vincoli's termination on October 2, 2007. (Docket Entry 62, ¶ 83.) It asserts, though, that Baptist engaged in retaliation by filing a lawsuit against Vincoli in 2011 for violating the Release's non-disparagement provisions. (See id., ¶¶ 84, 88.) Nevertheless, Vincoli's Response concedes that the statute of limitations bars any retaliation claim that Vincoli may have possessed against Baptist related to that lawsuit. (Docket Entry 73 at 28.) Thus, the only alleged act of retaliation in the Second Amended Complaint for which Vincoli could possibly obtain relief involves "the State of North Carolina's termination of Relator's employment" in 2013. (Docket Entry 62, ¶¶ 83-84, 97-99.) The Court should therefore dismiss Vincoli's retaliation claims insofar as they seek recovery

regarding his 2007 termination or the 2011 lawsuit. (See id., ¶¶ 84, 111-13, 118-20.)

Finally, the Second Amended Complaint maintains that the Hospitals' allegedly false Medicare Cost Reports "constitute false or fraudulent claims in violation of Section 3729(a)(1)(A) of the federal [FCA] . . . and/or false records or statements material to a false or fraudulent claim in violation of Section 3729(a)(1)(B) of the federal [FCA]." (Id., ¶ 21.) Vincoli's alternative theories notwithstanding, "[a] relator still must show that the government paid a false claim to prove a violation of the false statement or record provision of the FCA." Owens, 612 F.3d at 733 (internal quotation marks omitted). Accordingly, for purposes of the Motions to Dismiss, the Court need only consider whether Vincoli's allegations on this front sufficiently allege a violation of the FCA's false claims provision, 31 U.S.C. § 3729(a)(1)(A).

## IV. Vincoli's Allegations

According to Vincoli, he served as Baptist's "Associate Director of Patient Financial Services, Managed Care Contracting, between July 10, 2006, and October 2, 2007," in which role he "dealt with MedCost . . ., an administrative contractor to the healthcare benefit plans of both [Baptist] and CHS, which was owned by the two hospitals in the proportions of 50% each." (Docket Entry 62, ¶ 8.) Vincoli asserts that he initially received "positive feedback from his [Baptist] superiors," but "was fired by

[Baptist] on October 2, 2007, as a result of his complaints about transactions by which [Baptist] paid itself more for domestic care of its employees than commercial insurers were willing to pay for the same services." (Id., ¶ 9.) Shortly before entering into the Release with Baptist, Vincoli allegedly disclosed "all material facts to the United States" regarding this alleged fraud. (Id., ¶¶ 6, 9.) Vincoli maintains that, more than seven years later (on January 28, 2016), he "disclosed to the United States all additional facts and theories of liability raised in th[e Second A]mended [C]omplaint." (Id., ¶ 6.)

As relevant to the Motions to Dismiss, the Second Amended Complaint makes the following allegations:

## A. Fraud Allegations

In summary, the Hospitals violated the FCA "by failing to disclose on their Medicare Cost Reports more than a billion dollars in related-party transactions and by falsely claiming more than a billion dollars in fictitious costs for employee healthcare benefits that were not actually out-of-pocket costs." (Id., ¶ 1.) "Because the provision of healthcare to their own employees is considered to be a 'related party transaction,' the applicable federal laws mandated . . . that the [Hospitals] reduce the reported amounts for domestic care to only the actual unreimbursed costs" on their Medicare Cost Reports. (Id., ¶ 2.) The Hospitals failed to reduce these "amounts to the actual unreimbursed costs,

20

and thereby knowingly, falsely, and improperly inflat[ed] those amounts," increasing their Medicare reimbursements and the pertinent Medicare "Wage Index" for their geographic area, which in turn increased the Medicare reimbursement rates to other hospitals in the region. (Id.)

More specifically, CHS manages, leases, or owns "some 39 hospitals in North Carolina, South Carolina, and Georgia, including those shown on Exhibit A which file Medicare Cost Reports." (Id., ¶ 11 (emphasis omitted).) "[Vincoli] contends that CHS caused each of these owned, leased or managed hospitals to file false Medicare Cost Reports." (Id.) The Hospitals submitted the subject Medicare Cost Reports "electronically on or about the dates stated on Exhibit A." (Id., ¶ 60.) Exhibit A specifies the "Particulars of False Claims," including the name of the relevant hospital, its Medicare provider number, the relevant fiscal year, the "Fiscal Intermediary with Whom Cost Report Filed," the "Approximate Date Cost Report Filed or Was Due," and the "Approximate Amount of Cost Overstatement." (Docket Entry 62-1 at 1.) "[A]n officer or administrator of the Hospitals" certified that each Medicare Cost Report "is 'true, correct, complete' and 'prepared . . . in accordance with applicable instructions, except as noted.'" (Docket Entry 62, ¶ 19 (italicized font omitted; ellipsis in original).) That individual "'further certif[ied] that [he or she is] familiar with the laws and regulations regarding the provision

of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.'" (Id. (italicized font omitted).) Moreover,

> Defendant Hospitals have knowingly made those certifications on their annual Medicare Cost Reports each year from approximately 2000 to the present when, in truth and in fact, the "charges" from the hospitals to themselves for treating their own employees were not disclosed as related-party transactions, the charges were not reduced to unrecovered costs, and the actual costs were more than doubled . . . .

(Id., ¶ 20.)

Baptist and CHS self-fund employee health benefit plans for their respective 12,500 and 60,000 employees. (Id., ¶¶ 10-11.) In so doing, they utilize MedCost, a "captive or affiliated entit[y,] . . . as [a] 'plan supervisor[].'" (Id., ¶ 28.) Notably, although Vincoli previously alleged that MedCost constituted "a 'TPA,' contractually it is not a 'third party administrator' under its agreements with the Hospital[s]," but instead constitutes merely "a 'plan supervisor' with ministerial duties only and does not enjoy that degree of independence from oversight, direction and control that would be required to make it a 'third party.'" (Id. at 14 n.5.) Thus,

> [b]ecause the [Hospitals'] healthcare plans are organized with "plan supervisors" rather than true "third party administrators," because MedCost Services is a captive affiliate of the [Hospitals] rather than a "third party," and because MedCost Services, as the "plan supervisor," does not pay claims from its own funds, the Defendant Hospitals do not qualify for a CMS ruling that permits the reporting as allowable healthcare cost for wage index purposes of "amounts" a third party administrator "pays

22

to the hospital or other health care providers." *See* Medicare Provider Reimbursement Manual § 4005 at p. 40-62 . . . . [The H]ospitals cannot in good faith transform related-party transactions with themselves into allowable costs by interposing a sham entity which is owned and controlled by the Hospitals, which is contractually designated as a "plan supervisor" rather than a "third party administrator," and which acts only as a disbursing agent to write checks on the Hospitals' own bank accounts to pay themselves.

(<u>Id.</u>, ¶ 29 (footnote omitted).)

Pursuant to <u>Provider - St. Francis Hospital Greenville, South Carolina Provider No.: 42-0023 v. Intermediary – BlueCross Blueshield Association/Palmetto Government Benefits Administrators</u>, Case No. 04-1774, 2007 WL 1774634 (P.R.R.B. Apr. 19, 2007), a hospital engages in a related-party transaction when it "purchases healthcare services for its employees from itself pursuant to a self-funded employee healthcare benefit plan." (Docket Entry 62, ¶ 12.) In regard to such services, a hospital may only report on its Medicare Cost Report "its 'unrecovered cost,' which amounts to only fees paid to third parties for plan administrative services, as offset by employee contributions, deductibles or co-payments." (<u>Id.</u>, ¶ 14 (citing "Provider Reimbursement Manual §§ 332.1 and 2144.4").) A hospital must disclose related-party transactions on "Worksheet A-8-1 of Form CMS-2552." (<u>Id.</u>, ¶ 15.)

In providing domestic care, a hospital reports the costs it incurs for pertinent supplies and salaries "in the appropriate corresponding cost centers on the hospital's Medicare Cost Report such as the Outpatient Clinic." (<u>Id.</u>, ¶ 14.) However, "when a

hospital purchases healthcare services from itself, proper adjustment of the charges would require that they be reduced to zero." (Id.) To achieve this result, the hospital must "reclassify the hospital's already reported corresponding costs for cost centers such as the Outpatient Clinic (Line 60.05 on Worksheet A) . . . to the cost center for Employee Benefits (Line 4 or 5 on Worksheet A)." (Id.) The Hospitals failed to do so. (See id., ¶ 18.) Instead, with a "motive . . . to inflate their Medicare reimbursements through the wage-index adjustment," the Hospitals "knowingly and willfully" overstated their domestic care costs and failed to disclose their MedCost related-party transactions on their Medicare Cost Reports. (Id., ¶ 46; accord id., ¶ 18.)

In that regard:

> Examples of false Medicare Cost Report claims made or caused to be made by [Baptist] and CHS on CMS Form 2552 include those described on the Attached Exhibit A. Each of the Medicare Cost Reports listed on Exhibit A ha[s] been carefully examined by [Vincoli] and necessarily lead[s] to the plausible inference that domestic care claims paid by the Defendant Hospitals to themselves were reported as allowable costs on the Medicare Cost Report without declaring them related-party transactions or reducing the claims to actual unrecovered costs because (1) [Vincoli] knows from personal experience that the Defendant Hospitals organized their employee healthcare benefit plans as self-funded plans that paid themselves for domestic care of employees; (2) [Vincoli] knows from personal experience and industry custom that hospitals with such self-funded plans account for all "losses" on claims for employee healthcare as employee benefit costs whether the claims involve third-party providers or domestic claims paid by the hospitals to themselves; (3) there are no entries on Worksheet A-8-1 of the Hospitals' Medicare Cost Reports that self-report related-party transactions involving domestic care

claims; (4) there are no entries on Worksheet A-8 of the Hospitals' Medicare Cost Reports adjusting employee benefit costs to remove domestic care claims; and (5) there are no entries on Worksheet A or A-6 of the Hospitals' Medicare Cost Reports reclassifying costs of domestic care to Employee Benefits from other cost centers, which would be seen if domestic care claims were reduced to unrecovered costs.

(Id., ¶ 69.)

## B.  Retaliation Allegations

Baptist and the North Carolina State Health Plan (the "NC Plan") entered into a contract effective July 1, 2003, to June 30, 2008, regarding Baptist's provision of services to NC Plan participants (the "SHP contract").  (Id., ¶ 76.)  In December 2008 and January 2009, Vincoli informed the NC Plan that Baptist had failed to provide it with notices of interest rate changes that impacted the percentage discount applicable to Baptist's outpatient services under the SHP contract, resulting in an alleged $1.34 million overpayment to Baptist (the "NC Claim").  (See id., ¶¶ 75-81.)[13]  In February 2010, North Carolina Medicaid hired Vincoli, who transferred in November 2010 to another state agency that later became part of the North Carolina Department of Public Safety (the "NC DPS").  (Id., ¶ 87.)  At the NC DPS, Vincoli proposed cost-saving measures related to inmate care that saved North Carolina significant money.  (Id.)  Throughout his tenure at the NC DPS, Vincoli received "'outstanding'" employment reviews.  (Id., ¶ 97.)

