## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA, *ex rel.*
COMPLIN,

        Plaintiff/Relator,                         1:09CV420

v.

NORTH CAROLINA BAPTIST
HOSPITAL and CAROLINAS HEALTHCARE
SYSTEM,

        Defendants.

### RELATOR'S OBJECTIONS TO MAGISTRATE JUDGE'S
### MEMORANDUM OPINION AND RECOMMENDATION

### Introduction

Plaintiff/Relator objects to the Memorandum Opinion and Recommendation (MOR) of the Magistrate Judge (Magistrate) because the bedrock on which the decision is based is flawed, resting entirely upon the legally and factually incorrect conclusion that the defendant hospitals employed MedCost as the "third party administrator" (TPA) of their employee benefit plans. In so concluding, the Magistrate ignored the well-pled allegations of the Second Amended Complaint (SAC), including most notably its quotation from the relevant document by which the plans are operated, a document that *demonstrates on its face* that North Carolina Baptist Hospital (NCBH) designated itself, not MedCost, as the plan administrator. Though required to accept this pivotal fact as true, the Magistrate rejected it, an erroneous decision that tainted with error everything else he decided.

1

## I. The Magistrate Erred in Failing to Accept As True The Complaint's Well Pled Allegation That The Hospitals Have No Third-Party Administrator

In deciding a motion to dismiss, the court must accept as true all well-pled, non-conclusory factual allegations in the complaint. *Miller v. Carolinas Healthcare Sys.,* 561 F. App'x 239, 240 (4th Cir. 2014). "Although the Supreme Court has ... made clear that the factual allegations in a complaint must make entitlement to relief plausible and not merely possible, what Rule 12(b)(6) does not countenance are dismissals based on a ***judge's disbelief of a complaint's factual allegations***." *Id* (emphasis added).

The Magistrate concluded that MedCost was a third-party administrator for the Defendants' employee benefit plans, but this conclusion is directly contrary to the allegations in Relator's complaint, allegations relying on one of Defendants' *own contracts,* which demonstrates that NCBH—not MedCost—was the Defendants' plan administrator.

The "Plan Supervisor Administrative Services Agreement" (contract or agreement) dated January 1, 2002 executed between NCBH ("the Company") and MedCost, attached as **Exhibit A** to the Declaration of Charles H. Rabon, Jr., filed contemporaneously herewith, expressly designates *NCBH* as the Plan Administrator, with MedCost designated as the Plan Supervisor:

\* "The Company hereby appoints the Plan Supervisor and the Plan Supervisor hereby accepts its appointment as Plan Supervisor **to assist the Company, as Plan Administrator of the Plan** . . . ." [§1.01]

\* "**The Company shall be the Plan Administrator** (within the meaning of ERISA Section 3 (16)(A)" [about which see below]. [§2.01]

\* "Payment of claims shall be made by the Company from funds of the Company by checks signed by the Plan Supervisor as the Company's disbursing agent. . . ." [§4.01]

\* "The Plan Supervisor in performing its obligations under this Agreement is performing only ministerial duties on behalf of the Plan Administrator…[and]***"the Company shall be deemed to be the administrator*** and named fiduciary of the Plan"[§7.01] (Emphasis added).

The plan sponsor's [i.e., NCBH] contract with MedCost not only designates the "administrator" contractually, it also defines who is the "administrator" within the meaning of the Employee Retirement Income Security Act (ERISA), the federal statute regulating employee benefit plans, a statute that must be considered when construing Section 4005 of the Medicare Provider Reimbursement Manual (MPRM),[1] discussed below. Section 3(16)(A) of ERISA (the section specifically referred to in Section 2.01 of the NCBH/MedCost agreement), states:

> The term "administrator" means— (i) ***the person specifically so designated by the terms of the instrument under which the plan is operated***; (ii) if an administrator is not so designated, the plan sponsor; or (iii) in the case of a plan for which an administrator is not designated and a plan sponsor cannot be identified, such other person as the Secretary may by regulation prescribe.

29 U.S.C. §1002(16)(A) (emphasis added).

There is only one "administrator" designated by the hospitals' agreements with MedCost and that administrator is not MedCost; it is the hospitals themselves. There is no "third party" designated as administrator, whether MedCost or some other entity, so there simply is no "third party administrator" of the hospitals' employee benefit plans.[2]

_____

[1] Pursuant to Section 4 of the Act, ERISA applies to "any employee benefit plan if it is established or maintained by any employer engaged in commerce. . . ." *See* 29 U.S.C. §1003. Relator alleges in paragraphs 24 to 28 of the SAC that the hospitals have established and maintain "self-funded employee healthcare benefit plans." As a type of employee benefit plan offered by hospital employers engaged in commerce, the employee healthcare benefit plans at issue herein are governed by ERISA.