_____

    13  Vincoli does not pursue the NC Claim in this action. (Id., ¶¶ 75, 82.)

"In late 2010 or early 2011," Baptist discovered that Vincoli had reported its alleged wrongdoing regarding the SHP contract to North Carolina officials, prompting Baptist to file a lawsuit against Vincoli in January 2011 for violating the Release's non-disparagement clause. (Id., ¶ 88.) During discovery in that lawsuit, Vincoli obtained documents relevant to the NC Claim (the "Discovery Documents"). (Id., ¶ 89.) Vincoli asked the North Carolina Auditor's office to subpoena him "so that he could provide these documents to the Auditor," which occurred in July 2015. (Id.)

"In June 2011, on information and belief, [Baptist] learned of the filing of this qui tam action through the issuance of subpoenas by the Office of Inspector General, Department of Health and Human Services, and through communications with the Office of the United States Attorney." (Id., ¶ 91.) In September 2011, the North Carolina Auditor determined that Baptist's failure to provide rate change notices resulted in a $1.34 million estimated overpayment, but that Baptist bore no obligation to provide such notices under the SHP contract. (Id., ¶ 81.) The North Carolina Attorney General adopted the Auditor's conclusion that North Carolina lacked "grounds for legal recourse against [Baptist]" regarding this alleged overpayment. (Id.) In October 2011, Baptist withdrew its lawsuit "against Vincoli to avoid adverse publicity in the news media and perhaps also to protect itself against allegations that

it was retaliating against Vincoli on account of his filing of this action."  (Id., ¶ 92.)

In January 2013, Vincoli filed a State Property Incident Form with the State of North Carolina that included the Discovery Documents (the "Form").  (Id., ¶ 93.)  In July 2013, Vincoli copied his North Carolina General Assembly representative, "Donny Lambeth, a former [Baptist] executive, on two emails, one of which concerned [Vincoli's] efforts to report the $1.34 million overpayment . . . and the other of which concerned a Department of Labor investigation of CHS' status as a governmental entity."  (Id., ¶ 94.)  "Representative Lambeth forwarded those emails to MedCost Vice President Joel Groce, including a note stating:  'Here is this weeks (sic) email from JV.  Pass along to your attorney until I get him set up.'  On information and belief, . . . Lambeth sent similar e-mails to [Baptist]," which emails Lambeth failed to produce, "despite requests that he do so."  (Id.)

In August 2013, Vincoli discovered that, in violation of North Carolina law, the NC DPS failed to submit his Form to the State Bureau of Investigation (the "SBI").  (Id., ¶ 95.)  Vincoli emailed the North Carolina Director of Prisons about this failure, "stating (among other things), that the [NC DPS] executive who made the decision not to forward the documents to the [SBI] was Ellis Boyle, who, prior to his appointment to the department by Governor McCrory, formerly worked for the law firm providing counsel to

[Baptist] in this qui tam action." (<u>Id.</u>, ¶ 96.) In October 2013,

although "Vincoli did not meet the established criteria for

managerial exempt status," "Governor McCrory's administration

reclassified Vincoli as 'managerial exempt' and stripped him of his

North Carolina Personnel Act protections . . . . In December 2013,

Governor McCrory's administration fired Vincoli without notice,

severance, or even a full day's pay for his last day at work."

(<u>Id.</u>, ¶ 97.)

>    Further:

>        The state's explanation for why Vincoli was fired
>    was that they bought a computer program that could do his
>    job. However, Vincoli's supervisor was not even involved
>    in the decision to fire him. If the mere purchase of a
>    computer program that could do Vincoli's job was the true
>    reason for his firing, rather than a pretext, Vincoli
>    would have surely received at least notice and a full
>    day's pay for his last day of work. All in all, the
>    termination process had such a punitive nature and
>    overtones to it that it was clear that someone or some
>    organization of importance or influence wanted Vincoli
>    fired for reasons unrelated to his job performance.

>        On information and belief, the Governor's office
>    took these punitive and discriminatory employment actions
>    against Vincoli at the behest of his former employer,
>    North Carolina Baptist Hospital (and accomplished, at
>    least partly, via Representative Lambeth's
>    communications), whose motive was to crush Vincoli
>    financially and thereby silence his complaints in this
>    qui tam action and his complaints about the $1.34 million
>    owed by [Baptist] to the State of North Carolina.
>    Representative Lambeth has refused to answer questions
>    about the matter or to turn over copies of e-mails from
>    his legislative e-mail account that refer to Vincoli.

(<u>Id.</u>, ¶¶ 98-99 (footnote and paragraph numbering omitted); <u>see also</u>

<u>id.</u> at 36 n.8 ("On January 6, 2014, Representative Lambeth engaged

in an e-mail exchange with CHS officer Joseph Piemont by which Lambeth reported to CHS on 'the recent efforts' by Vincoli and asked Piemont to '[l]et me know how I can help you in Raleigh,' i.e. with state government in the capital.  It may well be that CHS conspired with Lambeth and [Baptist] to retaliate against Vincoli, but [Vincoli] is not yet in a position, prior to discovery, to make that allegation." (first set of brackets in original).)

### C.  **Proposed Allegations**

In the Response and Surreply, Vincoli proposes to add the following allegations to any Third Amended Complaint:

Baptist's counsel, Randy Loftis, told Vincoli's former lawyer, Robert Zaytoun, that the North Carolina hospital community "is very tight and" if Vincoli sued "the hospital that the hospital would do 'everything in its power to make sure he never worked for another hospital in the State again.'  Vincoli recorded these comments in a May 17, 2012 e-mail to Representative Donny Lambeth 19 months **before he was fired by the state** in December, 2013."  (Docket Entry 73 at 24 n.44 (emphasis in original); <u>accord id.</u> at 29.) Representative Lambeth served as "President of [Baptist] from 2007 until 2011."  (<u>Id.</u> at 24 n.43.)

Baptist "was placed on notice" "that [it] w[as] guilty of filing false cost reports" "through a demand letter on or about November 7, 2007 written by [Vincoli's] attorney Robert Zaytoun to McLain Wallace, legal counsel for [Baptist]," which "stat[ed,]

'these overstated costs may have been rolled up into the hospital's
Medicare and Medicaid cost reports (under the line item 'Employee
Health Care Costs').  If this is indeed true, the hospital may well
have overstated its costs to Medicare and Medicaid . . . .'"
(Docket Entry 81 at 7 (italicized font omitted).)  In turn,

> CHS was placed on notice that its Medicare [C]ost
> [R]eports contained overstated related-party charges when
> the Complaint and First Amended Complaint in this matter
> were partially unsealed and served upon CHS on or about
> September 14, 2010 (D.E. 17 & 19), yet did nothing to
> correct its earlier-filed cost reports and continued
> thereafter filing cost reports that reported fictitious
> costs and failed to disclose related-party transactions.

(Docket Entry 81 at 7.)

In regard to Baptist's assertion that "a more plausible
explanation of Mr. Vincoli's termination is that 'he is a difficult
employee with a pattern of wrongfully accusing his employers of
engaging in unethical or illegal conduct'" (id. at 8), Vincoli
states that

> [h]e has made only three complaints of unethical or
> illegal conduct and they all concerned [Baptist] or CHS:
> (1) the complaint that [Baptist] violated ERISA by
> engaging itself through MedCost's provider network to
> provide care to its own employees at above-market rates;
> (2) the complaint that [Baptist] and CHS overstated costs
> on their Medicare cost reports and failed to disclose
> related-party transactions; and (3) the complaint that
> [Baptist] intentionally failed to notify the N.C. State
> Health Plan ("SHP") of its rate increases, causing the
> SHP to overpay for services.

(Id. at 9.)  During Vincoli's employment at Baptist, his

> six-month review was excellent.  His annual review (after
> he had raised the ERISA issue with CFO Gina Ramsey) was
> mixed. [Vincoli's] boss (Rhonda Miller) told him that

Gina Ramsey (the CFO) had instructed Miller not to write his review because Ramsey was going to write it herself. The mixed annual review written by Ramsey retaliated against [Vincoli] for his criticism of Ramsey's actions concerning the ERISA issue.

(Id. at 9 n.7.)

Finally, Vincoli's job at the NC DPS qualifies as a hospital job, as "Vincoli worked for the [NC DPS's] Division of Health Services and the Central Prison Health Care Complex, the latter being the North Carolina hospital for inmates." (Id. at 9-10.)

## V. Rule 9(b) Challenges

### A. "Who" Committed the Fraud

The Hospitals seek dismissal of Vincoli's lawsuit for failure to identify the perpetrators of the alleged fraud. (See Docket Entry 64 at 2 (contending that the Second Amended Complaint "fails to identify any [Baptist] agent who participated in the alleged fraud"); Docket Entry 67 at 1-2 (same as to CHS agent).) In particular, the Hospitals maintain that the Second Amended Complaint "never identifies the name of a single [Baptist or] CHS agent or representative who was involved in the alleged scheme. It notes that [the Medicare] Cost Reports contained a certification 'by an [unnamed] officer,' but it fails to provide any identifying details about that ambiguous person, such as his . . . role or job description." (Docket Entry 68 at 10-11 (final set of brackets in original) (citing Docket Entry 62, ¶ 59); see also Docket Entry 66 at 12-13.)

In response, Vincoli asserts that he "has substantially satisfied the 'who' element by identifying the persons who committed the fraud as the corporate officers who certified the 324 cost reports for the 33 affiliates of the [Hospitals]." (Docket Entry 73 at 16.) He contends that the Hospitals "are required by law to maintain the cost report documents, including the original certifications by their own officers and administrators," from which they can discern the relevant individuals. (Id. at 15.) He further argues:

> [T]he Medicare [C]ost [R]eports are official documents generated by the accounting departments of the hospitals and certified by high-ranking corporate officers. [Vincoli] has identified the persons who committed the fraud as the corporate officers of the 33 affiliates who certified the cost reports and he has described the 324 cost report claims with great particularity. It is impossible that the [Hospitals] are unaware of who certified the reports or that they have any doubt about the fraud they are alleged to have committed.

(Id. at 16-17.)

The Second Amended Complaint primarily presents allegations regarding actions by "the Hospitals." (See, e.g., Docket Entry 62, ¶¶ 63 ("In truth and in fact, the Hospitals knowingly, willfully and recklessly disregarded, misrepresented and concealed related-party transactions on their Medicare Cost Reports . . . ."), 65 ("In truth and in fact, the Defendant Hospitals, having knowledge of their undisclosed related-party transactions, knowingly and willfully concealed and failed to disclose those transactions with an intent fraudulently to secure continued"

Medicare reimbursements.), 66 ("Defendant Hospitals submitted prospective and retrospective claims for payment, falsely certifying that they had not engaged in violations of the Related Party Rule . . . .").) However, one of its 121 paragraphs alleges that

> [t]hose Medicare Cost Reports also contained the following certification executed annually by an officer of each Defendant Hospital:
> . . . . .
> (Signed) (Signature on File)
> Officer or Administrator of Provider

(Id., ¶ 59.) Vincoli's Response clarifies that these "officer[s] of each [of the] Hospital[s]" (id.) — rather than any other of the Hospitals' 72,500 employees — constitute the alleged perpetrators of the fraud. (See Docket Entry 73 at 13-17.) In addition, the Second Amended Complaint alleges that all "[h]ospitals filing their Medicare Cost Reports electronically are required to submit a paper certification, which must be signed and dated." (Docket Entry 62, ¶ 60.) It further alleges that the Hospitals executed the required paper certifications for each Medicare Cost Report. (See id.)