[2] As governed by ERISA, an employee benefit plan is a contract between a plan sponsor and participants in the plan. Section 3(16)(B) of the Act defines the "plan sponsor" as the employer and Section 3(7) defines a "participant" as an employee eligible to receive a benefit under the plan. *See* 29 U.S.C. §1002 (7) & 16(B). An administrator, as previously noted, is the person "specifically so designated by the terms of the contract between the sponsor and the participants." *See* 29 U.S.C. §1002(16)(A). If a person other than a sponsor or participant is designated as the administrator of the plan, then that person is a "third party" administrator within the plain meaning of ERISA Section 3(16)(A) because he is a stranger to the contract between the sponsor and the participants. *See* Collins Dictionary of Law. (2006), retrieved January 12, 2017, from http://legal-dictionary.thefreedictionary.com/third+party (a third party is "a party who is a stranger to a transaction or proceeding between two other persons."). MedCost is neither a stranger to the contract (because it is a subsidiary of the plan sponsor) nor an administrator (because it was not so designated). Therefore, it cannot be a third party administrator.

In his complaint, the Relator specifically alleges that MedCost "is contractually designated as a 'plan supervisor' rather than a 'third party administrator. . . .'" SAC ¶29. The Relator also states in footnote 5 of the SAC that "[d]espite loose language used by the Hospital Defendants, the Relator and others referring to MedCost as a 'TPA,' contractually it is not a 'third party administrator' under its agreement with the Hospital Defendants; it was intentionally relegated to the lower status of a 'plan supervisor' with ministerial duties only. . . ." SAC p. 14, n. 5.

Despite these factual allegations, the Magistrate concluded that MedCost was a TPA under Section 4005 of the MPRM. This is a pivotal error as Section 4005 distinguishes between hospitals with and without TPAs and exempts those with TPAs from the strictures of the related-party rule, which ordinarily requires a hospital contracting with a related party to report the costs incurred by the related organization rather than the amounts purportedly charged in the related-party transaction. The related-party rule states in pertinent part:

> [C]osts applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization.

42 C.F.R. §413.17(a).

Section 4005 of the MPRM states:

The following are the allowable health insurance and health-related costs for the wage index….

Self (or Self-Funded) Health Insurance . . . .
- Without a Third-Party Administrator (TPA):
  - Costs the hospital incurs in providing services under the plan to its employees. (Domestic claim charges must be reduced to cost. Costs must also exclude any copayments and deductibles paid by employees.)
  - Hospital's payment to unrelated health care providers for services rendered, under the plan, to hospital's employees.

4

- With a TPA:
  - Amount the TPA pays to the hospital or other health care providers for services rendered under the plan. (For domestic claims, the hospital must provide documentation from its TPA to demonstrate that payments for services rendered to employees are based on a discount from full charges. Also, the payments must be reasonable; that is, the costs included for domestic claims must not exceed the amount that commercial insurers pay the hospital for the same services rendered to nonemployees.)

The first prong of Section 4005 requires a hospital without a TPA to observe the related-party rule. The second prong exempts hospitals with a TPA from the related-party rule.[3]

That the defendant hospitals do not have TPAs is evident from the language of their contracts quoted in the Relator's complaint and the plain language of Section 3 (16)(A) of ERISA, which requires that the administrator of a plan be so designated in the "instrument by which the plan is operated." The MedCost agreement is the instrument by which the hospital's plans are operated and it does not designate an administrator other than the hospital itself. Under the plain language of ERISA, a third party administrator is exactly that, some "third party" an employer appoints to serve as "administrator" because it chooses not to serve in that capacity itself. In other words, if the hospitals are occupying the role of administrator themselves, then there is no "third party" administrator.

The Magistrate found it significant that MedCost is licensed by the State of North Carolina to serve as a TPA in relation to certain insurance plans, MOR at pp. 45 & 50, but this fact is not probative of whether MedCost was a TPA in *relation to the hospitals' employee benefit plans*. First, for purposes of the transaction between *these parties,* the contract defines the relationship, and it clearly designates NCBH as administrator. Second, when the plan at

---

[3] Both NCBH and Carolinas Healthcare are bound to observe the related-party rule under Section 4005 of the MPRM, since they do not actually have TPAs, and thus both are required to reduce their domestic care charges to cost on their Medicare Cost Reports. Hence, the crux of the false claims against each defendant, and legal analysis here, are essentially the same for both defendants.

issue is an employee benefit plan, ERISA *preempts* state law on the issue of administrator status, a fact that the North Carolina General Assembly has acknowledged. While N.C. Gen. Stat. § 58-56-51(a) mandates that those wishing to serve as TPAs of life, health and annuity plans must hold a license to do so, subsection (f) states that this obligation does not apply "if the person provides services exclusively to one or more bona fide employee benefit plans... for which the insurance laws of this State are preempted pursuant to the Employee Retirement Income Security Act of 1974." N.C. Gen. Stat. § 58-56-51(a), (f). *See also* §58-56-2 (defining "third party administrator" to exclude persons acting as TPAs for employee benefit plans preempted by ERISA). Thus, even if MedCost *were* acting as a "TPA" for the defendant hospitals instead of a mere plan supervisor, it would not require a North Carolina TPA license to do so. In other words, as a matter of law, the fact that MedCost possesses a license to serve as a TPA for North Carolina insurance plans is not probative of its status as an alleged TPA of the employee benefit plans at issue here.