Importantly, Exhibit A identifies the relevant Medicare Cost Reports by provider, fiscal year, and submission date. (See Docket Entry 62-1.) The Hospitals can ascertain the names of the employees implicated in the alleged fraud by examining the corresponding certification for each specified Medicare Cost Report. (See Docket Entry 62, ¶ 60.) Under these circumstances, Rule 9(b) does not require identification of the names of the

33

certifying officers involved in the alleged fraud.  See, e.g., Smith, 796 F.3d at 432-33 (rejecting Rule 9(b) challenge to allegations involving false certification of pay records where the plaintiff identified the perpetrators as the corporate defendants and provided charts "specifically identifying [the plaintiff's] pay and comparing it to the applicable [federal] pay scales"); see also United States ex rel. Bledsoe v. Community Health Sys., Inc., 501 F.3d 493, 506 (6th Cir. 2007) (rejecting contention that, "in addition to alleging specific false claims, the [plaintiff] must plead the identity of the specific individual employees within the defendant corporation who submitted false claims to the government," and "hold[ing] that while such information is relevant to the inquiry of whether a relator has pled the circumstances constituting fraud with particularity, it is not mandatory"). Thus, in light of the Second Amended Complaint's certification allegations and Vincoli's clarification regarding the alleged perpetrators, the Court should reject this Rule 9(b) contention.

**B.  Indicia of Reliability**

The Hospitals further contend that the Second Amended Complaint "lack[s] plausibility and the required indicia of reliability under Rule 9 because Mr. Vincoli . . . has no actual knowledge of the alleged fraud."  (Docket Entry 64 at 2; Docket

Entry 67 at 1.)[14]  In so arguing, CHS emphasizes that "Vincoli lacks any person[al] knowledge about CHS because he never worked there." (Docket Entry 68 at 6.)  Baptist similarly highlights the short duration of Vincoli's employment and notes that Vincoli has not "explain[ed] how he might have any 'personal knowledge' about [Baptist's] preparation of its Medicare Cost Reports *after* his October 2007 termination."  (Docket Entry 66 at 14-15 (emphasis in original).)[15]

The extent of a relator's personal knowledge about a purported fraudulent scheme affects the relator's ability to allege a <u>qui tam</u> claim with sufficient particularly under Rule 9(b).  <u>Compare Harrison</u>, 176 F.3d at 781-83, 790-94 (concluding that allegations satisfied Rule 9(b) where the plaintiff alleged personal knowledge of the certification process and misrepresentations made therein), <u>with United States ex rel. Clausen v. Laboratory Corp. of Am., Inc.</u>, 290 F.3d 1301, 1313-15 (11th Cir. 2002) (affirming Rule 9(b) dismissal of complaint brought by a "corporate outsider," and acknowledging difficulties such plaintiffs face compared to "[m]ost

---

14   In making this argument, the Hospitals do not raise a public-disclosure challenge, <u>see</u> 31 U.S.C. § 3730(e)(4), to Vincoli's allegations.  (<u>See generally</u> Docket Entries 64, 66-68, 76-78.)

15   In that regard, the Hospitals emphasize that Vincoli cannot know their intent in submitting the relevant Medicare Cost Reports.  (<u>See</u> Docket Entry 66 at 14-15; Docket Entry 68 at 8.) This contention relates to the Hospitals' scienter challenge, analyzed in Section VI.

relators in *qui tam* actions[, who] are insiders"). However, at least in the absence of an original source requirement, <u>see</u> 31 U.S.C. § 3730(e)(4), neither the FCA nor Rule 9(b) mandates that a relator possess personal knowledge of the alleged fraud. <u>See</u> 31 U.S.C. §§ 3729-33; Fed. R. Civ. P. 9(b).[16] Thus, for instance, even "a busybody with his own agenda" who discovers fraud through investigative efforts rather than insider knowledge may, in appropriate circumstances, serve as a <u>qui tam</u> relator. <u>United States ex rel. Lamers v. City of Green Bay</u>, 168 F.3d 1013, 1017-18 (7th Cir. 1999); <u>see also</u> <u>United States ex rel. Bunk v. Government</u>

---

    16  The cases upon which the Hospitals rely similarly do not impose an independent personal knowledge requirement. (<u>See, e.g.</u>, Docket Entry 66 at 8, 13-14 (citing <u>Cade v. Progressive Cmty. Healthcare, Inc.</u>, No. 1:09-cv-3522, 2011 WL 2837648, at *9-10 (N.D. Ga. July 14, 2011); <u>United States ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc.</u>, 972 F. Supp. 2d 1317, 1335 (N.D. Ga. 2013); <u>United States ex rel. Walterspiel v. Bayer A.G.</u>, No. 1:12cv773, 2014 WL 7332303, at *5 (M.D.N.C. Dec. 19, 2014), <u>aff'd</u>, 639 F. App'x 164 (4th Cir.), <u>cert. denied</u>, __ U.S. __, 137 S. Ct. 162 (2016)).)  Instead, they involve circumstances where the relators failed to sufficiently allege the particulars of the fraud, including that the defendants actually submitted fraudulent claims to the government. <u>See</u> <u>Walterspiel</u>, 2014 WL 7332303, at *1, *4-6 (recommending dismissal of a complaint, regarding actions by the defendants' John, Jane, and Joe Doe employees, that "contains no allegation of any detail regarding the claims made on government funds in any respect"); <u>Saldivar</u>, 972 F. Supp. 2d at 1333-35 (explaining that relators who fail to satisfactorily allege presentment of a false claim may, under Eleventh Circuit precedent, be able to avoid Rule 9(b) dismissal if "the relator's complaint provides 'indicia of reliability' that support the relator's allegations," and concluding that the relator failed to satisfy either test); <u>Cade</u>, 2011 WL 2837648, at *9-11 (dismissing complaint where relator failed to describe the process a third party utilized in submitting claims to government, noting that "nothing in the [c]omplaint indicates with any reliability that she would even know whether or not [the d]efendants submitted any such claims").

Logistics N.V., __ F.3d __, 2016 WL 6695787 (4th Cir. Nov. 15, 2016) (evaluating successor liability on $24 million FCA judgment in consolidated qui tam action brought by "[r]elators [who] operated businesses that provided to the [government] services much like those performed by [certain defendants]," id., __ F.3d at __, 2016 WL 6695787, at *2); United States ex rel. May v. Purdue Pharm. L.P., 811 F.3d 636 (4th Cir. 2016) (evaluating application of public-disclosure bar to qui tam suit brought by, inter alia, the wife of the defendant's former employee, who learned "[t]he facts of the fraudulent scheme," id. at 638, from the attorney who represented her husband in a former qui tam suit).

Here, Vincoli alleges a fraudulent scheme that becomes evident upon review of the Hospitals' Medicare Cost Reports, if one knows of the allegedly self-dealing relationship between MedCost and the Hospitals (MedCost's joint owners). Vincoli maintains that he learned of this relationship through his employment at Baptist. (Docket Entry 62, ¶ 8.) He further asserts that he reviewed the Hospitals' publically available Medicare Cost Reports. (Id., ¶ 69.) He also specifically identifies the relevant Medicare Cost Reports, the dates that the Hospitals submitted those reports to the federal government via the fiscal intermediaries, and the omissions on those reports that (under his interpretation of Medicare rules) reveal the fraudulent claims contained therein. (See id., ¶¶ 18, 69; Docket Entry 62-1.) Under these

circumstances, Vincoli's lack of personal knowledge regarding the Hospitals' preparation of their Medicare Cost Reports does not (in and of itself) necessitate dismissal of his Second Amended Complaint.[17]

## VI. Scienter Challenge

### A. Second Amended Complaint

The Hospitals also ask the Court to dismiss this action for failure to allege the requisite scienter, i.e., the Hospitals contend that the Second Amended Complaint alleges insufficient facts to establish that the Hospitals knowingly submitted false claims to the United States. (Docket Entry 66 at 8-11; Docket Entry 68 at 12-16.)[18] In particular, the Hospitals maintain that the Second Amended Complaint (1) contains only conclusory

_____

17 However, this lack of personal knowledge hinders Vincoli's ability to sufficiently allege scienter. Moreover, this conclusion does not mean that the Second Amended Complaint satisfies Rule 9(b). For instance, serious questions exist regarding whether Vincoli alleges the "how" of the fraud with sufficient particularity. To take but one example, the Second Amended Complaint lacks factual allegations supporting its conclusory assertion that "CHS caused each of these owned, leased or managed hospitals [listed on Exhibit A] to file false Medicare Cost Reports." (Docket Entry 62, ¶ 11.) Because the Hospitals do not press such Rule 9(b) challenges — and because (as discussed below) Vincoli's qui tam claim fails to sufficiently allege scienter — the Court need not resolve whether the Second Amended Complaint satisfies each component of Rule 9(b)'s "who, what, when, where, and how" mandate.

18 In urging dismissal, the Hospitals also emphasize that Vincoli's qui tam theory depends entirely upon his interpretation of various Medicare rules and regulations. (See, e.g., Docket Entry 66 at 10; Docket Entry 68 at 1, 15; Docket Entry 76 at 3 & n.1; Docket Entry 77 at 9 & n.10.)

assertions that they acted knowingly and (2) lacks any factual allegations that plausibly support an inference that they "acted with any scienter in presenting a (supposedly) false claim to the Government." (Docket Entry 66 at 10.) In response, Vincoli maintains that he "is *not* required . . . to allege that the [Hospitals] . . . knew about the decision of the Provider Reimbursement Review Board in <u>St. Francis Hospital Greenville</u>." (Docket Entry 73 at 5 (emphasis in original).) Instead, Vincoli urges the Court to rely upon "circumstantial evidence" that purportedly permits an inference of scienter. (<u>Id.</u> at 5-7.)

Although Rule 9(b) does not impose a heightened pleading requirement for allegations of knowledge and intent, "an FCA plaintiff still must set forth specific facts that support an inference of fraud." <u>Wilson</u>, 525 F.3d at 379 (internal quotation marks omitted). Significantly, the Second Amended Complaint contains no allegations suggesting that anyone at the Hospitals possessed awareness of the <u>St. Francis Hospital</u> decision upon which Vincoli's allegations of fraud depend. (<u>See generally</u> Docket Entry 62.) Conceding this deficiency (<u>see</u> Docket Entry 73 at 5), Vincoli argues that "the Court must keep in mind that every person is presumed to know the law." (<u>Id.</u> at 4 (citing various criminal decisions, including <u>Cheek v. United States</u>, 498 U.S. 192, 199 (1991)).) In general, "ignorance of the law or a mistake of law is

no defense to criminal prosecution," <u>Cheek</u>, 498 U.S. at 199,[19] but Vincoli supplies no support for the proposition that this criminal precept applies in civil <u>qui tam</u> actions (<u>see</u> Docket Entries 73, 81). Nevertheless, Vincoli maintains — without supporting authority — that "[the Hospitals'] failure to be aware of the relevant laws and regulations in their own industry, after certifying that they were in fact aware of those laws, is sufficient in and of itself for the Court to draw an inference of 'recklessness,' thereby satisfying the scienter requirement of the FCA." (Docket Entry 73 at 5.)