By disregarding the Relator's well-pled allegations that the hospitals do not have a TPA, the Magistrate simply *disbelieved* the Relator's complaint, s*ee Miller v. Carolinas Healthcare System, supra,* on one of the central factual issues of the case, something the Court is not permitted to do. Accordingly, the Magistrate's recommendation must be rejected.

### II.   The Magistrate Erred, as a Matter of Law, in Holding that the Related Party Rule is Inapplicable to the Transactions by Which the Hospitals Purchased Domestic Care Services from Themselves

Under the related-party rule, a party is related if "the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services." 42 C.F.R. §413.17. The well-pled allegations of the complaint include allegations that the defendant hospitals paid themselves to provide domestic care to their employees.  SAC ¶ ¶

6

18, 29, 31 and 32. Clearly a hospital is associated or affiliated with itself and is controlled by itself and is a related party to itself. 42 C.F.R. §413.17(a); *St. Francis Hospital Greenville, South Carolina*, 2007 WL 1774634 (P.R.R.B. April 19, 2007). While the use of a TPA precludes application of this rule, MedCost did not serve that function in this case, so the hospitals are not exempt from the related-party rule and may report only their actual costs as dictated by the first prong of MPRM §4005.

Though *St. Francis Hospital* is directly on point, the Magistrate spent an entire page of his opinion explaining why the decision in *St. Francis Hospital* was not binding upon him, but never stated why he considered that the reasoning of that decision should not be considered highly-persuasive. He stated only that the decision could not "trump CMS instructions," meaning apparently the instructions in MPRM §4005 allowing a hospital with a TPA to report as cost the "amounts the TPA pays the hospital." But as we have already seen, the Magistrate was incorrect in his conclusion that the hospitals have a TPA. Also, even if MedCost *were* a TPA, the SAC clearly alleged that MedCost did not pay the hospitals as contemplated in Section 4005; they paid themselves with their own funds, with MedCost "performing only ministerial duties." Applying the related-party rule to this transaction also furthers its policy. When a hospital invoices itself for treating one of its employees, the transaction is not at arms-length and the hospital is engaged in self-dealing. This conduct puts Medicare at risk of paying highly inflated reimbursements when the domestic care charges are not reduced to cost.

The Magistrate ignored these well-pled allegations, side-stepping the real issue by concluding that the related-party rule is inapplicable because "the domestic care costs at issue here do not arise from any 'services, facilities, [or] supplies' that MedCost 'furnishe[s] to the [Hospitals].'" MOR, p. 51. But the issue is whether the *hospitals* administering the Plan were

engaged in related-party transactions with *themselves*, a question which the Magistrate never answered. As a matter of law, based upon the facts alleged in the complaint, the hospitals were engaged in related-party transactions with themselves and the Magistrate's recommendation must be rejected for this reason.

### III. The Magistrate Erred in Holding that the Relator's Complaint Does Not Plausibly Allege the "Knowing" Submission of False Claims.

The False Claims Act (FCA) prohibits knowingly presenting a false or fraudulent claim for payment or approval; or knowingly making or using a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1). A person acts "knowingly" not only where he has "actual knowledge" of the falsity of information, but also where he acts "in deliberate ignorance" or "reckless disregard" of the truth or falsity of the information. *Id.* § 3729(b). No proof of specific intent to defraud is required. *Id.* The term knowingly "refers to knowledge of the facts constituting the offense, as distinguished from knowledge of the law." *See Bryan v. United States*, 524 U.S. 184, 184, 118 S. Ct. 1939, 1941, 141 L. Ed. 2d 197 (1998). Every person is presumed to know the law. *See, e.g., Cheek v. United States*, 498 U.S. 192, 199, 111 S. Ct. 604, 609, 112 L. Ed. 2d 617 (1991).