Medicare constitutes "a complex and highly technical regulatory program." <u>Almy v. Sebelius</u>, 679 F.3d 297, 302 (4th Cir. 2012) (internal quotation marks omitted). Pursuant to Medicare regulations, fiscal intermediaries review hospitals' Medicare Cost Reports to determine their appropriate Medicare reimbursements for each fiscal year, after which a hospital can appeal the fiscal intermediary's determination to the Provider Reimbursement Review Board (the "Board"), <u>see</u> 42 U.S.C. § 1395oo, and subsequently appeal the Board's decision to the Administrator of CMS (the "Administrator"), <u>see</u> 42 C.F.R. §§ 405.1801, 405.1875; <u>see also</u> Medicare Provider Reimbursement Manual, Part I, § 2927. The

_____

19 Notably, even in the criminal context, Congress has relaxed this "common-law presumption" for certain offenses, such as federal criminal tax offenses, "largely due to the complexity of the [relevant] laws." <u>Id.</u> at 199-200.

Board's decisions "do not bind CMS or the Secretary" of Health and Human Services (the "Secretary").  St. Luke's Hosp. v. Sebelius, 611 F.3d 900, 907 n.10 (D.C. Cir. 2010).  Furthermore, the Board's decisions lack precedential value.  See, e.g., Almy v. Sebelius, 749 F. Supp. 2d 315, 326-27 (D. Md. 2010) (collecting cases holding that lower agency decisional bodies such as the Board cannot bind federal agencies, and rejecting contention that "the non-binding, non-precedential rulings of lower-level contractors may together constitute an authoritative agency interpretation directly attributable to the Secretary"), aff'd, 679 F.3d 297 (4th Cir. 2012); St. Francis Hosp., 2007 WL 1774634, at *4 (explaining that the Board "holds no authority beyond this specific case").

Indeed, not even the Administrator's decisions constitute precedent.  See Community Care Found. v. Thompson, 318 F.3d 219, 227 (D.C. Cir. 2003) (observing that "'[d]ecisions by the Administrator,' which constitute the final decisions of the Secretary, 'are not precedents for application to other cases'" (quoting Medicare Provider Reimbursement Manual, Part I, § 2927(C)(6)(e))).  Instead, a decision by the Administrator may

> be examined and an administrative judgment made as to whether it should be given application beyond the individual case in which it was rendered.  If it has application beyond the particular provider, the substance of the decision will, as appropriate, be published as a regulation, HCFA Ruling, manual instruction, or any combination thereof so that the policy []or clarification of policy having a basis in law and regulations may be generally known and applied by providers, intermediaries, and other interested parties.

Medicare Provider Reimbursement Manual, Part I, § 2927(C)(6)(e) (emphasis added).

Under these circumstances, a lack of awareness of one Board decision upon certifying "familiar[ity] with the laws and regulations regarding the provision of health care services" (Docket Entry 62, ¶ 19) does not suffice to establish scienter. Any contrary holding would improperly transform the FCA from a punishment for defrauding the United States into a mechanism for enforcing non-precedential regulatory determinations. See Owens, 612 F.3d at 728 (explaining that the FCA does "not punish honest mistakes or incorrect claims submitted through mere negligence" (internal quotation marks omitted)); see also Universal Health, __ U.S. at __, __, 136 S. Ct. at 1996, 2004 (observing that FCA "liability is essentially punitive in nature" with "treble damages plus civil penalties of up to $10,000 per false claim," and "emphasiz[ing] . . . that the [FCA] is not a means of imposing treble damages and other penalties for insignificant regulatory . . . violations" (internal quotation marks omitted)).

Vincoli next argues that the Court can infer scienter from the Hospitals' purported "motive and opportunity" to defraud the United States. (Docket Entry 73 at 5-6.) Vincoli derives this "motive and opportunity" argument from the securities litigation context. (See id. at 6 (citing "In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997); In re Time Warner Inc. Sec.

*Litig.*, 9 F.3d 259, 269 (2d Cir. 1993).").) Although facts showing motive and opportunity can support a "'strong inference'" of securities fraud, In re Burlington Coat Factory, 114 F.3d at 1418, "[t]he presence of a motive cannot substitute for evidence of knowledge and intent" in the qui tam realm, United States ex rel. K&R Ltd. P'ship v. Massachusetts Housing Fin. Agency, 456 F. Supp. 2d 46, 62 (D.D.C. 2006), aff'd, 530 F.3d 980 (D.C. Cir. 2008); see also Universal Health, __ U.S. at __, 136 S. Ct. at 2002 (emphasizing rigorous nature of FCA scienter requirement). This principle holds particular force in the context of this case, where the relator proffers only conclusory allegations of motive (see Docket Entry 73 at 6 (relying upon allegations that the Hospitals "acted **'with the motive** of inflating their Medicare reimbursement rates'" and that their "'**motive for overstating their costs** was to inflate their Medicare reimbursements'" (emphasis in original) (quoting Docket Entry 62, ¶¶ 18, 46))). See Iqbal, 556 U.S. at 678 (explaining that a complaint "offer[ing] labels and conclusions[,] or a formulaic recitation of the elements of a cause of action," or "naked assertion[s] devoid of further factual enhancement" fails to survive Rule 12(b)(6) (internal quotation marks omitted; final set of brackets in original)).

As further circumstantial evidence, Vincoli maintains that the Court must "infer an intention to obscure or hide the fraud" from "the complexity of the employee benefit plan structures the

hospitals set up to accomplish the scheme." (Docket Entry 73 at 6.) More specifically, Vincoli asserts that "[t]he Court must infer" that the Hospitals' MedCost-related "shell-game structures" "were intentionally set up to make the [relevant] transactions look like something other than what they were — hospitals paying themselves to provide domestic care to their own employees — with the intent and purpose that the hospitals would significantly enhance their reimbursements and the government would be deceived." (Id. at 6-7.) This argument likewise fails.

First, Vincoli's allegations regarding the structure of the Hospitals' employee benefit plans do not support his argument. According to the Second Amended Complaint, the Hospitals jointly own MedCost, which they hired to adjudicate and pay the domestic care and third-party healthcare service claims of their respective employees under their respective self-funded insurance plans. (Docket Entry 62, ¶¶ 8, 10-11, 30.) Pursuant to its contracts with the Hospitals, MedCost functions as a plan supervisor performing only ministerial duties rather than a true third-party administrator. (Id., ¶ 30; see also id. at 14 n.5.) Finally, according to Vincoli's proposed amendments, MedCost possesses a "provider network" to which the Hospitals gained access, through their contracts with MedCost, for their employees' healthcare treatment. (Docket Entry 81 at 9.) Given MedCost's legitimate functions vis-à-vis the Hospitals' employee benefit plans,

Vincoli's allegations fail to plausibly establish that the Hospitals engineered their employee benefit plans merely to defraud the United States.[20]

Moreover, the Second Amended Complaint contains no allegations suggesting that the employees who certified the Medicare Cost Reports — the individuals that Vincoli alleges committed the fraud — had any involvement in creating MedCost's relationship with the Hospitals. (See generally Docket Entry 62.) The Second Amended Complaint likewise lacks any allegations suggesting that these individuals bore any awareness of the fact that MedCost allegedly failed to qualify as a third-party administrator to the Hospitals' employee benefits plans. This omission holds particular significance given that the North Carolina Department of Insurance identifies MedCost as a licensed "Third Party Administrator (TPA)." (See Docket Entry 78-1 at 1, 23 (listing "TPA Status: Licensed" for MedCost); http://www.ncdoi.com/lh/Documents/TPADirectory.pdf, at 1, 23 (same) (last visited Dec. 28, 2016).)[21] Under these

_____

20  As such, these circumstances differ from those in United States v. Triple Canopy, Inc., 775 F.3d 628 (4th Cir. 2015), cert. granted, judgment vacated sub nom., Triple Canopy, Inc. v. United States ex rel. Badr, __ U.S. __, 136 S. Ct. 2504 (2016), upon which Vincoli relies (see Docket Entry 73 at 7), wherein a security contractor falsified the marksmanship scorecards of security guards at an airbase in an active combat zone to hide the fact "that the guards could not, for lack of a better term, shoot straight," Triple Canopy, Inc., 775 F.3d at 637-38.

21  Vincoli does not dispute MedCost's status as a licensed TPA (see Docket Entry 81 at 1 n.1), and the Court may take judicial notice of MedCost's status as represented on the North Carolina

circumstances, Vincoli's allegations about the complexity of the MedCost-administered employee health benefit plans fail to plausibly establish scienter.

Finally, Vincoli argues that the Court must infer scienter from his allegation that the Hospitals claimed "fictitious" costs on their Medicare Cost Reports. (Docket Entry 73 at 6.) Specifically:

> The Court must infer from this allegation that the Defendant hospitals — sophisticated institutions that are presumed to know the law — would not claim a billion dollars in *fictitious* costs innocently or by mistake. If [Vincoli] is correct in his allegation that the hospitals reported a billion dollars in fictitious costs — a well-pled fact the Court must accept as true — then the only plausible inference is that they acted "knowingly" as the term was defined by Congress.

(Id. (emphasis in original).)

Contrary to Vincoli's contention, whether or not these costs qualify as "fictitious" constitutes a legal determination subject to judicial resolution. See Rostholder, 745 F.3d at 700-03 (evaluating regulations to determine if the defendant submitted a "false" claim and affirming Rule 12(b)(6) dismissal for "fail[ure] to plead the existence of a false statement or fraudulent conduct"); see also Carlson v. DynCorp Int'l LLC, No. 14-1281,

---

Department of Insurance TPA Directory. See, e.g., Ademiluyi v. PennyMac Mortg. Inv. Trust Holdings I, LLC, 929 F. Supp. 2d 502, 510 (D. Md. 2013) ("tak[ing] judicial notice of [the] defendants' licensing status represented via the Nationwide Mortgage Licensing System . . . website," which "records show that [a relevant entity] holds a license as a mortgage lender under Maryland law").