Knowledge may be averred generally "[b]ecause it would be unrealistic to expect a plaintiff to read a defendant's actual state of mind." Fed. Rule Civ. Proc. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally"); *Powers v. British Vita P.L.C.*, 57 F.3d 176, 184 (2d Cir.1995); *U.S. ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 228 (1st Cir. 2004) ("a qui tam relator need not plead with particularity allegations concerning defendants' knowledge, reckless disregard, or deliberate ignorance of the submission of false claims….[t]he characterization of a state of mind, after all, does not lend

itself to detailed pleading); C. Wright & A. Miller, Federal Practice and Procedure §1301 (3d ed. 2004).[4]

Here, the Relator has alleged generally that the hospitals acted knowingly; that the hospitals operated their employee benefit plans without a TPA;[5] that they filed Medicare cost reports claiming as allowable costs the amounts the hospitals pay themselves, rather than their actual costs;[6] and that the charges reported are at least twice actual costs.[7] Knowledge of these facts constitutes "knowledge of the offense," *see Bryan, supra*, and is also knowledge of the facts that make the hospitals' cost report certifications false. Therefore, these allegations are sufficient to support a finding that defendants acted knowingly in submitting false claims.

### *Knowledge of Any One Employee is Sufficient; Relator is Not Required to Allege or Prove Knowledge of the Certifying Employee*

The Magistrate suggested, without citing authority, that to establish a knowing violation of the FCA the Relator is required to allege and prove that the individuals who certified the cost reports "had . . . involvement in creating MedCost's relationship with the Hospitals" or "bore some awareness of the fact that MedCost allegedly failed to qualify as a third-party administrator to the Hospitals' employee benefit plans." MOR at p. 45. On this critical point he was simply

---

[4] The courts generally relax the standard of pleading for such matters. *See Karvelas, supra,* 360 F.3d at 229 ("Rule 9(b) pleading standards may be relaxed…'when the opposing party is the only practical source for discovering the specific facts supporting a pleader's conclusion.'. . . In such case… a court may allow some discovery before requiring that plaintiff plead individual acts of fraud with particularity.'"); *Fed. Deposit Ins. Corp. v. Kerr*, 637 F. Supp. 828, 834 (W.D.N.C. 1986).

[5] *See* SAC ¶ 29 and facts presented at page 2 *supra.*

[6] SAC, ¶ 31 ("[A]ll claims for employee healthcare covered by the plans are paid by checks drawn on the Hospitals' own bank accounts. . . . In the case of domestic care for employees in the Hospitals' own facilities, the Hospitals issue checks drawn on their own bank accounts to pay themselves for their own 'charges,' which they alone determine.").

[7] SAC, ¶ 32 ("The checks that the Hospitals issue to themselves for domestic care of their employees do not represent actual out-of-pocket costs as the money goes from one pocket of the hospital to another. If the Hospitals report these related-party payments to themselves as 'costs,' then there is a double reporting of costs that are otherwise already recorded on the Hospitals' Medicare Cost Reports."). *See also* SAC, ¶ 17 ("the hospital is fraudulently recording an additional employee benefit cost of $80.00, more than twice its actual unrecovered cost of $30.00"). The Magistrate Judge took issue with the Relator's description of these charges as "fictitious," arguing that this is a legal conclusion that is not binding on the Court, MOR, pp. 46 & 47, but he failed to explain why the double reporting of costs does not create fictitious costs.

incorrect.  *See U.S. ex rel. Harrison v. Westinghouse Savannah River Co.*, 352 F.3d 908, 918–20 (4th Cir. 2003) (holding that the scienter requirement of the FCA is satisfied if any single employee of the defendant knows the facts that make a certification false -- even though another employee with no knowledge of the fraud actually signs the certification).

In *Harrison*, the relator alleged that Westinghouse Savannah River Company (Westinghouse or WSRC) falsely certified to the Department of Energy (DOE) that no organizational conflicts of interest (OCIs) existed between Westinghouse and a subcontractor, GPC, relating to a proposed subcontract. Westinghouse's manager Smith knew that a conflict of interest existed, but a different Westinghouse employee actually signed and submitted the no-OCI certification.  This did not dissuade the trial court, which instructed the jury as follows:

> In order to find that WSRC took any action knowingly, you must find that at least one individual employee had all of the relevant factual information to satisfy that standard as to the fact or action at issue. In this particular case, that means that you would need to find that at least one individual employee of WSRC knew that GPC was submitting a bid on the subcontract, and knew of facts which would have required disclosure of an organizational conflict of interest by GPC. You do not need to consider whether this individual knew that a certification would be required or what information GPC was actually disclosing on it.