__ F. App'x __, __, __, 2016 WL 4434415, at *1, *6 (4th Cir. Aug. 22, 2016) (explaining that "we are not bound to accept [the plaintiff's] legal conclusion[ ] that [the defendant's] alleged under billing violated [federal regulations] and [standards]," and affirming Rule 12(b)(6) dismissal with prejudice (internal quotation marks omitted; second set of brackets in original)). Therefore, Vincoli's characterization of these costs as fictitious does not bind the Court in resolving the Motions to Dismiss. See, e.g., Nathan, 707 F.3d at 455 (explaining that, in reviewing Rule 12(b)(6) motions, courts "will not accept legal conclusions couched as facts" (internal quotation marks omitted)).[22]

Even assuming that the costs qualify as "fictitious," Vincoli errs in arguing that the Court must infer scienter from the fact that the Hospitals claimed such costs (see Docket Entry 73 at 6 (asserting that "[t]he Court must infer . . . that the Defendant hospitals . . . would not claim a billion dollars in fictitious costs innocently or by mistake" (emphasis omitted))). As discussed below, the relevant Medicare rules and regulations do not, by

_____

    22 Moreover, as the discussion that follows above reflects, it remains at least questionable whether such costs qualify as fictitious, which circumstance undermines Vincoli's FCA claim. See Wilson, 525 F.3d at 377 (explaining that "imprecise statements or differences in interpretation growing out of a disputed legal question are similarly not false under the FCA" (internal quotation marks omitted)); Kirk, 130 F. Supp. 3d at 877 ("Where there are legitimate grounds for disagreement over the scope of a . . . regulatory provision, and the claimant's actions are in good faith, the claimant cannot be said to have knowingly presented a false claim." (internal quotation marks omitted; ellipsis in original)).

themselves, compel an inference that the Hospitals failed to act "innocently" in claiming the allegedly fictitious costs. As such, Vincoli's contention that "the only plausible inference is that [the Hospitals] acted 'knowingly'" if they reported these fictitious costs lacks merit and thus cannot establish scienter. See United States ex rel. Orgnon v. Chang, No. 3:13-cv-144, 2016 WL 715746, at *3 (E.D. Va. Feb. 19, 2016) (granting motion to dismiss where the complaint lacked facts showing that the defendant's actions "constituted anything more than mere negligence," finding that the failure to allege facts showing actual knowledge, reckless disregard, or deliberate ignorance meant that the relators' "claim does not satisfy the FCA's scienter requirement"), appeal dismissed, No. 16-1557 (4th Cir. Aug. 15, 2016); see also Owens, 612 F.3d at 728 (observing that the FCA does "not punish honest mistakes or incorrect claims submitted through mere negligence" (internal quotation marks omitted)); Wilson, 525 F.3d at 379 (explaining that "to adequately plead scienter," an FCA plaintiff must plead "specific facts that support an inference of fraud" (internal quotation marks omitted)).

To begin with, CMS provides instructions for completing the relevant domestic care cost section of the Medicare Cost Reports. See Medicare Provider Reimbursement Manual, Part II, § 4005.2, at 40-62 (specifying "the allowable health insurance and health-related costs for the wage index"). Section 4005.2 divides

hospitals into two categories: those with "Purchased Health Insurance" and those with "Self (or Self-Funded) Health Insurance." Id. The Hospitals fit the latter category. (Docket Entry 62, ¶¶ 10-11.) CMS further divides that category into two groups: those "Without a Third-Party Administrator (TPA)" and those "With a TPA." Medicare Provider Reimbursement Manual, Part II, § 4005.2, at 40-62. CMS identifies no criteria for qualifying as a TPA under this provision. See id.[23]

CMS specifies that all self-funding hospitals may include any "[c]osts paid to external organizations for plan administration" in their allowable costs. Id. In addition, CMS instructs those hospitals possessing a TPA that the "[a]mount the TPA pays to the hospital or other health care providers for services rendered under the plan" constitutes allowable costs. Id. By contrast, self-funding hospitals that lack a TPA may claim as allowable costs both the "[c]osts the hospital incurs in providing services under the plan to its employees" and the "[h]ospital's payment to unrelated health care providers for services rendered, under the plan, to [the] hospital's employees." Id. Finally, CMS provides that self-funding hospitals "are not required to remove from domestic claims costs, the personnel costs that are associated with hospital staff who deliver the services to employees." Id.

---

23 Vincoli likewise fails to identify any Medicare rule or regulation specifying the criteria for qualifying as a TPA. (See Docket Entries 62, 73, 81.)

Vincoli maintains that the Hospitals improperly claimed on their Medicare Cost Reports the amounts that MedCost paid them for their domestic care claims. MedCost constitutes a licensed TPA in North Carolina. (See Docket Entry 78-1 at 23.) Although Vincoli contends that MedCost does not qualify as a true "'third party administrator' under its agreements with the Hospital[s]" (Docket Entry 62 at 14 n.5), CMS specifies no criteria regarding the "degree of independence from oversight, direction and control" (id.) necessary for qualification as a TPA, see Medicare Provider Reimbursement Manual, Part II, § 4005.2, at 40-62. Accordingly, nothing in the relevant CMS guidance indicates that the Hospitals lacked authorization to claim as allowable costs the amounts that MedCost paid the Hospitals for their domestic care claims. Likewise, in light of its instruction regarding personnel costs, CMS appears to impose no obligation on the Hospitals to "reclassify" costs associated with the provision of this domestic care among their various costs centers.[24]

Vincoli contends, though, that these costs transgressed Medicare's related-party rule, 42 C.F.R. § 413.17, and Medicare

---

    24  The apparent adherence of the Hospitals' Medicare Cost Reports to CMS's instructions in the Medicare Provider Reimbursement Manual possesses special significance when considered in light of the fact that, in certifying these reports, the individuals at the Hospitals who allegedly committed the fraud averred that, "to the best of [their] knowledge and belief," the Medicare Cost Reports "are true, correct, complete and prepared . . . in accordance with applicable instructions," 42 C.F.R. § 413.24(f)(4)(iv).

Provider Reimbursement Manual, Part I, §§ 332.1 and 2144.4. (See

Docket Entry 62, ¶ 13.) The related-party rule specifies that,

> [e]xcept as provided in paragraph (d) of this section,
> costs applicable to services, facilities, and supplies
> furnished to the provider by organizations related to the
> provider by common ownership or control are includable in
> the allowable cost of the provider at the cost to the
> related organization. However, such cost must not exceed
> the price of comparable services, facilities, or supplies
> that could be purchased elsewhere.

42 C.F.R. § 413.17(a).[25] Under this regulation, "[r]elated to the

provider means that the provider to a significant extent is

associated or affiliated with or has control of or is controlled by

the organization furnishing the services, facilities, or supplies."

42 C.F.R. § 413.17(b)(1). Per Vincoli's allegations, MedCost

appears to qualify as a related party to the Hospitals under 42

C.F.R. § 413.17(b). (Docket Entry 62, ¶ 8.) However, the domestic

care costs at issue here do not arise from any "services,

facilities, [or] supplies" that MedCost "furnishe[s] to the

[Hospitals]." Accordingly, the plain language of this regulation

suggests its inapplicability to the pertinent transactions.[26]

Nevertheless, Vincoli maintains that, per Medicare Provider

Reimbursement Manual, Part I, §§ 332.1 and 2144.4, the Hospitals

_____

25 If the transaction meets specified criteria, "the charge
by the supplier to the provider for such services, facilities, or
supplies is allowable as cost." 42 C.F.R. § 413.17(d).

26 So interpreted, the Hospitals' failure to identify these
transactions on their Medicare Cost Reports does not qualify as a
false statement, let alone a knowingly false statement. See Kirk,
130 F. Supp. 3d at 877-78.

needed to reduce their domestic care costs from the amounts that
MedCost paid them for these services to the Hospitals' "actual out-
of-pocket costs." (Docket Entry 62, ¶ 13.) Section 2144 permits
medical providers to include in their costs certain fringe
benefits. See, e.g., Medicare Provider Reimbursement Manual, Part
I, § 2144.4. The unrecovered cost of medical discounts that
hospitals provide to their employees under Medicare Provider
Reimbursement Manual, Part I, § 332 represents one such fringe
benefit. Id. § 2144.4. The domestic care costs at issue here,
however, do not involve Section 332 discounts. Therefore, Sections
332.1 and 2144.4 lack clear applicability to the determination of
the Hospitals' allowable domestic care costs.

As a final matter, Vincoli maintains that the Board's St.
Francis Hospital decision renders invalid the Hospitals' claimed
domestic care costs. (See Docket Entry 62, ¶¶ 12-13, 38; see
also id., ¶¶ 42-44.) However, the St. Francis Hospital decision
carries no precedential weight and cannot trump CMS instructions.
See Medicare Provider Reimbursement Manual, Part I, § 2927; see
also St. Francis Hosp., 2007 WL 1774634, at *4 (explaining that the
Board "holds no authority beyond this specific case").[27] Thus, even

---

        27 Moreover, the relevance of the St. Francis Hospital
decision to the instant circumstances remains unclear. Here,
Vincoli alleges that MedCost constitutes an "administrative
contractor" that the Hospitals jointly own. (Docket Entry 62,
¶ 8.) In St. Francis Hospital, the hospital wholly owned the
subsidiary that processed its claims, preventing the necessary
shifting of risk to qualify the hospital's medical plan as self-

assuming that the certifying officers knew of the St. Francis Hospital decision, the foregoing analysis of the Medicare rules and regulations remains dispositive of the scienter issue.

In sum, the plain language of the pertinent Medicare rules and regulations does not suggest that the certifying officials acted with fraudulent intent simply because the Hospitals claimed the disputed domestic care costs without reclassifying employee benefit costs or identifying any related-party transaction with MedCost. The Second Amended Complaint does not allege that the Hospitals, in general, or the certifying officials, in particular, knew of the St. Francis Hospital decision (let alone perceived it as binding on them). (See Docket Entry 62.) It also fails to allege any factual content from which the Court could plausibly infer that the Hospitals possessed awareness of any information that disqualified these costs or otherwise precluded a good-faith interpretation of the relevant rules under which these costs appeared permissible.

---

insurance under Medicare Provider Reimbursement Manual, Part I, § 2162.7. See St. Francis Hosp., 2007 WL 1774634, at *2, *4-5 (observing that even if the arrangement had involved some risk-shifting, "the transfer would have been among operating components of the same entity and would have generated no change in the Provider's risk acceptance," id., 2007 WL 1774634, at *5). Medicare Provider Reimbursement Manual, Part II, § 4005.2 defines permissible costs according to whether the medical provider possesses a TPA, not whether it transfers insurance risks to that TPA. Finally, the alleged fraud at issue here does not involve attempts by the Hospitals to claim premium payments made to MedCost. Cf. St. Francis Hosp., 2007 WL 1774634, at *5 (analyzing permissible health insurance premiums under Medicare Provider Reimbursement Manual, Part I, § 2144.4).

(See id.)  In other words, the Second Amended Complaint fails to allege "specific facts that support an inference of fraud," thereby "fail[ing] to adequately plead scienter," Wilson, 525 F.3d at 379 (internal quotation marks omitted).  See Kirk, 130 F. Supp. 3d at 877-78; see also Commercial Contractors, Inc. v. United States, 154 F.3d 1357, 1366 (Fed. Cir. 1998) ("If a contractor submits a claim based on a plausible but erroneous contract interpretation, the contractor will not be liable, absent some specific evidence of knowledge that the claim is false or of intent to deceive.").

## B.  Proposed Amendments

Vincoli's proposed amendments do not change the foregoing conclusion.  Vincoli contends that Baptist "was placed on notice" that it "had filed false cost reports" through a November 2007 demand letter that Vincoli's attorney wrote to Baptist's attorney. (Docket Entry 81 at 7.)  This letter referenced "overstated costs" that "may have been rolled up into [Baptist's] Medicare and Medicaid cost reports (under the line item 'Employee Health Care Costs')."  (Id. (italicized font and internal quotation marks omitted).)  Vincoli provides no details from this 2007 letter regarding the nature of "these overstated costs."  (See id. (italicized font and internal quotation marks omitted).)