*Id.* at 918.  Westinghouse appealed, making the argument embraced by the Magistrate – that the jury instruction improperly allowed the jury to piece together knowledge of more than one of its employees to find that the corporation knowingly made a false statement, and that the relator's proof of knowledge failed because there was no "single actor" possessing the requisite scienter. The Fourth Circuit rejected this argument, stating in pertinent part that:

> We decline to adopt Westinghouse's "single actor" requirement [or its]… view that a single employee must know both the wrongful conduct and the certification requirement. If we established such a rule, corporations would establish segregated "certifying" offices that did nothing more than execute government contract certifications, thereby immunizing themselves against FCA liability.
> . . . . The district court's instruction appropriately focused on ***the issue of material importance, i.e., whether there was at least one Westinghouse employee who***

> ***knew or should have known that GPC was submitting a bid seeking government funds and that this bid was tainted by an OCI***. . . . [W]e conclude there was sufficient evidence for the jury to find that Westinghouse possessed the requisite scienter to be held liable under the FCA. . . . [R]egardless of whether Smith knew specifically that Westinghouse was submitting the no-OCI certification to DOE, Westinghouse knew, through Smith alone, that the substance of the no-OCI certification was false when Westinghouse submitted it to DOE.

Id. at 919–20 (emphasis added).

As stated above, the "facts [of the instant case] that make the certification false," within the meaning of *Harrison,* are that certain hospitals without TPAs file Medicare cost reports and claim as allowable costs the amounts the hospitals pay themselves – amounts that are at least twice their actual costs. If any one employee of each hospital knew or should have known (1) that the hospital reported employee benefit costs to Medicare (because all hospitals file cost reports with Medicare), (2) that the hospital had no third party administrator for its employee benefit plan (because he signed a contract that explicitly said so) and (3) that the hospital was writing checks to itself on its own bank accounts (again, because he signed a contract that explicitly said so), then the hospitals acted knowingly in submitting false claims for the amounts they paid themselves.

For example, in the case of NCBH, President and CEO Len Preslar signed the MedCost agreement on behalf of NCBH and therefore knew the facts that made false the hospital's certification of its cost reports. It is not necessary for Relator to allege or prove that the officer signing and submitting the certified cost reports knew these facts that made his certifications false. The Magistrate erred as a matter of law in his contention that the certifying officers must have known all the facts that make their certifications false.

***The Potential for a Wrong, but Good Faith, Interpretation of MPRM §4005 Does Not Negate Scienter As A Matter of Law***

Because the Magistrate incorrectly concluded that the hospitals qualify for the TPA exception to the related-party rule, and because he presumed the hospitals likely were guided by good-faith in their interpretation of MPRM 4005[8] (since MedCost is licensed as a TPA for state insurance regulatory purposes), the Magistrate relied upon *U.S. ex rel. Kirk v. Schindler Elevator Corp.*, 130 F. Supp. 3d 866, 877 (S.D.N.Y. 2015) for the proposition that "'[w]here there are legitimate grounds for disagreement over the scope of a . . . regulatory provision, and the claimant's actions are in good faith, the claimant cannot be said to have knowingly presented a false claim.'" MOR, pp. 16, 47 (at footnote 22), and 53. This may be a correct statement of the law insofar as it goes, but pre-supposes an inquiry into the defendant's subjective good faith, a matter that cannot be known at the pleading stage of the case.[9]

Whether a defendant acted "knowingly" under the Act is an evidentiary question to be determined based upon the facts, not a legal issue. *See United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1271-73 (D.C. Cir. 2010) (recognizing that the fact finder should weigh the evidence regarding knowledge, including the defendant's evidence that any false claims resulted from its "reasonable" but erroneous interpretation of a rule).

Contrary to the Magistrate's reasoning, the hospitals' potential ability to cobble together a facially reasonable interpretation of MPRM §4005 that would make MedCost a TPA does not

---

[8] *See* Memorandum Ruling at p. 16 ("where there are legitimate grounds for disagreement over the scope of a … regulatory provision, and the claimant's actions are in good faith, the claimant cannot be said to have knowingly presented a false claim"); p. 53 (there are no facts alleged that would preclude "a good-faith interpretation of the relevant rules under which these costs appeared permissible); footnote 22 ("Where there are legitimate grounds for disagreement over the scope of a . . . regulatory provision, and the claimant's actions are in good faith, the claimant cannot be said to have knowingly presented a false claim"); and footnote 24 ("nothing in the relevant CMS guidance indicates that the Hospitals lacked authorization to claim as allowable cost the amounts that MedCost paid").

[9] Notably, the cited *Schindler Elevator* opinion was rendered on a motion for summary judgment, "[a]fter extensive discovery", further distinguishing its relevance here at the motion to dismiss stage. 130 F. Supp. 3d at 868.

foreclose a finding of scienter as a matter of law; the interpretation must be one made in good faith at the time of the conduct in question. *U.S. ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 464 (9th Cir. 1999), *cert. denied* 530 U.S. 1228 (2000). Therefore, a defendant who knows the proper interpretation of a regulation but nonetheless chooses to rely on a different reading has "actual knowledge," regardless of its ability to proffer an objectively reasonable interpretation. *See Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.*, 276 F.3d 1032, 1053 (8th Cir. 2002).