However, the Second Amended Complaint alleges that "[Vincoli] was fired by [Baptist] on October 2, 2007, as a result of his complaints about transactions by which [Baptist] paid itself more

for domestic care of its employees than commercial insurers were willing to pay for the same services." (Docket Entry 62, ¶ 9.) Additionally, Vincoli seeks to add a factual allegation regarding his "mixed annual review," which occurred "after he had raised the ERISA issue with [Baptist] CFO Gina Ramsey." (Docket Entry 81 at 9 n.7.) This "ERISA issue" references Vincoli's "complaint that [Baptist] violated ERISA by engaging itself through MedCost's provider network to provide care to its own employees at above-market rates." (Id. at 9.) Vincoli worked for Baptist from July 2006 to October 2007 (Docket Entry 62, ¶ 8), and his pre-ERISA complaint "six-month review was excellent" (Docket Entry 81 at 9 n.7). Given these allegations, Vincoli began complaining about Baptist's allegedly above-market rates between approximately January 2007 and July 2007. Under these circumstances, the only plausible interpretation of Vincoli's proposed factual allegation remains that the "overstated costs" in Vincoli's 2007 demand letter reference the ERISA-related "above-market rate[]" charges. See Nathan, 707 F.3d at 455 (explaining that, in analyzing whether a complaint survives Rule 12(b)(6), courts "will not accept . . . unwarranted inferences[ or] unreasonable conclusions" (internal quotation marks omitted)).[28]

---

28 This understanding comports with the allegations in the Complaint (filed in 2009) and First Amended Complaint (filed in 2010), which challenge the allegedly inadequate discount that Baptist offered to MedCost plan participants compared to the discounts it offered participants in other "managed care contracts"

Telling Baptist that "it may well have overstated its costs to Medicare and Medicaid" because it included costs for above-market rate services does not suffice to establish that Baptist acted with scienter in failing to reduce its domestic care costs to its actual out-of-pocket costs for those services. These purported improprieties constitute "substantially different" allegations of fraud. (Docket Entry 61 at 2, 3.) Therefore, Vincoli's proposed factual allegations fail to plausibly establish that Baptist acted with scienter in submitting Medicare Cost Reports that did not reduce its domestic care claims from the amount that MedCost paid Baptist to its actual out-of-pocket costs. See Rostholder, 745 F.3d at 702 (explaining that the FCA does not constitute "a sweeping mechanism to promote regulatory compliance").

The same conclusion holds true regarding Vincoli's CHS allegations. Vincoli maintains that CHS "was placed on notice" of its false reports "when the Complaint and First Amended Complaint in this matter were partially unsealed and served upon CHS on or about September 14, 2010." (Docket Entry 81 at 7 (citing Docket Entries 17, 19).) Neither of these pleadings references the St. Francis Hospital decision upon which the Second Amended Complaint's allegations rely; nor do they reference either Medicare Provider Reimbursement Manual, Part I, §§ 332.1 or 2144.4, or Medicare

(Docket Entry 1, ¶ 40; Docket Entry 16, ¶ 47), thereby allegedly inflating Medicare Cost Report wage data. (See Docket Entry 1, ¶¶ 9-15, 29-61; Docket Entry 16, ¶¶ 9-15, 35-69.)

Provider Reimbursement Manual, Part II, § 4005.2. Instead, the Complaint and First Amended Complaint detail a fraudulent scheme arising from the alleged lack of an independent fiduciary for the Hospitals' self-funded health insurance plans and the resulting comparatively insufficient discount that the Hospitals provided to MedCost plan participants as versus participants in other managed care contracts (such as BlueCross/BlueShield of North Carolina). (See Docket Entry 1, ¶¶ 9-15, 29-61; Docket Entry 16, ¶¶ 9-15, 35-69.) That CHS received notice of Vincoli's allegations regarding this "substantially different" scheme fails to satisfy the FCA's rigorous scienter requirement.

Simply put, both the Second Amended Complaint and Vincoli's proposed amendments fail to plausibly allege that the Hospitals "knowingly" submitted false claims to the United States. Vincoli's failure to satisfy the FCA's rigorous scienter requirement necessitates dismissal of the Second Amended Complaint. See Vitol, S.A. v. Primerose Shipping Co., 708 F.3d 527, 547-49 (4th Cir. 2013) (evaluating complaint and affirming propriety of Rule 12(b)(6) dismissal where the "allegations are conclusory and contain legal conclusions couched as factual allegations," and, "[t]o the extent that the Amended Verified Complaint does properly allege facts, those facts do not show more than a sheer possibility that a defendant has acted unlawfully" (internal quotation marks omitted)); Francis, 588 F.3d at 197 (affirming Rule 12(b)(6)

dismissal because, "[t]aking the facts alleged in the complaint in context and as true, [the court] conclude[s] that the complaint does not state any claim for relief that is plausible on its face"); see also Orgnon, 2016 WL 715746, at *3 (granting motion to dismiss for failure to allege scienter). Furthermore, because Vincoli's proposed amendments fail to cure this deficiency, the Court should dismiss the Second Amended Complaint's qui tam claim with prejudice. See Rostholder, 745 F.3d at 703 (affirming dismissal with prejudice of FCA claim for "fail[ure] to plead the existence of a false statement and scienter as required by the FCA," noting that "any amendment would have been futile").

## VII. Retaliation Claims

As pertinent to this action, each of the Acts prohibits retaliation "in the terms and conditions of employment" against an individual "because of lawful acts done by" the individual "in furtherance of an action under" that Act. 31 U.S.C. § 3730(h); N.C. Gen. Stat. § 1-613. To establish such retaliation claim, a plaintiff must satisfy three elements. Mann v. Heckler & Koch Def., Inc., 630 F.3d 338, 343 (4th Cir. 2010). Specifically, the "'employee must prove that (1) he took acts in furtherance of a qui tam suit; (2) his employer knew of these acts; and (3) his employer [took adverse action against] him as a result of these acts.'" Id. (brackets in original) (quoting Zahodnick v. International Bus.

<u>Machs. Corp.</u>, 135 F.3d 911, 914 (4th Cir. 1997)).[29]  Baptist

maintains that Vincoli "fails to establish the third element, as

§ 3730(h) does not extend to post-employment acts of retaliation

and the Complaint fails to establish a plausible nexus between

[Baptist's] alleged knowledge of this litigation and the alleged

adverse actions."  (Docket Entry 66 at 15-16.)

"The vast majority of courts to have considered the issue have

found, most even at the motion to dismiss stage, that § 3730(h)

provides no remedy for retaliation alleged to have occurred

following a plaintiff's termination of employment." <u>Fitzsimmons v.

Cardiology Assocs. of Fredericksburg, Ltd.</u>, No. 3:15cv72, 2015 WL

4937461, at *7 & n.15 (E.D. Va. Aug. 18, 2015) (collecting cases).

In reaching this conclusion, courts emphasize that the FCA provides

relief when an employer takes adverse action regarding "the terms

and conditions of employment" of an individual who acts in

furtherance of the FCA.  <u>See, e.g.</u>, <u>Bechtel v. St. Joseph Med.

Ctr., Inc.</u>, Civil Action No. MJG-10-3381, 2012 WL 1476079, at *9

(D. Md. Apr. 26, 2012) ("[Section] 3730(h) expressly provide[s]

relief when an employee 'is discharged, demoted, suspended,

---

    29  Neither the parties nor the undersigned has located any
North Carolina decisions construing the NC FCA's retaliation
provision.  However, the NC FCA provides that it "shall be
interpreted and construed so as to be consistent with the federal
False Claims Act, 31 U.S.C. § 3729, et seq., and any subsequent
amendments to that act." N.C. Gen. Stat. § 1-616(c). Accordingly,
both the parties and the undersigned rely on decisions interpreting
the FCA in analyzing Vincoli's NC FCA retaliation claim.

threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment.'  This language is not reasonably interpreted to include post-termination retaliatory actions.").  Vincoli concedes this "general rule," but urges the Court to follow "a developing line of cases recognizing an exception to this rule for blacklisting, blackballing or other post-termination interference with subsequent employment." (Docket Entry 73 at 22.)

The Court need not resolve whether the Acts' retaliation provisions cover the post-termination employment situation at issue in this case.  Even assuming the Acts' application, Vincoli fails to plausibly allege that Baptist caused the North Carolina "Governor's office" to take adverse employment actions against him (Docket Entry 62, ¶ 99).

## A.  FCA Retaliation

The following allegations in the Second Amended Complaint relate to Vincoli's FCA retaliation claim:

In November 2010, Vincoli began working for the NC DPS.  (Id., ¶ 87.)  "In June 2011, on information and belief, [Baptist] learned of the filing of this qui tam action through the issuance of subpoenas" and communications with the United States Attorney's Office.  (Id., ¶ 91.)  In October 2011, "perhaps . . . to protect itself against allegations that it was retaliating against Vincoli on account of his filing of this action" (id., ¶ 92), Baptist

dismissed a lawsuit that it had filed in January 2011 against Vincoli for violating the Release (id., ¶ 88).

In July 2013, Vincoli copied his state representative, Lambeth, "a former [Baptist] executive, on two emails, one of which concerned [Vincoli's] efforts to report the $1.34 million overpayment [that North Carolina made to Baptist]." (Id., ¶ 94.) In October 2013, even though Vincoli did not qualify for such status, "Governor McCrory's administration reclassified Vincoli as 'managerial exempt' and stripped him of his North Carolina Personnel Act protections . . . . In December 2013, Governor McCrory's administration fired Vincoli without notice, severance, or even a full day's pay for his last day at work." (Id., ¶ 97.) Vincoli's supervisor did not participate in this termination decision, and "[t]he state's explanation" for his firing "was that they bought a computer program that could do his job." (Id., ¶ 98.) "All in all, the termination process had such a punitive nature and overtones to it that it was clear that someone or some organization of importance or influence wanted Vincoli fired for reasons unrelated to his job performance." (Id.) "On information and belief, the Governor's office took these" adverse employment actions the behest of Baptist (assisted by Lambeth), "whose motive was to crush Vincoli financially and thereby silence his complaints in this qui tam action and his complaints about the $1.34 million owed by [Baptist] to the State of North Carolina." (Id., ¶ 99.)

Lambeth refuses to answer questions regarding this matter or to produce "e-mails from his legislative e-mail account that refer to Vincoli." (Id.)

Baptist asserts that the Second Amended Complaint fails to allege any non-conclusory factual content "linking Vincoli's firing to [Baptist], much less any facts linking his firing to [Baptist's] knowledge of this lawsuit." (Docket Entry 66 at 20.) This argument possesses merit.

In the retaliation context, a plaintiff can establish a "prima facie case of causa[tion]" through temporal proximity between the employer learning of the protected activity and the adverse employment action. Dowe v. Total Action Against Poverty in Roanoke Valley, 145 F.3d 653, 657 (4th Cir. 1998) (internal quotation marks omitted; brackets in original); see also Shenoy v. Charlotte-Mecklenburg Hosp. Auth., 521 F. App'x 168, 174-75 (4th Cir. 2013) (evaluating whether temporal proximity established causation for § 3730(h) claim); Harrington v. Aggregate Indus.-Ne. Region, Inc., 668 F.3d 25, 32 (1st Cir. 2012) (analyzing § 3730(h) claim, explaining that, "in the context of temporal proximity, courts typically look to the time between protected activity and retaliation"). For temporal proximity to establish causation, it "must be 'very close.'" Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (citing cases holding that three-month and four-month periods fail to establish causation). Accordingly, "[a]

lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two." Dowe, 145 F.3d at 657.