Further, if a defendant has notice of the possibility that its interpretation is incorrect and fails to make a limited inquiry regarding the proper interpretation, then the defendant may be found to have acted with deliberate ignorance or reckless disregard, regardless of the existence of an objectively reasonable interpretation. *See* S. Rep. No. 99-345, at 7 (1986), reprinted in 1986 U.S.C.C.A.N. 5266, 5272 (explaining that the FCA's definition of "knowingly" was designed to distinguish "honest mistakes" from "'ostrich-like' conduct" and other forms of bad faith, but also to require defendants to conduct "a limited inquiry" to resolve the uncertainty and "ensure the claims they submit are accurate").

Thus, while regulatory ambiguity may be relevant to scienter, because it turns on the defendant's good faith belief in its alternate construction, it is a question for the factfinder, which must evaluate the defendant's state of mind at the time the claims were submitted. "Simply making a case after the fact…that the applicable regulation is ambiguous and that defendant's stated interpretation of that ambiguous regulation is reasonable, is not the standard by which knowledge is determined." *Parsons Co.*, 195 F.3d at 463-4; *Minnesota Ass'n of Nurse Anesthetists*, 276 F.3d 1032.

Here, the hospitals may argue that they acted in good faith on advice of counsel and

13

therefore did not have the scienter required to violate the FCA because they honestly believed that, despite the express language of their contracts, MedCost qualified as a TPA because it is licensed as such by the state for the purpose of administering insurance plans.  If that is the hospitals' defense, Vincoli will be entitled to discover all opinions and advice NCBH and CHS received from counsel and a jury may well decide that the hospitals ignored warnings and acted "knowingly." *See U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364 (4th Cir. 2015)*,* an "advice-of-counsel" case in which the hospitals' current defense counsel served as the relator's counsel.[10] But that—like all other matters pertaining to good faith— is a matter for discovery and trial and is an issue that is not appropriate for resolution at the motion to dismiss stage.  Embracing the Magistrate's position would encourage defendants seeking to avoid liability to come up with *post hoc* legal ambiguity theories, an escape hatch this Court should not endorse.

## IV.      The Magistrate Erred in Making Note of the Government's Failure to Intervene and in Questioning the Relator's  Good Faith

In addition to his incorrect decision of the TPA and scienter issues, the Magistrate's report seemed to find something amiss in the history of the litigation.  In his six-page procedural background of the case, MOR, pp. 6-12, the Magistrate recited facts about different theories of liability pursued by prior counsel for the Relator, also noting particularly that the United States officially declined to intervene in the case "after CMS finished reviewing information from the Hospitals and MedCost regarding the 'related party' issue," implying that CMS did not believe

---

[10] *Drakeford* was decided on appeal after two trials on the merits and was not a case that addressed the standard for pleading knowledge at the pleading stage. The hospital in *Drakeford* pled the affirmative defense of good faith and advice of counsel based upon advice it had received from one law firm, but the hospital had received contrary advice from a different lawyer.  This advice-of-counsel issue occupied center stage in the case, with the hospital winning the first trial after the court excluded the second lawyer's testimony, but losing the second trial in which the second lawyer's testimony was admitted.

the related-party issue was meritorious. MOR, p. 9. He also found the Relator to be in bad faith for purposes of denying leave to amend, MOR, pp. 74-76.

### *No Inference May Be Drawn From the Government's Failure to Intervene*

In evaluating a motion to dismiss, no inference can be drawn from the Government's failure to intervene. Courts do not assume that because "the government declines intervention . . . it does so because it considers the evidence of wrong doing insufficient or the *qui tam* relator's allegations for fraud to be without merit. In any given case, the government may have a host of reasons for not pursuing a claim." *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006). "Non-intervention does not necessarily signal governmental disinterest in an action," *United States ex rel. DeCarlo v. Kiewit/AFC Enterprises*, 937 F. Supp. 1039, 1047 (S.D.N.Y. 1996); it signals that the United States is not intervening – no more, no less.

As such, "[t]here is no reason to presume that a decision by the Justice Department not to assume control of the suit is a commentary on its merits. The Justice Department may have myriad reasons for permitting the private suit to go forward including limited prosecutorial resources and confidence in the relator's attorney." *United States ex rel. Chandler v. Cook County*, 277 F.3d 969, 974 n.5 (7th Cir. 2002), *aff'd*, 538 U.S. 119 (2003). Similarly, such an assumption is contrary to the purpose of the qui tam provision, i.e., encouraging private parties to litigate on behalf of the government. *United States ex rel. Berge v. Bd. of Trustees*, 104 F.3d 1453, 1458 (4th Cir. 1997) ("[T]he plain language of the [False Claims] Act clearly anticipates that even after the Attorney General has 'diligently' investigated a violation ..., the Government will not necessarily pursue all meritorious claims; otherwise there is little purpose to the qui tam provision permitting private attorneys general."). "Indeed, assuming the government looked unfavorably upon each *qui tam* action in which it did not intervene would seem antithetical to the

15

purpose of the qui tam provision – to encourage private parties to litigate on behalf of the government." *United States ex rel. El-Amin v. George Washington University*, 533 F. Supp. 2d 12, 21-22 (D.D.C. 2008).