Accepting Vincoli's contentions, Baptist became aware of his protected activity in filing a qui tam suit in June 2011. At that time, Vincoli worked for the state of North Carolina. More than two years later, in October 2013, Governor McCrory's administration reclassified Vincoli's employment status and, in December 2013, fired him. The period between Baptist's discovery of Vincoli's pursuit of this qui tam suit and North Carolina's firing of Vincoli "is several years, which is simply not 'very close' in time." Shenoy, 521 F. App'x at 175 (holding that the plaintiff "cannot show causation" where the employer "knew of [his] actions . . . at the latest[] more than three years before his termination"); see also Clark, 532 U.S. at 274 ("Action taken (as here) 20 months later suggests, by itself, no causality at all."); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998) ("A thirteen month interval between the charge and termination is too long to establish causation absent other evidence of retaliation."). Simply put, the Second Amended Complaint does not allege factual matter sufficient to support an inference that the employment-related actions by North Carolina officials in late 2013 resulted from retaliation by

Baptist for Vincoli's filing of a <u>qui tam</u> action revealed to Baptist in June 2011.

The Second Amended Complaint's allegations regarding Lambeth likewise fail to satisfy the causation element. As a preliminary matter, the Second Amended Complaint contains no factual content indicating that Lambeth played any role in Vincoli's firing. (<u>See generally</u> Docket Entry 62.) Even if such allegations existed, the Second Amended Complaint lacks any basis for imputing Lambeth's actions to Baptist. To the contrary, the only factual allegation connecting Lambeth to Baptist concerns Lambeth's status as a "<u>former</u> [Baptist] executive." (<u>Id.</u>, ¶ 94 (emphasis added).) Moreover, even accepting Vincoli's "belief" that Lambeth forwarded certain of Vincoli's emails to Baptist, none of those emails involve this <u>qui tam</u> suit. (<u>See</u> <u>id.</u>) Accordingly, Vincoli's allegations fail to plausibly establish that Baptist (motivated by the filing of this action) carried out any retaliation involving Vincoli's state employment, "at least partly, via Representative Lambeth's communications" (<u>id.</u>, ¶ 99).

Vincoli's proposed amendments do not change the foregoing causation analysis. Vincoli asserts that Baptist's lawyer informed his former lawyer, Robert Zaytoun, that the North Carolina hospital community "is very tight and" Baptist "would do 'everything in its power to make sure he never worked for another hospital in the State again'" if Vincoli sued Baptist. (Docket Entry 73 at 24

n.44.) Vincoli maintains that he included "these comments in a May 17, 2012 e-mail to Representative Donny Lambeth 19 months **before he was fired by the state** in December, 2013." (<u>Id.</u> (emphasis in original).) Finally, Vincoli alleges that Lambeth served as Baptist's president from 2007 to 2011 (<u>id.</u> at 24 n.43), and that Vincoli's job with the NC DPS qualifies as a hospital job (Docket Entry 81 at 9-10).

Aside from implicitly conceding that they occurred before May 17, 2012, Vincoli does not specify when Baptist's lawyer made his comments to Vincoli's lawyer. (<u>See</u> Docket Entry 73 at 24 n.44.) Given the date that Zaytoun ceased serving as Vincoli's lawyer, these comments apparently occurred on or before November 2009 (<u>see</u> Docket Entry 11 at 1 (granting Zaytoun's motion "to withdraw as counsel for Plaintiff/Relator")). In November 2010, Vincoli began working in a hospital job for North Carolina, a position he continued to occupy for three years. Vincoli relayed Baptist's lawyer's statement to Lambeth in May 2012, 19 months before North Carolina fired him. Under these circumstances, even assuming that they implicated the <u>qui tam</u> lawsuit, Baptist's lawyer's comments as conveyed to Lambeth do not establish causation.[30] The period

_____

30   Vincoli provides no factual allegations indicating that Baptist's lawyer's comments involved his pursuit of a federal <u>qui tam</u> claim. It remains at least equally conceivable that those comments involved Vincoli's termination from Baptist (<u>see</u> Docket Entry 65-1 at 6 (Zaytoun's signature, dated May 19, 2008, on Release)) or related to Vincoli's ERISA complaint (<u>see</u> Docket Entry 81 at 9 & n.7 (alleging that Baptist's CFO gave Vincoli a "mixed

between when Baptist's lawyer made these comments, when Vincoli sent them to Lambeth, and when North Carolina fired Vincoli remains too long to establish causation.  See Shenoy, 521 F. App'x at 174-75; Causey, 162 F.3d at 803.  This deficiency becomes even more apparent when considered in light of the fact that Vincoli occupied the relevant hospital job in June 2011, when Baptist learned of the qui tam suit; in other words, the more than two-year delay between Baptist's discovery of this action and Vincoli's firing negates the suggestion that Baptist acted in conformance with comments made in or before 2009.

In sum, the Second Amended Complaint and Vincoli's proposed amendments fail to plausibly establish that Baptist caused North Carolina to reclassify and fire Vincoli as a result of his pursuit of this qui tam action.  As such, the Court should grant Baptist's request to dismiss the FCA retaliation claim with prejudice.  See Vitol, 708 F.3d at 548-49 (affirming Rule 12(b)(6) dismissal, concluding that "[b]ecause the well-pleaded facts do not permit [this] [C]ourt to infer more than the mere possibility of misconduct, the complaint has alleged — but it has not shown — that the pleader is entitled to relief" (internal quotation marks omitted; final two sets of brackets in original)).

_____

annual review" in retaliation "for his criticism of [her] actions concerning the ERISA issue")).

**B.  NC FCA Retaliation**

The following allegations in the Second Amended Complaint relate to Vincoli's NC FCA retaliation claim:

In December 2008 and January 2009, Vincoli informed the NC Plan of Baptist's failure to provide it with notices under the (expired) SHP contract.  (Docket Entry 62, ¶ 80.)  "In late 2010 or early 2011," Baptist learned that Vincoli reported its alleged wrongdoing regarding the SHP contract to North Carolina officials.  (Id., ¶ 88.)  In January 2011, Baptist sued Vincoli for violating the Release's non-disparagement clause.  (Id.)  During that litigation, Vincoli obtained Discovery Documents regarding Baptist's wrongdoing.  (Id., ¶ 89.)  In September 2011, the North Carolina Auditor determined that Baptist's actions resulted in an estimated $1.34 million overpayment, but concluded that North Carolina lacked "grounds for legal recourse against [Baptist]" regarding this alleged overpayment because the SHP contract contained no "express notice requirement."  (Id., ¶ 81.)  The North Carolina Attorney General adopted that conclusion (id.), and Baptist withdrew its lawsuit against Vincoli in October 2011 (id., ¶ 92).

In July 2013, Vincoli copied Lambeth "on two emails, one of which concerned his efforts to report the $1.34 million overpayment . . . and the other of which concerned a Department of Labor investigation of CHS' status as a governmental entity."  (Id.,

¶ 94.) Lambeth forwarded those emails to a MedCost executive, along with "a note stating: 'Here is this weeks (sic) email from JV. Pass along to your attorney until I get him set up.'" (Id.) Vincoli believes that "Lambeth sent similar e-mails to [Baptist]," but Lambeth refuses to produce those emails. (Id.)

In January 2013, Vincoli submitted his Form containing the Discovery Documents related to Baptist's NC Claim wrongdoings, but the NC DPS "leadership, in violation of state law," failed to forward the Form to the SBI. (Id., ¶¶ 93, 95.) After discovering this failure, in August 2013, Vincoli sent an email to the Director of Prisons that stated, in part, that the NC DPS "executive who made the decision not to forward the documents to the [SBI]" previously worked at the law firm representing Baptist in this qui tam action. (Id., ¶¶ 95-96.) Governor McCrory's administration reclassified Vincoli's position in October 2013, and fired him in December 2013. (Id., ¶ 97.)

As with the FCA retaliation claim, Vincoli fails to plausibly establish that Baptist caused North Carolina to reclassify and fire Vincoli for his efforts regarding the NC Claim. According to Vincoli, Baptist became aware of his actions regarding the NC Claim by early 2011, but North Carolina did not take adverse employment actions against Vincoli until late 2013. This lengthy period negates any inference of causation. See Shenoy, 521 F. App'x at 174-75; Dowe, 145 F.3d at 657.

Vincoli's allegations about his 2013 email regarding "his efforts to report the $1.34 million overpayment" (Docket Entry 62, ¶ 94) likewise fail to establish causation. Most fundamentally, North Carolina officials determined in 2011 that, under the SHP contract's terms, North Carolina lacked legal recourse against Baptist regarding the NC Claim. (See id., ¶ 81 (detailing North Carolina's conclusion that it lacked "grounds for legal recourse against [Baptist] because there was no express notice requirement in the [SHP] contract").) Against this backdrop, the fact that Lambeth received Vincoli's email detailing "his efforts to report the $1.34 million overpayment" and, Vincoli speculates, forwarded that email to Baptist, does not plausibly establish that Baptist caused North Carolina to fire Vincoli because of Vincoli's lawful acts in furtherance of an NC FCA action. See, e.g., Glynn v. EDO Corp., 710 F.3d 209, 214 (4th Cir. 2013) (explaining that, to satisfy the protected activity element of an FCA retaliation claim, an "employee's investigation must concern 'false or fraudulent claims'" and must involve "matters that reasonably could lead to a viable FCA action" (quoting Eberhardt v. Integrated Design & Const., Inc., 167 F.3d 861, 869 (4th Cir. 1999))).[31] Nor do the

---

[31] Because the SHP contract expired in June 2008 (Docket Entry 62, ¶ 76), before Vincoli took any action regarding the NC Claim (id., ¶ 80), his retaliation claim arises under the Acts' first prong (i.e., acts done in furtherance of a qualifying qui tam action). Even evaluated under the "broadened" second prong, however, his actions fail to suffice. See, e.g., Carlson, 2016 WL 4434415, at *3, *6 ("assum[ing] without deciding, that [the

allegations regarding the NC DPS official who declined to forward Vincoli's Form suffice. The mere fact that this official formerly served as an attorney at the firm representing Baptist in the instant action provides an insufficient basis for inferring that Baptist possessed any knowledge of Vincoli's Form, let alone that Baptist caused North Carolina to fire Vincoli in retaliation for his submission of this Form.[32]

Simply put, the Second Amended Complaint fails to plausibly allege that Baptist retaliated against Vincoli in contravention of the NC FCA. In addition, notwithstanding the opportunity to do so, Vincoli failed to present any proposed amendments in support of his NC FCA claim. (See Docket Entries 73, 81; see also Text Order dated July 12, 2016.) Accordingly, the Court should grant Baptist's request to dismiss the NC FCA retaliation claim with prejudice. See Francis, 588 F.3d at 197 (affirming denial of amendment request on Rule 12(b)(6) dismissal where party failed to

---

plaintiff] is correct in arguing that the second prong of § 3730(h) makes 'efforts to stop 1 or more violations' protected activity where those efforts are motivated by an objectively reasonable belief that the employee's employer is violating, or soon will violate, the FCA," and affirming Rule 12(b)(6) dismissal "[b]ecause [the plaintiff] has failed to plausibly allege facts sufficient to show he reasonably believed that [the defendant] was engaged in a fraud on the government").