### *The Magistrate Has Misjudged Vincoli's Good Faith*

Just as the Magistrate reached incorrect conclusions about the TPA and scienter issues, he has likewise seriously misjudged Joe Vincoli's character, or that of his counsel.  His conclusion that the SAC was filed in bad faith appears to arise from several mistaken assumptions.  First, the Magistrate observed that the SAC was filed six months after the Government declined,[11] a fact apparently deemed pertinent, although the reason was not explained.  Perhaps the assumption was that Vincoli's counsel withdrew upon learning of the Government's declination, necessitating a search for new counsel to salvage the case as sometimes happens in qui tam cases.  In fact, current counsel with the firm of Waters & Kraus were retained approximately two years before the declination on September 20, 2013, to replace Philip Michael of Troutman Sanders in New York who was retiring from the practice of law.  Counsel did not enroll in the case until October 6, 2015 (DE 55 & 56) because it was under seal or not in a litigation posture until service was effected upon the defendants on December 28, 2015 (DE 57 & 58).

Second, the Magistrate suggested that counsel's changed theory of liability and allegations about MedCost's status as a TPA were an indication of bad faith.  MOR, p. 77.  Vincoli does not question that MedCost referred to itself as a TPA and his prior counsel even referred to MedCost as a TPA.  However, the use of such label does not magically make MedCost a TPA within the meaning of MPRM § 4005 or ERISA when the reality of the operative agreement tells otherwise.

---

[11] MOR, p. 9.  The delay was actually slightly more than five months from the 27 August 2015 order unsealing the case (DE 49) until 4 February 2016, when the SAC was filed (DE 50).

Also, Vincoli does not dispute that MedCost provides a service to the hospitals by renting its PPO network of third-party providers. However, even that service is illegitimate in the sense that it constitutes a prohibited transaction under ERISA.[12] MedCost is also an *illegitimate sham*, in the Relator's opinion, in its role as an interposed straw man providing cover for self-dealing transactions between the hospitals and themselves. In sum, there is no inconsistency in the Relator's position about MedCost; he deems it's relationships with the hospitals to be entirely conflicted and illegitimate.

Vincoli's story has never changed from his original complaint that the hospitals are overcharging for domestic care, and passing those charges on to Medicare. All that has changed is his counsel's theory of legal responsibility for that behavior. That change occurred after Mr. Lawrence, present lead counsel for Mr. Vincoli, assumed responsibility for this case in September 2013, upon the retirement of the relator's prior counsel, Philip Michael. In a complex fraud case of this sort, no two lawyers view the case in exactly the same way and the lawyers at Waters Kraus saw the case differently from Philip Michael.

Mr. Lawrence worked with AUSA Cheryl Sloan in the conduct of her investigation for almost two years before the case was declined in August, 2015. During the period between the Government's declination and the filing of the SAC, counsel substantially revised the complaint and the theories of liability to reflect the results of that two-year investigation, most notably to

---

[12] ERISA treats any transaction by a plan sponsor with a "party in interest" as a prohibited transaction. See 29 U.S.C. §1106 ("A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . sale or exchange, or leasing, of any property between the plan and a party in interest"). A party in interest is defined to include "a corporation . . . of which . . . 50 percent or more of . . . the combined voting power of all classes of stock . . . is owned directly or indirectly" by a plan sponsor. 29 U.S.C. §1002 (14)(G). The Secretary of the U.S. Department of Labor filed comments in the ERISA case that was filed in this district against NCBH cautioning NCBH that it should not use MedCost as a provider network without either selling MedCost or obtaining a Prohibited Transaction Exemption (PTE). NCBH applied for a PTE, but it was preliminarily denied by the Department of Labor, causing NCBH to withdraw it application. Therefore, by hiring MedCost to rent its PPO network, NCBH is engaged in a transaction prohibited by ERISA.

incorporate Mr. Lawrence's conclusion that even if MedCost is not a related party to the hospitals (as originally alleged), the hospitals were engaged in related-party transactions *with themselves,* as held in the *St. Francis Hospital* decision, and are not exempt from the related party rule because MedCost was not a TPA. There is nothing to suggest bad faith in a diligent lawyer's evolving insights and amendment of his pleadings to properly present them to the Court. Indeed, not only is that not an indication of bad faith, but Mr. Lawrence as new counsel was duty-bound to recommend amendments that were supported by the law and facts, whether previous counsel had drawn the same conclusions or not.