    32 At the time these events occurred (in 2013), Vincoli's qui tam pleadings failed to mention the NC Claim. (See Docket Entries 1, 16.) This absence further undermines any attempt to link the NC DPS's actions and/or knowledge of Vincoli's activities to Baptist through an NC DPS official's former employment at the firm representing Baptist in this action.

provide proposed amendments, concluding that the court bore no obligation "to give the plaintiffs a blank authorization to 'do over' their complaint").

## VIII. Amendment Requests

In opposing the Motions to Dismiss, Vincoli repeatedly asks for leave to amend the Second Amended Complaint. (See Docket Entry 73 at 24 n.44, 30; Docket Entry 81 at 10.) A court may deny a request for leave to amend a pleading "when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would have been futile." Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006) (en banc) (internal quotation marks omitted); see also Foman v. Davis, 371 U.S. 178, 182 (1962) (explaining that, although courts generally should freely give leave to amend, they may deny such leave for "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment"). In addition, a court may deny a request for leave to amend that fails to comply with the court's local rules. See Francis, 588 F.3d at 197; see also M.D.N.C. LR 83.4.

To begin with, futility warrants denial of Vincoli's request for leave to amend. See Wilson, 525 F.3d at 376 (affirming denial of "motion for leave to file a third amended complaint" on futility

71

grounds "[b]ecause [the r]elators' proposed amended complaint does not properly state a claim under Rule 12(b)(6) and lacks sufficient particularity under Rule 9(b)").  In response to his requests for leave to amend and to file a surreply, the Court ordered Vincoli to provide in his Surreply any additional factual allegations he intended to include in any Third Amended Complaint.  (See Text Order dated July 12, 2016.)  In analyzing the Motions to Dismiss, this Memorandum Opinion addressed each proposed factual allegation, but found them insufficient to save his claims.  Accordingly, Vincoli's proposed amendments qualify as futile.  See Katyle v. Penn Nat'l Gaming, Inc., 637 F.3d 462, 471 (4th Cir. 2011) (recognizing that "[f]utility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards"); Smith v. Bank of the Carolinas, No. 1:11cv1139, 2012 WL 4848993, at *3 (M.D.N.C. Oct. 11, 2012) (observing that a proposed amendment fails for futility if it could not survive a Rule 12(b)(6) motion to dismiss (citing Wilson, 525 F.3d at 376)).

Further, to the extent Vincoli seeks leave to amend to add as-yet undisclosed factual allegations to his pleadings, such request fails.  First, Vincoli's requests for leave to amend do not comply with this Court's Local Rules regarding amendments.  A footnote in the Response requests "leave to amend to explicitly describe the retaliation here as 'blacklisting' and to state related state-law

72

causes of action." (Docket Entry 73 at 24 n.44.) In addition, the final sentence of the Response and Surreply state that, "if the Court believes that further development of the particulars of the fraud and retaliation claims are [sic] required, Vincoli respectfully requests leave to file a Third Amended Complaint." (Docket Entry 73 at 30; Docket Entry 81 at 10.) Pursuant to this Court's Local Rules, parties must request leave to amend by separate motion to which the party attaches the proposed amended pleading. M.D.N.C. LR 7.3(a), 15.1. Despite his repeated expressions of desire to amend, Vincoli failed to comply with this Court's local rules regarding amendment requests. (See Docket Entries dated Apr. 8, 2016, to present.) That failure justifies denial of his request. See Francis, 588 F.3d at 197 (affirming denial of leave to amend where the plaintiffs failed to "provide a copy of the proposed amendment," concluding that the court bore no obligation "to give the plaintiffs a blank authorization to 'do over' their complaint"); M.D.N.C. LR 83.4.

Moreover, Vincoli's latest request for leave to amend fails to satisfy the requirements for obtaining such leave. See Foman, 371 U.S. at 182 (recognizing that "bad faith or dilatory motive on the part of the movant, [as well as] repeated failure to cure deficiencies by amendments previously allowed" justify denial of amendment request); Laber, 438 F.3d at 426. As an initial matter, the Complaint, First Amended Complaint, Second Amended Complaint,

73

Response, and Surreply provided Vincoli five separate opportunities to present viable allegations in support of his claims. The Court need not allow him a sixth chance to restate claims. See, e.g., United States ex rel. Black v. Health & Hosp. Corp. of Marion Cty., 494 F. App'x 285, 297 (4th Cir. 2012) (affirming denial of motion to amend in qui tam action where, "after 'four[ ] iteration[s]' of his complaint, [the relator] still failed to provide allegations sufficient to survive a motion to dismiss") (first two sets of brackets in original)); Glaser v. Enzo Biochem, Inc., 126 F. App'x 593, 602 (4th Cir. 2005) (affirming district court's "ruling that the plaintiffs' 'many opportunities . . . to present their claim' warranted denial of the motion to amend" (ellipsis in original) (citing Foman, 371 U.S. at 182)); Jensen v. Western Carolina Univ., No. 2:11cv33, 2012 WL 5439144, at *4 (W.D.N.C. Nov. 7, 2012) (rejecting amendment request where "[t]he [p]laintiff has thus on three previous occasions amended the complaint without curing th[e relevant] defect").

In addition, Vincoli's amendment request suggests bad faith. For the first six and a half years of this litigation, Vincoli pursued a qui tam theory founded upon his assertion that the Hospitals needed an independent fiduciary for their self-funded employee benefit plans. (See Docket Entry 1, ¶ 12; Docket Entry 16, ¶ 12.) In pursuing this theory, Vincoli maintained that the Hospitals "co-owned a managed care organization, MedCost, which

consisted of a Preferred Provider Organization (or 'PPO') and a Third Party Administrator (or 'TPA')." (Docket Entry 1, ¶ 9; Docket Entry 16, ¶ 9.) He asserted that the Hospitals utilized "MedCost's PPO network and its Third Party Administrator ('TPA') for their respective self-funded health plans," and explained that "[a]s a PPO rental network, MedCost's business model is to secure negotiated (discounted) rates from physicians and hospitals as a condition of participation" in MedCost's PPO network. (Docket Entry 16, ¶ 44; <u>accord</u> Docket Entry 1, ¶ 37.) In those pleadings, Vincoli further contended that the Hospitals' failure "to have in place an independent fiduciary with legal control of their respective self-funded employee health benefit Plans" victimized the Hospitals' employees and the United States because the Hospitals offered a smaller discount on healthcare services to MedCost participants than to participants in other "managed care contracts." (Docket Entry 1, ¶¶ 12, 40; Docket Entry 16, ¶¶ 12, 47.)[33]

After Vincoli filed his First Amended Complaint, CMS determined that the Hospitals were "not required to have a fiduciary for [their] self-insurance plan[s]." (Docket Entry 43 at 4.) Following this determination, Vincoli presented a "Second

---

[33] Vincoli's initial pleadings also insisted that the lack of an independent fiduciary disqualified the $30 million and estimated $45 million plan contributions that Baptist and CHS, respectively, made to their self-funded insurance plans each year. (Docket Entry 1, ¶ 52; Docket Entry 16, ¶ 59.)

Amended Complaint [that] differs substantially from" his previous complaints. (Docket Entry 61 at 4.) In this "substantially different" Second Amended Complaint (id. at 2), Vincoli describes MedCost as "a sham entity" that lacks sufficient independence from the Hospitals to qualify as "a 'third party,'" such that MedCost constitutes not a third-party administrator but solely "a 'plan supervisor' with ministerial duties only" (Docket Entry 62, ¶ 29 & 14 n.5). Vincoli's new "theor[y] of liability" (id., ¶ 6), namely that the Hospitals defrauded Medicare by failing to reduce their domestic claim costs from the amounts that MedCost paid them to their actual out-of-pocket costs for such services (see generally Docket Entry 62), depends upon this recharacterization of MedCost as a sham entity rather than a TPA, see Medicare Provider Reimbursement Manual, Part II, § 4005.2, at 40-62.

However, in opposing Baptist's challenge to his retaliation claims, Vincoli proffers additional factual allegations contradicting his assertion that MedCost constitutes merely a "sham entity" employed by the Hospitals solely to defraud the United States. (See Docket Entry 81 at 9 (alleging the existence of "MedCost's provider network").) This proposed factual allegation mirrors Vincoli's initial assertions that MedCost constitutes both a PPO network and a TPA, a status that North Carolina recognizes (see Docket Entry 78-1 at 23 (identifying MedCost as a licensed TPA)) and Vincoli does not dispute (see Docket Entry 81 at 1 n.1).

Vincoli's evolving, contradictory allegations regarding MedCost suggest bad faith. See Standard Pac. of the Carolinas, LLC v. Nationwide Mut. Ins. Co., No. 0:11-cv-598, 2011 WL 2681880, at *4 (D.S.C. July 11, 2011) (denying motion to amend where the proposed amendment represents "a complete about-face with respect to the factual basis for the claim(s) . . . . [and] effectively concedes that the policy issued did not contain the critical provision" upon which the original complaint depended); see also Trans Video Elecs., Ltd. v. Sony Elecs., Inc., 278 F.R.D. 505, 510 (N.D. Cal. 2011) (concluding "that the motion to amend was taken in bad faith . . . as a last-ditch attempt to avoid the case being dismissed in its entirety," and explaining that the plaintiff's "tactical shifting of positions" regarding "inconsistent" assertions "smacks of gaming the [c]ourt and opposing party"), aff'd, 475 F. App'x 334 (Fed. Cir. 2012).

Under these circumstances, the Court should deny Vincoli leave to file a third amended complaint.

## CONCLUSION

The Release bars Vincoli's claims against Baptist arising on or before May 30, 2008, and the statute of limitations bars Vincoli's retaliation claim as to the 2011 lawsuit. The Second Amended Complaint sufficiently alleges "who" committed the fraud, and Rule 9(b) does not mandate that Vincoli possess personal knowledge of the alleged fraud. However, the Second Amended

Complaint and Vincoli's proposed amendments fail to plausibly allege the requisite scienter for an FCA claim. Additionally, even assuming that the Acts covered the type of post-termination retaliation alleged here, the Second Amended Complaint fails to plausibly allege that, as a result of Vincoli's pursuit of qualifying qui tam actions, Baptist caused North Carolina to take adverse employment actions against Vincoli. The proposed amendments likewise fail to plausibly allege such retaliation. Finally, Vincoli's request for leave to amend fails to satisfy the rules and standards regarding amendment requests, particularly as to futility, repeated failures to correct deficiencies, and bad faith.

**IT IS THEREFORE RECOMMENDED** that Baptist's Motion (Docket Entry 64) and CHS's Motion (Docket Entry 67) be granted and Plaintiff's Second Amended Complaint be dismissed with prejudice.

This 28th day of December, 2016.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**