## V. The Magistrate Erred in Holding that Vincoli Failed to Plausibly Plead a Retaliation Claim

The Magistrate recommended dismissal of Vincoli's retaliation complaint on the grounds that he failed to allege a plausible causal connection between NCBH's knowledge of his protected activity and his dismissal by the North Carolina's Governor's office. Specifically, the Magistrate found that there was not sufficient temporal proximity between the hospitals' learning of the protected activity and the adverse employment action. The Magistrate noted that more than two years expired between June of 2011, when NCBH learned of the protected activity, and December of 2013, when the Governor's office fired Vincoli. MOR, p. 63 & 66.

The problem with the Magistrate's analysis is that Vincoli *could not be fired* except for good cause, and his position with the state could not be reclassified as managerial exempt, at any time between June 2011 and August 21, 2013, the date the North Carolina Governor signed into law House Bill 834, 2013 N.C. Sess. Laws, c. 382 ("the Act"). The Act, *inter alia*, amended the "Employee Grievance" section of the North Carolina Human Resources Act ("NCHRA") by repealing N.C. Gen. Stat. § 126–34.1 and replacing it with N.C. Gen. Stat. § 126–34.02, which omitted an employee's action to challenge an exempt designation as grounds for a contested case

hearing and, in effect, eliminated a career state employee's opportunity to a contested case hearing on this issue. *See Vincoli v. State*, 792 S.E.2d 813, 815 (N.C. Ct. App. 2016).

On October 1, 2013, Vincoli, who was employed by DPS as a Special Assistant to the Secretary for Inmate Medical Services and who had attained career status, was notified that the Governor had declared his position as "managerial exempt." The reclassification became effective on October 15, 2013. Approximately two months later, on December 9, 2013, Vincoli received a letter terminating him from employment on the stated grounds that "a change in agency staff is appropriate at this time[.]" *Id.*

Thus, the time that actually elapsed between enactment of the Governor's new powers and Vincoli's firing was only about two months. Prior to that time, NCBH could not have caused or influenced Vincoli's termination, no matter how much it may have wanted to. And accepting Vincoli's allegations as true, it did not take NCBH and its former president and legislator, Donny Lambeth, long to act once it was within their power to do so.

Given the extraordinary partisanship that has been exhibited in North Carolina politics over the past several years, it should not seem implausible to the Court that Vincoli was a victim of a spoils system that permitted NCBH to call in a chip once the Governor's office had the power to grant that favor. Moreover, the Magistrate likely recommended dismissal of Vincoli's retaliation claim as a house-cleaning measure because he concluded that the larger qui tam case should be dismissed.

Since the Magistrate's ruling on the qui tam case should be rejected, the Court should also reject his recommendation that Vincoli's retaliation claim be dismissed. The burden of discovery on this issue will be small. Under these circumstances, in the interest of justice, including an objective perception based on the evidence alleged in the complaint that Mr.

Vincoli has been unfairly denied his day in court, the retaliation claim is more properly dealt with at the summary judgment stage of the case, after discovery, than at this preliminary pleadings stage.

## Conclusion

The Magistrate committed error in deciding one of the core issues of the case – whether the hospitals are exempt from the related-party rule because they have TPAs – without adequate briefing from the parties, without a review of the applicable contract, without consideration of controlling ERISA law and without a dialogue with counsel through oral argument.[13]  Having reached a wrong conclusion on this pivotal issue before it was squarely presented, the Magistrate then compounded his error by recommending that the District Court dispose of that and every other position of the Relator in order to rid the Court's docket of a case he deemed to lack merit. The entire MOR is tainted by the Magistrate's legally and factually mistaken conclusion on the TPA issue and should be rejected in its entirety.

---

[13] Counsel herewith renew their request for oral argument on the motion to dismiss.  See DE 79.

Respectfully submitted,

**RABON LAW FIRM, PLLC**
/s/ Charles H. Rabon, Jr.
NC Bar #16800
225 E. Worthington Avenue, Suite 100
Charlotte, NC 28203
Telephone: 704-247-3247
Fax: 704-208-4645
Crabon@usfraudattorneys.com

**WATERS & KRAUS, LLP**
Wm. Paul Lawrence, II
37163 Mountville Road
Middleburg, VA 20117
Telephone: 540-687-6999
Fax:  540-687-5457
plawrence@waterskraus.com
(Pro Hac Vice)

## <u>CERTIFICATE OF SERVICE</u>

I, Charles Rabon, hereby certify that on January 18, 2017, I electronically filed the

foregoing RELATOR'S OBJECTIONS TO MAGISTRATE JUDGE'S MEMORANDUM

OPINION AND RECOMMENDATION with the Clerk of the Court using the CM/ECF system

which will send notification to all registered users of record.

<u>/s/ Charles Rabon</u>
